# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FWK Holdings, L.L.C., on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ACTAVIS ELIZABETH, LLC, TEVA PHARMACEUTICALS USA, INC., PLIVA, INC., MYLAN INC., MYLAN PHARMACEUTICALS INC., UDL LABORATORIES, INC., ENDO INTERNATIONAL PLC; PAR PHARMACEUTICALS HOLDINGS, INC., HERITAGE PHARMACEUTICALS INC., BRECKENRIDGE PHARMACEUTICALS, INC., and UPSHER-SMITH LABORATORIES, INC.,<br><br>Defendants. | Civil Action No. 16-cv-9901<br><br><br><br><br>**JURY TRIAL DEMANDED** |

## DIRECT PURCHASER CLASS ACTION COMPLAINT

<u>**TABLE OF CONTENTS**</u>

**Page(s)**

I.      INTRODUCTION ................................................................................................ 1

II.     PARTIES ........................................................................................................... 10

        A.      Agents and Co-Conspirators .................................................................. 13

III.    JURISDICTION AND VENUE ....................................................................... 13

IV.     INTERSTATE TRADE AND COMMERCE .................................................. 14

V.      FACTUAL ALLEGATIONS ........................................................................... 15

        A.      Overview of the Generic Drug Market .................................................. 15

        B.      Consolidation of Generic Drug Market ................................................. 17

        C.      Opportunities for Collusion ................................................................... 18

        D.      Propranolol Prices Soar......................................................................... 20

        E.      Congressional and Regulators' Responses to Rising
                Generic Drug Prices .............................................................................. 23

VI.     THE PROPRANOLOL MARKET IS HIGHLY SUSCEPTIBLE
        TO COLLUSION............................................................................................. 25

VII.    THE DEFENDANTS ACTED AGAINST THEIR UNILATERAL
        SELF-INTEREST ABSENT A CARTEL ....................................................... 27

VIII.   CLASS ACTION ALLEGATIONS ................................................................. 28

IX.     ANTITRUST INJURY .................................................................................... 30

X.      VIOLATION OF THE SHERMAN ACT § 1 ................................................. 31

DEMAND FOR RELIEF............................................................................................. 26

DEMAND FOR JURY TRIAL ................................................................................... 27

Plaintiff FWK Holdings, L.L.C. ("Plaintiff"), on behalf of itself and all others similarly situated, against: 1) Defendant Actavis Elizabeth, LLC; 2) Defendant Teva Pharmaceuticals USA, Inc., and Defendant Pliva, Inc. (collectively defined below as "Teva"); 3) Defendant Mylan Inc., Defendant Mylan Pharmaceuticals Inc., and Defendant UDL Laboratories, Inc. (collectively defined below as "Mylan"); 4) Defendant Endo International PLC; and Par Pharmaceuticals Holdings, Inc. (collectively defined below as "Endo"); 5) Defendant Heritage Pharmaceuticals Inc.; 6) Defendant Breckenridge Pharmaceuticals, Inc.; and 7) Upsher-Smith Laboratories, Inc., (collectively, the "Defendants") alleges:

## I.    INTRODUCTION

1.    This is a civil antitrust action seeking treble damages arising out of the Defendants' unlawful scheme to fix, maintain, and stabilize the prices of generic propranolol tablets and capsules (collectively, "Propranolol").

2.    Propranolol is the generic version of Inderal. The U.S. Food and Drug Administration approved Inderal, developed by Wyeth Pharmaceuticals, Inc., in 1967.

3.    Propranolol is a beta-blocker. Beta-blockers affect the heart and circulation (blood flow through arteries and veins). Propranolol is used to treat tremors, angina (chest pain), hypertension (high blood pressure), heart rhythm disorders, and other heart or circulatory conditions. It is also used to treat or prevent heart attack, and to reduce the severity and frequency of migraine headaches.  Propranolol is reportedly the highest-selling beta-blocker as measured by prescriptions.

4.    As alleged below, Defendants' scheme injured Plaintiff and the Classes of direct purchasers it seeks to represent (as defined below), causing them to pay overcharges. Plaintiff seeks to recover these overcharges and seeks other relief arising out of Defendants' conspiracy to

charge supra-competitive prices for: 1) Propranolol capsules during the period from December 18, 2013 to the present ("Propranolol Capsules Class Period"), and 2) for Propranolol tablets during the period from February 18, 2015 to the present ("Propranolol Tablets Class Period").

> **i.      The Average Price of Propranolol Capsules Increased by an Extraordinary Amount.**

5.      Beginning in December 2013, contrary to past practice, Defendants caused the price of Propranolol capsules to dramatically increase in unison. The increases were the result of an agreement among Defendants to increase pricing and restrain competition for the sale of Propranolol capsules in the United States. The agreement was furthered by discussions held at Generic Pharmaceutical Association ("GPhA") meetings, including a meeting in Bethesda, Maryland in October 2013 that was attended by Defendants.

6.      Defendants Mylan, Actavis, Breckenridge, and Upsher-Smith sold Propranolol capsules during the Propranolol Capsules Class Period.  Prior to October 2013, the average amount in the U.S. paid for Propranolol capsules was stable. Within a few weeks of the October 2013 meeting, the average prices for Propranolol capsules began to increase by extraordinary amounts:

   a.      ***Propranolol 60mg ER Capsules.*** Between December 18, 2013 and July 23, 2014, average prices increased by 164%.

   b.      ***Propranolol 80mg ER Capsules.*** Between December 18, 2013 and September 17, 2014, average prices increased by 174%.

   c.      ***Propranolol 120mg ER Capsules.*** Between December 18, 2013 and July 23, 2014, average prices increased by 181%.

   d.      ***Propranolol 160mg ER Capsules.*** Between December 18, 2013 and October 22, 2014, average prices increased by 174%.

7.    Defendants' price increases were, for the most part, in lockstep. Prices for Propranolol capsules remained at supra-competitive levels throughout the Class Period.

ii.    **The Average Price of Propranolol Tablets Increased by an Extraordinary Amount.**

8.    Beginning in February 2015, contrary to past practice, Defendants caused the price of Propranolol tablets to dramatically increase in unison. The increases were the result of an agreement among Defendants to increase pricing and restrain competition for the sale of Propranolol capsules in the United States. The agreement was furthered by discussions held at GPhA meetings, including a meeting in Miami Beach, Florida in February 2015 that was attended by Defendants.

9.    Defendants Mylan, Actavis, Teva, Endo, and Heritage sold Propranolol tablets during the Propranolol Tablets Class Period. Prior to February 2015, the average amount in the U.S. paid for Propranolol tablets was stable. Within a few weeks of the February 2015 meeting, the average prices for Propranolol tablets began to increase by extraordinary amounts:

a.    ***Propranolol 10mg Tablets.***  Between March 18, 2015 and September 23, 2015, average prices increased 818%.

b.    ***Propranolol 20mg Tablets.***  Between March 18, 2015 and November 18, 2015, average prices increased 892%.

c.    ***Propranolol 40mg Tablets.***  Between February 18, 2015 and February 17, 2016, average prices increased 1008%.

d.    ***Propranolol 60mg Tablets.***  Between February 18, 2015 and August 19, 2015, average prices increased 104%.

e.    ***Propranolol 80mg Tablets.***  Between February 18, 2015 and November 18, 2015, average prices increased 1033%.

3

10.     Defendants' price increases were, for the most part, in lockstep. Prices for Propranolol tablets remained at supra-competitive levels throughout the Class Period.

11.     Defendants' price increases for Propranolol capsules and tablets were against their economic self-interest.  Propranolol is a commodity product. Therefore, absent a cartel, if any manufacturer increased the price of Propranolol capsules or tablets, it would be expected that its competitors would not increase the price but would seek to sell more Propranolol capsules or tablets to the first manufacturer's customers. Accordingly, it would not be in any manufacturer's unilateral self-interest to increase the price of the Propranolol capsules or tablets it sold unless it had an agreement with the other manufacturers that they would do the same.

12.     During the Class Periods, there was no significant increase in the costs of making Propranolol capsules or tablets, there was no significant decrease in supply, and there was no significant increase in demand. Nonetheless, there were extraordinary increases by each of the Defendants in the prices they charged their customers for Propranolol capsules or tablets. Such price increases in a commodity product for which there were no significant increases in costs or demand, or significant decrease in supply, would not have been in each Defendant's unilateral self-interest absent the existence of a cartel.

13.     Defendants' dramatic and unexplained price increases have resulted in extensive scrutiny by federal and state regulators, including by the Antitrust Division of the United States Department of Justice ("DOJ"), the United States Senate, the United States House of Representatives, and various States' Attorneys General.

14.     The DOJ is currently conducting a wide-ranging criminal investigation into collusion among generic drug companies. According to *Bloomberg News,* the investigation reportedly covers more than 12 companies and at least 24 drugs.

15.     On December 14, 2016, the DOJ unsealed criminal Informations against two former senior executives of Defendant Heritage for violations of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) ("Sherman Act") for their roles in conspiracies to fix prices, rig bids, and allocate customers for certain generic drugs (Glyburide and Doxycycline Hyclate DR).  The Heritage executives who have been charged are Jeffrey A. Glazer (former CEO and Chairman) ("Glazer"), and Jason T. Malek, former SVP (former Senior Vice President, Commercial Operations, and subsequently President) ("Malek").  The criminal actions are styled *U.S. v. Glazer* (16cr506) and *U.S. v. Malek* (16cr508), and are pending in U.S. District Court in the Eastern District of Pennsylvania.  Reportedly, the DOJ is preparing additional cases involving other generic drugs.

16.     On December 15, 2016, several states' attorneys general, led by the State of Connecticut Office of Attorney General ("Connecticut AG"), filed a civil action for violations of the Sherman Act against Heritage and other sellers of Glyburide and Doxycycline Hyclate DR, including Defendants Teva and Mylan.  The action filed by the attorneys general is styled *The State of Connecticut, et al., v. Aurobindo Pharma USA, Inc., Citron Pharma, LLC, Mylan Pharmaceuticals USA, Inc. and Teva Pharmaceuticals USA, Inc., Heritage Pharmaceuticals, Inc., and Mylan Pharmaceuticals, Inc.*, and is pending in U.S. District Court in Connecticut (16-cv-2056) (the "State AG Action").

17.     According to the State AG Action, the information developed through its investigation (which is still ongoing) uncovered evidence of a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the U.S.  Although the State AG Action focuses on Glyburide and Doxycycline Hyclate DR, it alleges that the Plaintiff States have uncovered a wide-ranging series of conspiracies

implicating numerous different drugs and competitors, including Defendants Heritage, Mylan and Teva.

18.     Defendants operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors. They exploited their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements. The anticompetitive agreements are further refined and coordinated at regular "industry dinners", "girls nights out", lunches, parties, and numerous and frequent telephone calls, emails and text messages.

19.     This anticompetitive conduct – schemes to fix and maintain prices, allocate markets and otherwise thwart competition – has caused a significant, lasting and ultimately harmful rippling effect in the United States healthcare system, which is still ongoing today.  Moreover, many of these schemes were conceived and directed by executives at the highest levels of the Defendant companies.

20.     The State AG Action alleges that the anticompetitive schemes have been carried out in two principal ways: First, to avoid competing with one another and thus eroding the prices for certain generic drugs, the conspirators -- either upon their entry into a given generic market or upon the entry of a new competitor into that market -- communicated with each other to determine and agree on how much market share or which customers each competitor was entitled to. They then effectuated the agreement by either refusing to bid for particular customers or by providing a cover bid that they knew would not be successful. These schemes have the effect of reducing or eliminating competition for a particular drug, and have allowed the conspirators to maintain artificially supracompetitive prices in these markets throughout the United States.

6

21.     Alternatively, or often in conjunction with those schemes, competitors in a particular market simply communicate -- typically either in person, by telephone, or by text message -- and agree to collectively raise prices for a particular generic drug.

22.     Most of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct. Defendants had opportunities to communicate and collude at trade shows, customer events and smaller, more intimate dinners and meetings. When communications were made in writing, or by text message, some of the conspirators even took overt and calculated steps to destroy evidence of those communications.

23.     When entering a generic drug market, Heritage, Teva and Mylan and others routinely sought out their competitors in an effort to reach agreement to allocate market share, maintain high prices and/or avoid competing on price. These agreements had the effect of artificially maintaining high prices for a large number of generic drugs and creating an appearance of competition when in fact none existed.

24.     For example, in 2013 and 2014, Jason Malek, former President of Defendant Heritage, and Jeffrey Glazer, former CEO and Chairman of Defendant Heritage, compiled a large list of generic drugs and instructed employees to contact competitors to reach agreement to increase prices and allocate customers.  Malek was responsible for contacting Defendants Teva and Mylan and did so with respect to a number of drugs, including, on information and belief, Propranolol.  The employees also contacted competitors and reached agreements to raise prices.

25.     During the course of these communications, Heritage, Teva and Mylan executives agreed to raise prices, allocate market share and refrain from competing with one another for customers.  The objective was to avoid a price war which would reduce profitability for

Defendants.  Mylan agreed to "walk away" from at least one large national wholesaler and one large pharmacy chain to allow Heritage to obtain the business and increase its market share.

26.     In addition to reaching agreements with competitors to allocate markets for a number of different generic drugs, including, on information and belief, Propranolol, Heritage, Mylan, Teva and others routinely and as part of their regular course of business, sought and obtained agreements with competitors to fix and raise prices.

27.     As set forth above, Malek was responsible for communicating with Defendant Teva, among others, which was a competitor on several of the drugs on the list, including, on information and belief, Propranolol.  Malek had a direct relationship with a Teva executive and was able to successfully communicate with her and reach an agreement to raise prices on several drugs, including, on information and belief, Propranolol.

28.     Both Malek and Glazer pushed Heritage employees to communicate with their competitors and obtain agreements to raise prices.

29.     In 2014, a Teva executive met in person and discussed the price increase strategies with a number of different competitors at the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP") conference.  According to its website, MMCAP is a "free, voluntary group purchasing organization for government facilities that provide healthcare services. MMCAP has been delivering pharmacy and healthcare value to members since 1985. MMCAP's membership extends across nearly every state in the nation, delivering volume buying power. Members receive access to a full range of pharmaceuticals and other healthcare products and services; such as, medical supplies, influenza vaccine, dental supplies, drug testing, wholesaler invoice auditing and returned goods processing."

30.     In December 2015, Defendant Endo received Interrogatories and Subpoenas Duces Tecum from the Connecticut AG requesting information regarding pricing of certain of its generic products.

31.     Defendants Teva, Actavis, and Mylan, have received grand jury subpoenas.

32.     On June 21, 2016, Teva received a subpoena from the DOJ seeking documents and other information relating to the marketing and pricing of certain of Teva's generic products and communications with competitors about such products. Defendant Actavis received a similar subpoena in June 2015.

33.     On July 12, 2016, Teva received a subpoena from the Connecticut AG seeking documents and other information relating to potential state antitrust law violations. Defendant Actavis has also received a similar subpoena from the Connecticut AG.

34.     On October 7, 2016, Mylan disclosed in a filing with the U.S. Securities and Exchange Commission ("SEC") that on September 8, 2016, the DOJ "subpoenaed a company subsidiary, a senior executive and other employees about alleged price fixing and also executed multiple search warrants related to its probe." Mylan further disclosed that the DOJ is seeking "additional information relating to the marketing, pricing and sale of" several generic drugs, **including Propranolol**, "and any communications with competitors about such products."

35.     Plaintiff alleges that during the Class Periods, Defendants combined, conspired and contracted to fix, raise, maintain and stabilize prices at which Propranolol would be sold in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. As a result of Defendants' unlawful conduct, Plaintiff and the other members of the Classes paid artificially inflated prices that exceeded the amount they would have paid if a competitive market had determined prices for Propranolol.

9

## II.    PARTIES

36.    Plaintiff FWK Holdings, L.L.C. is an Illinois limited liability company located in Glen Ellyn, Illinois. Plaintiff is the assignee of antitrust claims possessed by Frank W. Kerr Company ("Kerr") and brings this action as successor-in-interest to Kerr's claims arising from its purchase of Propranolol during the Class Periods directly from one or more of the Defendants at artificially inflated prices.

37.    Defendant Actavis Elizabeth, LLC ("Actavis") is a Delaware limited liability company with its principal place of business at 200 Elmora Ave., Elizabeth, NJ 07207.  At the beginning of the Propranolol Capsules Class Period, Actavis was a subsidiary of Actavis, plc.  In March 2015, Actavis, plc completed a merger with Allergan, plc ("Allergan") and adopted Allergan's name.  In August 2016, Teva (defined below) purchased the Actavis Generics business, which included Defendant Actavis, from Allergan.  During the Class Periods, Actavis sold Propranolol tablets and capsules in this District and throughout the United States.

38.    Defendant Teva Pharmaceuticals USA, Inc. ("Teva Pharma") is a Delaware corporation with its principal place of business at 1090 Horsham Road, North Wales, PA 19454. Teva Pharma's parent corporation is Teva Pharmaceutical Industries, Ltd., an Israeli corporation with its principal place of business at 5 Basel Street, Petach Tikva 49131, Israel.  During the Class Periods, Teva Pharma sold Propranolol tablets and capsules in this District and throughout the United States.

39.    Defendant Pliva, Inc. ("Pliva") is a New Jersey corporation with its principal place of business at 72 Deforest Ave, East Hanover, NJ 07936.  Pliva is a subsidiary of Teva Pharmaceutical Industries, Ltd.  During the Class Periods, Pliva sold Propranolol tablets in this District and throughout the United States.

40.    In this Complaint, Teva Pharma and Pliva will be referred to collectively as "Teva." Teva maintains an office in this District at 145 West 57th Street, NY, NY 10019.

41.    Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business at 1000 Mylan Blvd., Canonsburg, PA 15317.  The parent corporation of Mylan Inc. is Mylan N.V., a Netherlands corporation with global headquarters in Hertfordshire, U.K., and in Canonsburg, Pennsylvania.  During the Class Periods, Mylan Inc. sold Propranolol tablets and capsules in this District and throughout the United States through its subsidiaries, Mylan Pharmaceuticals Inc. and UDL Laboratories, Inc.

42.    Defendant Mylan Pharmaceuticals Inc. is a West Virginia corporation with its principal place of business at 781 Chestnut Ridge Road, Morgantown, WV 26505.  During the Class Periods, Mylan Pharmaceuticals Inc. sold Propranolol tablets and capsules in this District and throughout the United States.

43.    Defendant UDL Laboratories, Inc. ("UDL") is an Illinois corporation with its principal place of business at 1718 Northrock Ct, Rockford, IL 61103.  UDL is, and was throughout the Class Period, a subsidiary of Mylan, Inc.  During the Propranolol Tablets Class Period, UDL sold Propranolol tablets in this District and throughout the United States.

44.    In this complaint, Defendants Mylan Inc., Mylan Pharmaceuticals Inc. and UDL will be referred to collectively as "Mylan."  Mylan maintains an office in this District at 405 Lexington Avenue, NY, NY 10174.

45.    Defendant Endo International PLC ("Endo International") is an Irish corporation with its principal place of business located at First Floor, Minerva House, Simmonscourt Road, Ballsbridge, Dublin 4, Ireland.  During the Propranolol Tablets Class Period, Endo International's subsidiary Qualitest Pharmaceuticals, Inc. sold Propranolol tablets in this District and throughout

11

the United States.  Endo International maintains an office in this District at 70 High Street, Rye, NY 10580.

46.    Defendant Par Pharmaceuticals Holdings, Inc. ("Par"), is a Delaware corporation with its principal place of business at One Ram Ridge Road, Chestnut Ridge, NY 10977.  In September 2016, Endo International completed an acquisition of Par at which time it created a combined U.S. Generics segment that included Par and Qualitest, naming the segment Par Pharmaceutical, an Endo International Company.  On information and belief, Qualitest merged into Par.

47.    In this complaint, Defendants Endo International, Par and Qualitest will be referred to collectively as "Endo."

48.    Defendant Heritage Pharmaceuticals Inc. ("Heritage") is a Delaware corporation with its principal place of business at 12 Christopher Way #300, Eatontown, NJ 07724.  During the Propranolol Tablets Class Period, Heritage sold Propranolol tablets in this District and throughout the United States.  Heritage is a subsidiary of Emcure Pharmaceuticals Ltd., based in Pune, India.

49.    Defendant Breckenridge Pharmaceuticals, Inc. ("Breckenridge") is a Delaware corporation with its principal place of business at 1 Passaic Ave, Fairfield, NJ 07004.  During the Propranolol Capsules Class Period, Breckenridge sold Propranolol capsules in this District and throughout the United States.  Breckenridge maintains an office in this District at 60 E. 42nd Street, Suite 5210, New York, NY 10165.

50.    Defendant Upsher-Smith Laboratories, Inc. ("Upsher-Smith") is a Minnesota corporation with its principal place of business at 6701 Evenstad Drive, Maple Grove, MN 55369.

During the Propranolol Capsules Class Period, Upsher-Smith sold Propranolol capsules in this District and throughout the United States.

51.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

### A.     <u>Agents and Co-Conspirators</u>

52.     Each Defendant acted as the principal of, or agent for, all other Defendants with respect to the acts, violations, and common course of conduct described in this Complaint.

53.     Various other persons, firms, companies, and corporations not named as Defendants knowingly and willingly conspired with Defendants, and performed acts and made statements in furtherance of the conspiracy and the alleged anticompetitive conduct.

54.     The wrongful acts alleged to have been done by any one Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affairs.

## III.    JURISDICTION AND VENUE

55.     Plaintiff brings this action to (i) recover treble damages, attorneys' fees, litigation expenses, and court costs, and (ii) secure injunctive relief for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, pursuant to Sections 4 and 16 of the Clayton Act of 1914 ("Clayton Act"), 15 U.S.C. §§ 15 and 26.

56.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. § 15.

57.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §§ 1391(b), (c), and (d) because during the Class Periods, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity affecting interstate trade and commerce, discussed below, has been carried out in this District.

58.     Defendants' conduct, as described in this Complaint, was within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District.

59.     This Court has personal jurisdiction over each Defendant, because each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of its illegal scheme and conspiracy throughout the United States and including in this District. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## IV.    INTERSTATE TRADE AND COMMERCE

60.     Defendants are the leading manufacturers and suppliers of Propranolol capsules and tablets sold in the United States.

61.     Propranolol capsules and tablets are produced by or on behalf of Defendants or their affiliates in the United States and/or overseas.

62.     During the Class Periods, Defendants, directly or through one or more of their affiliates, sold Propranolol capsules and tablets throughout the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

63.     The activities of Defendants and their co-conspirators were within the flow of, intended to, and had a substantial effect on interstate commerce in the United States.

64.     Defendants' and their co-conspirators' conduct, including the marketing and sale of Propranolol capsules and tablets, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

65.     The conspiracy alleged in this Complaint has directly and substantially affected interstate commerce in that Defendants deprived Plaintiff of the benefits of free and open competition in the purchase of Propranolol within the United States.

66.     Defendants' agreement to inflate, fix, raise, maintain, or artificially stabilize prices of Propranolol capsules and tablets, and their actual inflating, fixing, raising, maintaining, or artificially stabilizing Propranolol prices, were intended to have, and had, a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States and on import trade and commerce with foreign nations.

## V.     FACTUAL ALLEGATIONS

### A.     <u>Overview of the Generic Drug Market</u>

#### 1.     Generic drugs should lead to lower prices

67.     Brand name drugs are typically patented and the patent owner can charge a monopoly price.  After the patent expires, generic drugs enter the market.  Generic drugs typically provide consumers with a lower cost alternative to brand name drugs while providing the same treatment. Specifically:

> A generic drug is the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use. Before approving a generic drug product, FDA requires many rigorous tests and procedures to assure that the generic drug can be substituted for the brand name drug. The FDA bases evaluations of substitutability, or "therapeutic equivalence," of generic drugs on scientific

evaluations. By law, a generic drug product must contain the identical amounts of the same active ingredient(s) as the brand name product. Drug products evaluated as "therapeutically equivalent" can be expected to have equal effect and no difference when substituted for the brand name product.

FDA, Generic Drugs: Questions and Answers, *available at* http://www.fda.gov/Drugs/ResourcesForYou/Consumers/QuestionsAnswers/ucm100100. htm.

68.     Further, "[d]rug products classified as therapeutically equivalent can be substituted with the full expectation that the substituted product will produce the same clinical effect and safety profile as the prescribed product." *Id.*

69.     Generic versions of brand name drugs are priced significantly below the brand versions. Because of the price differentials, and other institutional features of the pharmaceutical market, generic versions are liberally and substantially substituted for their brand counterparts. In every state, pharmacists are permitted (and, in some states, required) to substitute a generic product for a brand product unless the doctor has indicated that the prescription for the brand product must be dispensed as written. States adopted substitution laws following the federal government's 1984 enactment of the Hatch-Waxman Act.

70.     Prior to the conspiracy alleged herein, the FDA has recognized that "[g]eneric competition is associated with lower drug prices[.]" A Federal Trade Commission study reached the same conclusion finding that in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug prices." Economic literature in the healthcare market further confirms that competition by generic products results in lower prices for consumers. In the period before generic entry, a brand drug commands 100% of the market share for that drug and the brand manufacturer can set the price without the impact of competitive market forces. Once the first generic enters the market, however, a brand drug rapidly loses sales, on average 90% within a year. As more generic manufacturers enter the market, prices for generic versions of a drug predictably

will continue to decrease because of competition among the generic manufacturers, and the loss of sales volume by the brand drug to the corresponding generic accelerates as more generic options are available to purchasers.

71.    A mature generic market, such as the market for Propranolol, has several generic competitors. Due to the fact that each generic is readily substitutable for another generic of the same brand drug, the products behave like commodities, with pricing being the main differentiating feature and the basis for competition among manufacturers.[1] Over time, generics' pricing nears the generic manufacturers' marginal costs.

72.    Generic competition usually enables purchasers to purchase generic versions of the brand drug at a substantially lower price than the brand drug. Generic competition to a single blockbuster brand drug product can result in billions of dollars in savings to direct purchasers, consumers, insurers, local, state, and federal governments, and others. Indeed, one study found that the use of generic medicines saved the United States healthcare system $254 billion in 2014 alone, and $1.68 trillion between 2005 and 2014.

**B.    Consolidation of Generic Drug Market**

73.    The global market for generic pharmaceuticals has undergone substantial consolidation. Generic pharmaceutical leader Teva, for example, acquired Ivax Corporation for $7.4 billion in 2006, Ben Laboratories for $7.4 billion in 2008, and Ratiopharma – Germany's second largest generic drug producer – for $5 billion in 2010.  In March 2015, Defendant Actavis merged with Allergan, and Defendant Teva acquired Actavis Generics in 2016.  Defendant Endo

---

[1] *See, e.g.*, FTC, AUTHORIZED GENERIC DRUGS: SHORT-TERM EFFECTS AND LONG-TERM IMPACT, at 17 (Aug. 2011) ("[G]eneric drugs are commodity products marketed to wholesalers and drugstores primarily on the basis of price."); Congressional Budget Office, "How Increased Competition From Generic Drugs Has Affected Prices and Returns in the Pharmaceutical Industry" (July 1998).

acquired Qualitest Pharmaceuticals for $1.2 billion in 2010, and Defendant Par in 2016.  As a result of the consolidation, Defendants dominate the U.S. Propranolol market.

### C.    Opportunities for Collusion

74.    The DOJ is reportedly looking closely at trade associations. According to an intelligence report from Policy and Regulatory Report, a source that was given inside information by someone with knowledge of the government's generic pricing investigation, the DOJ is looking closely "at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."

75.    Generic drug manufacturers attend various industry trade shows throughout the year, including those hosted by the GPhA, National Association of Chain Drug Stores, Healthcare Distribution Management Association (now the Healthcare Distribution Alliance), and Efficient Collaborative Retail Marketing.

76.    At these various conferences and trade shows, representatives from Defendants have opportunities to interact with each other and discuss their respective businesses and customers. Attendant with many of these conferences and trade shows are organized recreational and social events, such as golf outings, lunches, cocktail parties, dinners, and other scheduled activities that provide further opportunity to meet with competitors outside of the traditional business setting. Of particular importance here, generic drug manufacturer representatives who attend these functions use these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers, among other competitively-sensitive information.

77.    In short, these trade shows and customer conferences provide generic drug manufacturers with ample opportunity to meet, discuss, devise and implement a host of

anticompetitive schemes that unreasonably restrain competition in the United States' market for generic drugs.

78.     In addition to these frequent conferences and trade shows, representatives of generic drug manufacturers get together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business.  A large number of generic drug manufacturers, including several of the Defendants, are headquartered in close proximity to one another in New Jersey, eastern Pennsylvania, or New York, giving them easier and more frequent opportunities to meet and collude.   In fact, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as "industry dinners."

79.     As a result of these various interactions, Defendants' sales and marketing executives are often acutely aware of their competition and, more importantly, each other's current and future business plans. This familiarity and opportunity often leads to agreements among competitors to fix prices or to allocate a given market so as to avoid competing with one another on price.

80.     Defendants routinely communicate and share information with each other about bids and pricing strategy. This can include forwarding bid packages received from a customer (e.g., a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that type of information.

81.     Defendants also share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection and rebates. Generic drug manufacturers use this information from their competitors to negotiate potentially better prices or terms with their customers, which could be to the ultimate detriment of consumers.

D.     **Propranolol Prices Soar**

82.     The GPhA is the "leading trade association for generic drug manufacturers and distributors, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry." GPhA was formed in 2000 from the merger of three industry trade associations: GPhA, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

83.     According to GPhA's website, "GPhA member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year." GPhA states that, "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry and help secure the future of this vital pharmaceutical market segment. In addition, GPhA provides valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."

84.     Defendants each attended the GPhA Fall Technical Conference in Bethesda, Maryland on October 28-30, 2013.

85.     This meeting, as well as other industry gatherings referred to above, provided Defendants with opportunities to collude, and on information and belief, at these meetings Defendants agreed to increase pricing for Propranolol.

86.     Within a few weeks of the October 2013 GPhaA meeting, the average prices for Propranolol capsules began to increase by extraordinary amounts:

        a.     ***Propranolol 60mg ER Capsules.*** Between December 18, 2013 and July 23, 2014, average prices increased by 164%.

        b.     ***Propranolol 80mg ER Capsules.*** Between December 18, 2013 and September 17, 2014, average prices increased by 174%.

        c.      ***Propranolol 120mg ER Capsules.*** Between December 18, 2013 and July 23, 2014, average prices increased by 181%.

        d.      ***Propranolol 160mg ER Capsules.*** Between December 18, 2013 and October 22, 2014, average prices increased by 174%.

87.     Defendants also attended the GPhA Annual Meeting in Miami Beach, Florida on February 9-11, 2015.

88.     Within a few weeks of the February 2015 GPhA meeting, the average prices for Propranolol tablets began to increase by extraordinary amounts:

        a.      ***Propranolol 10mg Tablets.***  Between March 18, 2015 and September 23, 2015, average prices increased 818%.

        b.      ***Propranolol 20mg Tablets.***  Between March 18, 2015 and November 18, 2015, average prices increased 892%.

        c.      ***Propranolol 40mg Tablets.***  Between February 18, 2015 and February 17, 2016, average prices increased 1008%.

        d.      ***Propranolol 60mg Tablets.***  Between February 18, 2015 and August 19, 2015, average prices increased 104%.

        e.      ***Propranolol 80mg Tablets.***  Between February 18, 2015 and November 18, 2015, average prices increased 1033%.

89.     There were no reasonable justifications for this abrupt shift in pricing, as Defendants' price increases were not necessitated by increased manufacturing costs, or research and development costs. Likewise, there were no shortages of Propranolol in the United States.

21

90.     Federal law requires drug manufacturers to report potential drug shortages to the FDA, the reasons therefor, and the expected duration of the shortage. No supply disruption was reported by Defendants with respect to Propranolol during the Class Periods.

91.     In a report dated April 21, 2015, Richard Evans, Scott Hinds and Ryan Baum at Sector & Sovereign Research concluded that: "A plausible explanation is that generic manufacturers . . . **are cooperating to raise the prices of products whose characteristics** (low sales due to either very low prices or very low volumes) accommodate price inflation." (Emphasis added).

92.     The abrupt shift in the pricing of Propranolol has had a devastating impact on customers. As noted in letters from members of Congress to generic drug manufacturers as part of a wide investigation into unexplained increases in generic drug prices:

> This dramatic increase in generic drug prices results in decreased access for patients. According to the National Community Pharmacists Association (NCPA), a 2013 member survey found that pharmacists across the country "have seen huge upswings in generic drug prices that are hurting patients and pharmacies ability to operate" and "77% of pharmacists reported 26 or more instances over the past six months of a large upswing in a generic drug's acquisition price." These price increases have a direct impact on patients' ability to purchase their needed medications. The NCPA survey found that "pharmacists reported patients declining their medication due to increased co-pays," and "84% of pharmacists said that the acquisition price/lagging reimbursement trend is having a 'very significant' impact on their ability to remain in business to continue serving patients.

93.     As a 2015 white paper published by Elsevier Clinical Solutions noted, this also has a detrimental impact on direct purchasers of the drugs:

> High generic drug prices have had an adverse effect on almost everyone in the pharmaceutical supply chain. Consumers face higher co-pays and prices and health plans are dealing with higher drug spend. Physicians are finding the need to prescribe alternative drug therapies while dealing with angry patients. In some cases, consumers are declining their medications due to increased prices. **Many pharmacies are receiving inadequate reimbursements and can lose money**

**when drugs must be purchased at rapidly rising prices but reimbursed at lower predetermined rates.**[2]

94.     And another 2015 white paper examining generic drug pricing, published by

Wolters Kluwer, explained:

> While the impact is being felt across the industry, small to mid-sized pharmacies can face notably greater challenges, as they do not have the resources, prescription volume, or affiliations with other purchasers that can empower them to bargain for discounts in a competitive marketplace.  A survey conducted by the National Community Pharmacists Association (NCPA) revealed that pharmacy acquisition prices for many essential generic drugs have generally risen by between 600% and 1,000% in recent years. The same survey revealed that **84% of pharmacists at small or mid-sized pharmacies believed that increasing generic drug costs could result in unsustainable losses that would have a "very significant" impact on their ability to remain in business.**[3]

95.     Defendants' adherence to their price-fixing scheme generated considerable profits.

For example, in Endo's Q1 2015 earnings call on May 11, 2015, Endo CEO Rajiv De Silva stated

"[i]n 2015, we expect strong double-digit revenue growth for U.S. Generics, as a result of

consistent volume growth **supplemented by recent pricing opportunities**…."

**E.     Congressional and Regulators' Responses to Rising Generic Drug Prices**

96.     Defendants' dramatic and unexplained price hikes have engendered extensive

scrutiny by the United States Congress and by federal and state antitrust regulators.

97.     On October 2, 2014, U.S. Senator Bernie Sanders and U.S. Congressman Elijah

Cummings sent letters to several generic drug manufacturers, including Defendants Actavis, Endo,

Heritage, Mylan and Teva.

---

[2]     "The Impact of Rising Generic Drug Prices on the U.S. Drug Supply Chain," at pp. 1-2, available at http://www.ncpa.co/pdf/elsevier_wp_genericdrug.pdf.

[3]     Donald J. Dietz, RPh, MS, and Fred Hamilin, "Generic Drug Pricing: Understanding the Impact," available at http://www.wolterskluwercdi.com/documents/white-papers/ms-generic-pricing-info.pdf.

98.     On November 20, 2014, Senator Sanders's committee held a hearing entitled "Why Are Some Generic Drugs Skyrocketing In Price?" Various witnesses discussed the price increases for generic drugs. No chief executive of a generic drug manufacturer testified.

99.     By November 3, 2014, the DOJ opened a wide-ranging grand jury investigation into the marketing and pricing practices of generic drugs, and has caused grand jury subpoenas to be issued to several generic drug manufacturers, including manufacturers of Propranolol.

100.    According to a June 26, 2015 report by the service Policy and Regulatory Report ("PaRR Report") (available at http://www.mergermarket.com/pdf/DoJCollusion-Generic-Drug-Prices-2015.pdf):

> A PaRR source says prosecutors see the case much like its antitrust probe of the auto parts industry, which has gone on for years and morphed into the department's largest criminal antitrust probe ever. Like in that case, prosecutors expect "to move from one drug to another in a similar cascading fashion."

101.    In December 2015, Defendant Endo received Interrogatories and Subpoenas Duces Tecum from the Connecticut AG requesting information regarding pricing of certain of its generic products.

102.    Several Defendants have confirmed receipt of grand jury subpoenas.

103.    On June 21, 2016, Teva received a subpoena from the DOJ seeking documents and other information relating to the marketing and pricing of certain of Teva's generic products and communications with competitors about such products. Defendant Actavis received a similar subpoena in June 2015.

104.    On July 12, 2016, Teva received a subpoena from the Connecticut AG seeking documents and other information relating to potential state antitrust law violations. Defendant Actavis has also received a similar subpoena from the Connecticut AG.

105.    On October 7, 2016, Mylan disclosed in a filing with the SEC that on September 8, 2016, the DOJ "subpoenaed a company subsidiary, a senior executive and other employees about alleged price fixing and also executed multiple search warrants related to its probe." Mylan further disclosed that the DOJ is seeking "additional information relating to the marketing, pricing and sale of" several generic drugs, **including Propranolol**, "and any communications with competitors about such products."

## VI.    THE PROPRANOLOL MARKET IS HIGHLY SUSCEPTIBLE TO COLLUSION

106.    Factors showing that the Propranolol market is susceptible to collusion are present in this case.

107.    **High Degree of Industry Concentration**:    A concentrated market is more susceptible to collusion and other anticompetitive practices. The Propranolol market is highly concentrated and is dominated by a handful of companies. Therefore, elaborate communications, quick to be detected, would not have been necessary to enable pricing to be coordinated.

108.    **High Barriers to Entry**: Costs of manufacture, intellectual property, and expenses related to regulatory oversight are barriers to entry. Barriers to entry increase a market's susceptibility to a coordinated effort to maintain supracompetitive prices because it is difficult for new suppliers to enter the market and destabilize coordinated supracompetitive prices.

109.    As the dominant players in the Propranolol market, Defendants were able to fix, raise, and maintain their prices for Propranolol without competitive threats from rival generic drug manufacturers.

110.    **Lack of Substitutes**: Many patients are unable to substitute other medications for Propranolol.

111.   **Demand Inelasticity**: "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline, if any, in the quantity sold of that product. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase the product despite the price increase.

112.   For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

113.   Demand for Propranolol is highly inelastic because it is a unique product for which there is no reasonable substitute.  Propranolol is a necessary treatment for millions of patients for which no substitutes are available. Propranolol is thus particularly susceptible to collusive price fixing as price increases will not result in such a loss of sales as to reduce profits, but instead will result in more profits for cartel members.

114.   **High Degree of Interchangeability**: Propranolol is a commodity product. Therefore, Defendants' products are interchangeable, as they contain the same chemical compounds made from the same raw materials and are therapeutically equivalent.  This characteristic facilitates collusion because cartel members can more easily monitor and detect deviations from a price-fixing agreement.  In addition, because these are commodity products, all Defendants had to raise prices for the cartel to work.  Indeed, it was against a Defendant's individual economic interest to raise prices since the other Defendants could have priced below that Defendant's price and taken substantial market share.

115.     **Opportunities for Contact and Communication Among Competitors**:
Defendants are members of the trade association GPhA, and attend other industry events and
meetings, which provide opportunities to communicate. Defendants' representatives regularly
attended meetings of GPhA, including the October 2013 and February 2015 meetings, and
meetings of other trade associations during the Class Periods. Indeed, the DOJ is reportedly
analyzing trade associations like GPhA as a potential avenue for facilitating collusion between
different generic drug manufacturers as part of its years-long investigation into anticompetitive
pricing activities among them.

## VII.     THE DEFENDANTS ACTED AGAINST THEIR UNILATERAL SELF-INTEREST ABSENT A CARTEL

116.     Propranolol is a commodity product. Therefore, absent a cartel, if any manufacturer
increased the price of Propranolol, it would be expected that its competitors would not increase
the price but would seek to sell more Propranolol to the first manufacturer's customers.
Accordingly, it would not be in any manufacturer's unilateral self-interest to increase the price of
the Propranolol it sold unless it had an agreement with the other manufacturers that they would do
the same.

117.     During the Class Periods, there was no significant increase in the costs of making
Propranolol, no significant decrease in supply, and no significant increase in demand. Nonetheless,
there were extraordinary increases by each of the Defendants in the prices they charged their
customers for Propranolol. Such price increases in a commodity product for which there were no
significant increases in costs or demand and no significant decrease in supply would not have been
in each Defendant's unilateral self-interest absent the existence of a cartel.

## VIII.   CLASS ACTION ALLEGATIONS

118.   Pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), Plaintiff brings this action on behalf of the following Classes:

a.   All persons or entities that directly purchased Propranolol capsules from Defendants in the United States and its territories and possessions at any time during the Propranolol Capsules Class Period (December 18, 2013 to the present). Excluded from the Class are Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and all federal governmental entities; and

b.   All persons or entities that directly purchased Propranolol tablets from Defendants in the United States and its territories and possessions at any time during the Propranolol Tablets Class Period (February 18, 2015 to the present). Excluded from the Class are Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and all federal governmental entities.

119.   Members of the Classes are so numerous that joinder is impracticable. Plaintiff believes the Class Members are numerous and widely dispersed throughout the United States. Further, the Class is readily identifiable from information and records maintained by Defendants.

120.   Plaintiff's claims are typical of the claims of the members of the Classes. Plaintiff's interests are not antagonistic to the claims of the other Class Members, and there are no material conflicts with any other member of the Classes that would make class certification inappropriate. Plaintiff and all members of the Classes were damaged by the same wrongful conduct of Defendants.

121.   Plaintiff will fairly and adequately protect and represent the interests of the Classes. The interests of the Plaintiff are coincident with, and not antagonistic to, those of the Classes.

122.    Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action litigation, and who have particular experience with class action litigation involving alleged violations of antitrust law in the pharmaceutical industry.

123.    Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual Class Members because Defendants have acted on grounds generally applicable to the entire Classes, thereby determining damages with respect to the Classes as a whole is appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

124.    The common legal and factual questions, which do not vary from Class Member to Class Member and which may be determined without reference to individual circumstances of any Class Member, include, but are not limited to, the following:

a.      Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to eliminate competition and thereby artificially increase the prices of Propranolol capsules and tablets in the United States;

b.      The duration and extent of the alleged contract, combination, or conspiracy;

c.      Whether Defendants and their co-conspirators were participants in the contract, combination, or conspiracy alleged herein;

d.      The effect of the contract, combination, or conspiracy on the prices of Propranolol capsules and tablets in the United States during the Class Period;

e.      Whether Defendants' conduct caused supracompetitive prices for Propranolol;

f.      Whether, and to what extent, the conduct of Defendants and their co-conspirators caused injury to Plaintiff and other members of the Classes; and

g.    Whether the alleged contract, combination, or conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

125.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

126.    Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## IX.    ANTITRUST INJURY

127.    During the Class Periods, Plaintiff and Class Members directly purchased Propranolol from Defendants. As a result of the Defendants' anticompetitive conduct, Plaintiff and Class Members paid more for Propranolol than they would have and thus suffered substantial overcharges. This is a cognizable antitrust injury and constitutes harm to competition under the federal antitrust laws.

128.    Because Defendants' unlawful conduct has successfully eliminated competition, Plaintiff and Class Members have sustained, and continue to sustain, significant overcharges in the form of artificially inflated prices paid to Defendants. The full amount of such overcharges will be calculated after discovery and upon proof at trial.

129.    Defendants' misconduct reduced competition in the sale of Propranolol, reduced choice for purchasers, and caused injury to purchasers.

130.    Defendants' anticompetitive conduct is ongoing, and as a result Plaintiff and the Classes continue to pay supracompetitive prices for Propranolol.

## X.    VIOLATION OF THE SHERMAN ACT § 1

131.    Defendants and their co-conspirators entered into, and engaged in, a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

132.    Defendants' anticompetitive acts were intentional, were directed at the sales of Propranolol in the United States, and had a substantial and foreseeable effect on interstate commerce by raising and fixing Propranolol prices throughout the United States.

133.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects upon commerce in the United States:

        a.    Prices charged to, and paid by, Plaintiff for Propranolol were artificially raised, fixed, maintained, or stabilized at supra-competitive levels;

        b.    Plaintiff was deprived of the benefits of free, open, and unrestricted competition in the sale of Propranolol in the United States market; and

        c.    Competition in establishing the prices paid for Propranolol was unlawfully restrained, suppressed, or eliminated.

134.    Defendants' and their co-conspirators' anticompetitive activities directly and proximately caused injury to Plaintiff in the United States.

135.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff paid artificially inflated prices for Propranolol.

136.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff was damaged in its business or property by paying prices for Propranolol that were higher than they

would have been but for Defendants' unlawful conduct, which has resulted in an amount of ascertainable overcharges to be established at trial.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff and Class Members respectfully demand the relief as set forth below:

A.      Certification of the action as a Class Action pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiff as Class Representative and its counsel of record as Class Counsel;

B.      That acts alleged herein be adjudged and decreed to be unlawful restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.      Permanent injunctive relief that enjoins Defendants from violating the antitrust laws and requires them to take affirmative steps to dissipate the effects of the violations;

D.      A judgment against Defendants, jointly and severally, for the damages sustained by Plaintiff and the Classes defined herein, and for any additional damages, penalties, and other monetary relief provided by applicable law, including treble damages;

E.      By awarding Plaintiff and Class Members pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the Complaint in this action;

F.      The costs of this suit, including reasonable attorney fees; and

G.      Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

137.    Plaintiff, on behalf of itself and all others similarly situated, hereby requests a jury trial, pursuant to Federal Rule of Civil Procedure 38, on any and all claims so triable.

Dated: December 23, 2016                    Respectfully submitted,

                                            KAPLAN FOX & KILSHEIMER LLP


                                            By: */s/ Robert N. Kaplan*
                                                Robert N. Kaplan
                                                Richard J. Kilsheimer
                                                Jeffrey P. Campisi
                                                Joshua Saltzman
                                                850 Third Avenue, 14th Floor
                                                New York, New York 10022
                                                Tel: 212-687-1980
                                                Fax: 212-687-7714
                                                rkaplan@kaplanfox.com
                                                rkilsheimer@kaplanfox.com
                                                jcampisi@kaplanfox.com
                                                jsaltzman@kaplanfox.com

                                                Thomas M. Sobol
                                                David S. Nalven, DN-2374
                                                Lauren Guth Barnes
                                                Kiersten Taylor
                                                Hagens Berman Sobol Shapiro LLP
                                                55 Cambridge Parkway, Suite 301
                                                Cambridge, Massachusetts 0214 2
                                                617-482-3700
                                                617-482-3003 (fax)
                                                tom@hbsslaw.com
                                                davidn@hbsslaw.com
                                                lauren@hbsslaw.com
                                                kiersten@hbsslaw.com


                                            and

                                            VANEK, VICKERS & MASINI P.C.
                                                Joseph M. Vanek
                                                David P. Germaine
                                                55 W. Monroe, Suite 3500
                                                Chicago, Illinois 60603
                                                Tel: 312-224-1500
                                                Fax: 312-224-1510
                                                E-mail: Jvanek@vaneklaw.com
                                                E-mail: Dgermaine@vaneklaw.com

*Attorneys for Plaintiff*