**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FWK HOLDINGS, L.L.C., on behalf of itself and all others similarly situated,<br><br>               Plaintiff,<br><br>    v.<br><br>ACTAVIS ELIZABETH, LLC, TEVA PHARMACEUTICALS USA, INC., PLIVA, INC., MYLAN INC. MYLAN PHARMACEUTICALS INC., UDL LABORATORIES, INC. ENDO INTERNATIONAL PLC, PAR PHARMACEUTICALS HOLDINGS, INC., HERITAGE PHARMACEUTICALS INC., BRECKENRIDGE PHARMACEUTICALS, INC., AND UPSHER-SMITH LABORATORIES, INC.<br><br>               Defendants. | Case No. 1:16-cv-09901 (JSR)<br><br>ECF Case |
| CÉSAR CASTILLO, INC., individually and on behalf of all those similarly situated,<br><br>               Plaintiff,<br><br>    v.<br><br>ACTAVIS ELIZABETH, LLC, BRECKENRIDGE PHARMACEUTICALS, INC., ENDO INTERNATIONAL PLC, HERITAGE PHARMACEUTICALS INC., MYLAN INC. MYLAN PHARMACEUTICALS INC., PAR PHARMACEUTICALS HOLDINGS, INC., PLIVA, INC., TEVA PHARMACEUTICALS USA, INC., UDL LABORATORIES, INC., AND UPSHER-SMITH LABORATORIES, INC.<br><br>               Defendants. | Case No. 1:17-cv-00078 (JSR)<br><br>ECF Case |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**JOINT MOTION TO DISMISS THE CLASS ACTION COMPLAINTS**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND .................................................................................. 3

    A.    The Parties ............................................................................................. 3

    B.    The Generic Drug "Propranolol" .......................................................... 4

    C.    Defendants' Participation in Trade Associations .................................... 4

    D.    Plaintiffs' Claims ................................................................................... 5

ARGUMENT .......................................................................................................... 7

I.    PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE AN UNLAWFUL
    AGREEMENT IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT ......... 7

    A.    Plaintiffs allege no direct evidence that Defendants conspired to fix prices
        for Propranolol. ...................................................................................... 8

    B.    Plaintiffs fail to allege parallel conduct and circumstantial evidence to
        support the claim that Defendants agreed to fix the price of Propranolol. ........... 11

        1.    Plaintiffs' allegations of parallel conduct do not support a plausible
            inference of conspiracy. .......................................................... 11

        2.    Plaintiffs do not allege sufficient additional circumstantial
            evidence to support their claim of conspiracy. ......................... 12

    C.    Plaintiffs have failed to plead a plausible conspiracy with respect to the
        individual Defendants. ........................................................................... 19

II.    PLAINTIFFS DO NOT HAVE STANDING TO PURSUE THEIR CLAIMS ........ 23

CONCLUSION ..................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*,
   181 F.3d 216 (2d Cir. 1999)............................................................................9

*Arista Records LLC v. Lime Grp. LLC*,
   532 F. Supp. 2d 556 (S.D.N.Y. 2007)......................................................23, 24

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...............................................................................7, 16

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)........................................................................22

*Baur v. Veneman*,
   352 F.3d 625 (2d Cir. 2003).......................................................................6

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................. *passim*

*Blue Tree Hotels Inv., Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*,
   369 F.3d 212 (2d Cir. 2004)......................................................................24

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
   985 F. Supp. 2d 612 (S.D.N.Y. 2013)......................................................7, 9, 10

*Burtch v. Milberg Factors, Inc.*,
   662 F.3d 212 (3d Cir. 2011).......................................................................8

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
   996 F.2d 537 (2d Cir. 1993).....................................................................19

*Cargill, Inc. v. Monfort of Colo., Inc.*,
   479 U.S. 104 (1986)...............................................................................25

*Clapper v. Amnesty Int'l, USA*,
   133 S. Ct. 1138 (2013)............................................................................25

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
   No. 09-4050, 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010) ................................17

*Garber v. Legg Mason, Inc.*,
   347 F. App'x 665 (2d Cir. 2009) ..................................................................6

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
    620 F. Supp. 2d 499 (S.D.N.Y. 2009)................................................................................20

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
    790 F. Supp. 2d 106 (S.D.N.Y. 2011)................................................................................10

*In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF),
    2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014)...................................................................19

*In re Baby Food Antitrust Litig.*,
    166 F.3d 112 (3d Cir. 1999)..................................................................................12, 14, 16

*In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*,
    No. 11-2213, 2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012) ..............................................9

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
    903 F. Supp. 2d 198 (S.D.N.Y. 2012).................................................................................25

*In re Elevator Antitrust Litig.*,
    No. 04 CV 1178 (TPG), 2006 WL 1470994 (S.D.N.Y. May 30, 2006)...............................19

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007).............................................................................10, 11, 18

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ........................................................................16, 21

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
    No. 14 md 2573, 2016 WL 5794777 (S.D.N.Y. Oct. 3, 2016) ...........................................18

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) .................................................................................14, 15, 16

*In re Parcel Tanker Shipping Servs. Antitrust Litig.*,
    541 F. Supp. 2d 487 (D. Conn. 2008)................................................................................10

*In re Platinum & Palladium Commodities Litig.*,
    828 F. Supp. 2d 588 (S.D.N.Y. 2011)..................................................................................9

*In re Processed Egg Prods. Antitrust Litig.*,
    312 F.R.D. 124 (E.D. Pa. 2015).........................................................................................12

*In re Publ'n Paper Antitrust Litig.*,
    690 F.3d 51 (2d Cir. 2012).................................................................................................20

*In re Zinc Antitrust Litig.*,
    155 F. Supp. 3d 337 (S.D.N.Y. 2016)...........................................................................10, 13

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*JBCHoldings NY, LLC v. Pakter,*
   931 F. Supp. 2d 514 (S.D.N.Y. 2013).................................................................................11

*Jung* v. *Ass'n of Am. Med. Colls.,*
   300 F. Supp. 2d 119 (D.D.C. 2004) ...................................................................................10

*Kendall v. Visa USA, Inc.,*
   518 F.3d 1042 (9th Cir. 2008) .............................................................................................8

*LaFlamme v. Societe Air France,*
   702 F. Supp. 2d 136 (E.D.N.Y. 2010) ...............................................................................19

*Lipsky v. Commonwealth United Corp.,*
   551 F.2d 887 (2d Cir. 1976)...............................................................................................17

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.,*
   709 F.3d 129 (2d Cir. 2013)........................................................................................ *passim*

*Morris v. Wyeth, Inc.,*
   Civil No. 09–0854, 2012 WL 601455 (W.D. La. Feb. 23, 2012)...........................................6

*Navarra v. Marlborough Gallery, Inc.,*
   820 F. Supp. 2d 477 (S.D.N.Y. 2011)................................................................................11

*Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE,*
   763 F.3d 198 (2d Cir. 2014)...............................................................................................6

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.,*
   507 F.3d 117 (2d Cir. 2007)...............................................................................................8

*Resco Prod., Inc. v. Bosai Minerals Grp. Co.,*
   158 F. Supp. 3d 406 (W.D. Pa. 2016)................................................................................12

*Simon v. E. Ky. Welfare Rights Org.,*
   426 U.S. 26 (1976)..............................................................................................................24

*Spokeo, Inc. v. Robins,*
   136 S.Ct. 1540 (2016).........................................................................................................24

*Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.,*
   738 F. Supp. 2d 505 (D. Del. 2010)..................................................................13, 14, 17

*TechnoMarine SA v. Giftports, Inc.,*
   758 F.3d 493 (2d Cir. 2014)...............................................................................................7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308 (2007)............................................................................................................6

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Total Benefits Planning Agency, Inc.* v. *Anthem Blue Cross & Blue Shield*,
  552 F.3d 430 (6th Cir. 2008) ..............................................................................................10

*Twombly v. Bell Atl. Corp.*,
  425 F.3d 99 (2d Cir. 2005)..................................................................................................17

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990)............................................................................................................25

**Statutes**

15 U.S.C. § 26..........................................................................................................................25

## **<u>INTRODUCTION</u>**

Plaintiffs, purported direct purchasers of the generic drug Propranolol, claim that increases in the average prices of Propranolol capsules in 2013-2014 and Propranolol tablets in 2015-2016 must have resulted from a price-fixing conspiracy among Defendants.  But there are no factual allegations in Plaintiffs' complaints to support these claims.  On the contrary, Plaintiffs do not even attempt to identify which Defendant, if any, increased its prices for Propranolol capsules or tablets during these time periods, the amount of any increase by any particular Defendant, or the dates on which these purported increases occurred.  The complaints also fail to allege that either Plaintiff paid at any time the so-called "average price" for Propranolol tablets or capsules.  And even more fatal to their complaints, Plaintiffs fail to plead with any specificity any purported agreement by any Defendant to engage in anti-competitive conduct.  Plaintiffs rely solely on (1) their own rank speculation and (2) boilerplate recitations of the elements of their claims, both of which fall far short of the pleading standards of *Twombly* and Second Circuit law.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

In particular, Plaintiffs' threadbare conspiracy claims rest entirely on alleged increases in the average market prices of Propranolol capsules and later Propranolol tablets, inconclusive and unrelated government investigations, and Defendants' participation in trade association events. These allegations come nowhere close to meeting the pleading standards set forth in *Twombly*. Plaintiffs do not allege when, where, or how the supposed conspiracy formed, nor do they identify individuals involved in the conspiracy.  Plaintiffs do not allege any individual Defendant's Propranolol prices during the purported conspiracy period but, instead, rely on a purported "average" increase across all suppliers.  Nor do Plaintiffs allege whether or when any individual Defendant instituted a price increase.  And Plaintiffs do not allege any fact that renders the alleged conspiracy plausible, rather than merely possible.  In short, although they

include scattershot allegations regarding other generic drugs, other drug manufacturers, and other unrelated proceedings, the complaints lack any factual allegations that constitute direct evidence, or that create an inference, of an agreement by ***these Defendants*** to fix the price of ***Propranolol***. As a result, the complaints fail—and should be dismissed in their entirety—on several grounds.

***First***, Plaintiffs have not alleged any facts demonstrating the existence of an agreement among Defendants to fix the price of Propranolol.  The complaints' conclusory assertion that an agreement must have been reached does not constitute direct evidence of a conspiracy.

***Second***, Plaintiffs have not sufficiently pled that Defendants engaged in parallel conduct, which is necessary for a conspiracy case premised on circumstantial evidence.  Plaintiffs' reliance on average price increases has been rejected in the Second Circuit and elsewhere.

***Third***, Plaintiffs have not sufficiently alleged any "plus factors" to support a plausible inference that Defendants' conduct was the result of collusion rather than independent action.  In that regard, the complaints' sparse allegations regarding unrelated government investigations and trade association participation cannot create an inference of conspiracy because they do not sufficiently suggest an agreement among Defendants to fix the price of Propranolol.

***Fourth***, Plaintiffs' claims fail for the independent reason that Plaintiffs do not have Article III or statutory standing to assert class claims against Defendants for any alleged conspiracy regarding Propranolol tablets or capsules.

Ultimately, these complaints raise the exact concerns that motivated the Supreme Court's decision in *Twombly*.  Defendants should not be exposed to the incredible costs associated with defending against antitrust claims when those claims are based on nothing more than Plaintiffs' suspicion that average price increases must have been the result of a conspiracy.  The

complaints' speculative allegations repeatedly assume the existence of a conspiracy rather than plead it. *Twombly* requires dismissal under such circumstances.

## FACTUAL BACKGROUND

### A.    The Parties

Defendants Actavis Elizabeth, LLC ("Actavis"), Teva Pharmaceuticals USA, Inc. ("Teva"), Pliva, Inc. ("Pliva"), Mylan Inc.[1], Mylan Pharmaceuticals Inc. (together with Mylan, Inc., "Mylan"), UDL Laboratories, Inc. ("UDL"), Par Pharmaceutical, Inc. ("Par"), Heritage Pharmaceuticals Inc. ("Heritage"), Breckenridge Pharmaceutical, Inc. ("Breckenridge"), and Upsher-Smith Laboratories, Inc. ("Upsher-Smith") (together, "Defendants")[2] are pharmaceutical companies with operations based throughout the country. Depending on the year, some Defendants made and sold generic Propranolol tablets (while others did not), some Defendants made or sold generic Propranolol capsules (while others did not), and some Defendants made and sold both Propranolol tablets and capsules. (FWK Compl. ¶¶ 6, 9.)[3]

According to its Direct Purchaser Class Action Complaint (the "FWK Complaint"), Plaintiff FWK Holdings, L.L.C. ("FWK") is an assignee of Frank W. Kerr Company ("Kerr") and purportedly brings this action "as successor-in-interest" to Kerr. (FWK Compl. ¶ 36.) Kerr is presently engaged in a wind-down of its operations pursuant to Chapter 11 proceedings in the

---

[1]   Mylan, Inc. does not manufacture, sell, or distribute pharmaceutical products.

[2]   Plaintiffs' Complaints incorrectly named Endo International plc and Par Pharmaceuticals Holdings, Inc. The parties have agreed to substitute Par for the two incorrectly named parties. And, as Plaintiffs have been informed, the correct corporate name of Breckenridge is Breckenridge Pharmaceutical, Inc.

[3]   Unless otherwise specified, internal quotations and citations are omitted, and all emphasis has been added. All references to "FWK Compl." are to FWK's Direct Purchaser Class Action Complaint, Case No. 1:16-cv-09901 (JSR), Doc. 1, and all references to "CCI Compl." are to César Castillo, Inc.'s Class Action Complaint, Case No. 1:17-cv-00078 (JSR), Doc. 1.

United States Bankruptcy Court for the Eastern District of Michigan.  *See In re Frank W. Kerr Co.*, Case No. 16-51724, Doc. 43 (Bankr. E.D. Mich. 2016).  According to its Class Action Complaint (the "CCI Complaint," and together with the FWK Complaint, the "Complaints"), Plaintiff César Castillo, Inc. ("CCI") is a Puerto Rico corporation that purportedly "purchased Propranolol directly from one or more Defendants."  (CCI Compl. ¶ 27.)  Plaintiffs do not describe any particular Propranolol purchases, including the type of Propranolol purchased, the timing of such purchases, or the prices Kerr or CCI paid, and to whom.

### B.    The Generic Drug "Propranolol"

Propranolol is the generic version of the pharmaceutical Inderal, which was developed by Wyeth Pharmaceuticals, Inc.  (FWK Compl. ¶ 2.)  Propranolol is classified as a beta blocker and is used to treat various heart and circulatory conditions, including tremors, angina, hypertension, and heart rhythm disorders.  (FWK Compl. ¶ 3; CCI Compl. ¶ 2.)  Propranolol is sold both as a capsule and as a tablet.  (FWK Compl. ¶¶ 6, 9.)

### C.    Defendants' Participation in Trade Associations

Generic pharmaceutical companies, no different from companies in every other industry, attend trade shows and are members of numerous associations and charitable organizations, including the Generic Pharmaceutical Association ("GPhA"), a trade association which has existed since 2000.  *Id.* ¶ 82.  GPhA's membership consists of generic drug manufacturers, including some Defendants, as well as "distributors, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."  *Id.*  GPhA provides various membership services, including networking opportunities, technical and educational forums, and opportunities to meet lawmakers and regulators.  *Id.* ¶ 83.  Like many trade associations, GPhA holds numerous meetings and events throughout the year, including annual meetings.  *Id.* ¶ 87.

### D.      Plaintiffs' Claims

Plaintiffs here purport to represent (1) a class of individuals that purchased generic Propranolol capsules from December 18, 2013 to the present and (2) a class of individuals that purchased generic Propranolol tablets from February 18, 2015 to the present.  (FWK Compl. ¶ 118; *see* CCI Compl. ¶ 41 (commencing tablets period on Feb. 1, 2015).)  The crux of Plaintiffs' Complaints is that between December 18, 2013 and October 22, 2014, "the average prices for Propranolol capsules began to increase by extraordinary amounts" and between February 18, 2015 and February 17, 2016 "the average prices for Propranolol tablets began to increase by extraordinary amounts."  (FWK Compl. ¶¶ 6, 9; CCI Compl. ¶¶ 9, 11.)  Plaintiffs do not explain how the alleged "average prices" were calculated.  Nor do Plaintiffs identify which Defendant, if any, increased its prices for Propranolol capsules and tablets during this time, the amount of increase by any particular Defendant, or the date on which these purported increases occurred. The Complaints do not allege that Kerr or CCI paid the "average price[]" for Propranolol.  (*See generally* FWK Compl.; CCI Compl.)

Though Plaintiffs allege "on information and belief" that the increase in the price for Propranolol resulted from an unlawful agreement between Defendants, (FWK Compl. ¶ 20; CCI Compl. ¶ 73), Plaintiffs do not allege any facts suggesting that any Defendant actually agreed to fix the price for Propranolol with any other Defendant.  There is no description of the alleged terms, formation, or operation of any agreement.   The best Plaintiffs can muster is that Defendants attended trade associations meetings before the alleged average price increases, but Plaintiffs do not allege any facts about which Defendants attended and specifically discussed Propranolol at those meetings (or any others).  Plaintiffs also do not even allege any actual communication or conversation between Defendants regarding Propranolol.  Nor do Plaintiffs identify any individual employed by any Defendant that allegedly agreed to fix the price of

Propranolol (other than through unsupported "information and belief").  (FWK Compl. ¶ 27.)

While Plaintiffs allege that Defendants have "no reasonable justifications" for the alleged price

change and that there were "no shortages" of the drug or "potential drug shortages" disclosed to

the FDA, (FWK Compl. ¶¶ 89-90), they ignore contemporaneous publications, subject to judicial

notice, showing that by the fall of 2015 market participants knew the shortage of Propranolol

tablets was reportedly caused by ingredient scarcity, *i.e.*, a "raw materials issue"[4] and that the

FDA downgraded certain suppliers, preventing them from supplying Propranolol.[5]

Plaintiffs also copy and paste allegations from a December 15, 2016 action brought by

the attorneys general of several states regarding generic drugs Glyburide and Doxycycline

Hyclate DR (the "State AG Action").  (FWK Compl. ¶ 16; CCI Compl. ¶ 18.)  The complaint in

the State AG Action does not pertain to or mention Propranolol.  Nor are Actavis, Pliva, UDL,

---

[4]  *See* Am. Soc'y of Health-Sys. Pharmacies, *Current Drug Shortage Bulletin: Propranolol-Hydrochloride Tablets* (July 30, 2015), *available at* https://web.archive.org/web/20150910103007/http:/www.ashp.org/menu/DrugShortages/CurrentShortages/bulletin.aspx?id=1189; Ventura County Medi-Cal Managed Care Comm'n, Gold Coast Health Plan, *Pharmacy Newsletter* 23 (Sept. 2015), *available at* http://64.232.102.10/download/GCHP_Pharmacy_Newsletter_20150923.pdf; *PerformRx Drug Information Update* 72 (July 2015), *available at* http://www.performrx.com/sites/default/files/downloads/July%202015%20Drug%20Information%20Update.pdf; *see generally Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 202 (2d Cir. 2014) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

[5]  *See* Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations, http://www.accessdata.fda.gov/scripts/cder/ob/search_product.cfm (last accessed January 25, 2017) (showing Propranolol suppliers downgraded from approved "AB" rating to "BX" rating given to a product deemed not to be therapeutically equivalent to other pharmaceutically equivalent products).  The Court may take judicial notice of government documents on government websites.  *See, e.g.*, *Morris v. Wyeth, Inc.*, Civil No. 09–0854, 2012 WL 601455, at *5 (W.D. La. Feb. 23, 2012) (taking judicial notice that the Orange Book "identifies drug products approved on the basis of safety and effectiveness by the FDA"), *aff'd sub nom. Morris v. PLIVA, Inc.*, 713 F.3d 774 (5th Cir. 2013); *see also Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009); *Baur v. Veneman*, 352 F.3d 625, 638 n.12 (2d Cir. 2003).

Endo, Par, Breckenridge, or Upsher-Smith defendants in the State AG Action.  *Id.*  Plaintiffs also cite to criminal proceedings pending in the Eastern District of Pennsylvania against two former Heritage executives concerning two different products, Glyburide and Doxycycline Hyclate DR.[6] Neither of these proceedings pertain to or mention Propranolol.

## ARGUMENT

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 616 (S.D.N.Y. 2013).  In particular, the plaintiff must plead sufficient "factual content" to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Mere "labels and conclusions" do not satisfy the need for plausible factual allegations, and a complaint may not rely on a "formulaic recitation of the elements of a cause of action." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014).  "Importantly, the plausibility standard applies only to a complaint's factual allegations" and courts "give no effect at all to legal conclusions couched as factual allegations." *Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013).

## I.   PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE AN UNLAWFUL AGREEMENT IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

To state a claim under Section 1 of the Sherman Act, a plaintiff must allege facts supporting a plausible inference that defendants conspired to unreasonably restrain trade.  *See Twombly*, 550 U.S. at 556-57; *Amazon.com, Inc.*, 985 F. Supp. 2d at 618.  In antitrust cases,

---

[6]   *See United States v. Glazer*, E.D. Pa. No. 2:16-cr-506, Doc. 1 (Information, filed Dec. 12, 2016); *id.*, Doc. 15 (minute entry for plea, filed Jan. 9, 2017); *United States v. Malek*, E.D. Pa. No. 2:16-cr-508, Doc. 1 (Information, filed Dec. 13, 2016); *id.*, Doc. 14 (minute entry for plea, filed Jan. 10, 2017).

where the enormous costs of litigation allow plaintiffs "to extort large settlements even where [they] do[] not have much of a case," *Kendall v. Visa USA, Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008), mere "conclusory allegation[s] of agreement at some unidentified point," or a "suspicion" or "possibility" of agreement, are not enough to survive a motion to dismiss. *Twombly*, 550 U.S. at 557. It is also "not enough to make allegations of an antitrust conspiracy that are consistent with an unlawful agreement; to be viable, a complaint must contain enough factual matter (taken as true) to suggest that an agreement to engage in anticompetitive conduct was made." *Citigroup*, 709 F.3d at 135 (quoting *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007)). "[I]t is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense" of litigation in cases where there is no "reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556, 559.

In particular, to plead the existence of an unlawful agreement under Section 1 of the Sherman Act, a plaintiff must allege either (1) "direct evidence" of an unlawful agreement, or (2) sufficient parallel conduct and "circumstantial facts supporting the inference that a conspiracy existed." *Citigroup*, 709 F.3d at 136. Here, Plaintiffs do neither.

> **A.    Plaintiffs allege no direct evidence that Defendants conspired to fix prices for Propranolol.**

Direct evidence of a conspiracy is "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011). The "paradigmatic example" is a "recorded phone call in which two competitors agreed to fix prices at a certain level." *Citigroup*, 709 F.3d at 136. Plaintiffs here allege nothing of the sort; their Complaints are devoid of any specific facts that would

directly establish an "actual agreement" between Defendants regarding Propranolol.  *See Twombly*, 550 U.S. at 564; *Citigroup*, 709 F.3d at 136.

As an initial matter, Plaintiffs' Complaints do not describe any "actual, verbalized communication" among Defendants regarding Propranolol, *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 597 (S.D.N.Y. 2011), let alone "specific communications between Defendants about any specific plan to cause artificial prices" for Propranolol, *see In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*, No. 11-2213, 2012 WL 6700236, at *11 (S.D.N.Y. Dec. 21, 2012), *aff'd*, 560 F. App'x. 84 (2d Cir. 2014).  Indeed, Plaintiffs will not even definitively say when or where any of the Defendants purportedly agreed to fix the prices for Propranolol, and the Complaints include only the unilluminating (and entirely conclusory) allegation that "[t]he agreement was furthered by discussions held at GPhA meetings."  (FWK Compl. ¶¶ 5, 8); *see also Amazon.com, Inc.*, 985 F. Supp. 2d at 618 (dismissing complaint where "Plaintiffs do not allege an unlawful agreement, only vague 'oral discussions or agreements' . . . Plaintiffs do not even allege that any such discussions or agreements actually occurred, only that they 'may have' occurred.").

Nor do the Complaints identify the role that any particular Defendant played in the alleged conspiracy or the employees of Defendants who allegedly participated.  Courts are clear that antitrust plaintiffs must allege facts showing that the defendants, "***in their individual capacities***, consciously committed themselves to a common scheme."  *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999) (rejecting claim that defendants could be liable for antitrust violation by virtue of their membership in a trade association); *see also Twombly*, 550 U.S. at 565 n.10 (dismissing complaint where plaintiff provided "no clue" as to which of the defendants' "legions" of employees entered into the alleged agreement).  Once

again, such allegations are wholly absent here.  "Generic pleading, alleging misconduct against defendants without specifics as to the role each played in the alleged conspiracy, was specifically rejected by *Twombly*."  *Total Benefits Planning Agency, Inc.* v. *Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008);  *see also Hinds Cty., Miss. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 106, 115 (S.D.N.Y. 2011) (an antitrust plaintiff must "adequately allege the plausible involvement of each defendant" individually in order to survive a motion to dismiss).  "Mere generalizations as to . . . defendants as a group—are insufficient."  *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016); *see Jung* v. *Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 163 (D.D.C. 2004) (same), *aff'd*, 184 F. App'x 9 (D.C. Cir. 2006).

In lieu of actual facts, Plaintiffs offer the conclusory assertion that "Defendants"—applying this generic label without any specification—"caused the price of Propranolol [capsules and tablets] to dramatically increase in unison" and that "[t]he increases were the result of an agreement among Defendants to increase pricing and restrain competition" in the sale of Propranolol capsules and tablets.  (FWK Compl. ¶¶ 5, 8.)  Those allegations, which lack any animating factual detail or descriptions of "specific wrongful acts of specific defendants," *In re Parcel Tanker Shipping Servs. Antitrust Litig.*, 541 F. Supp. 2d 487, 491 (D. Conn. 2008), are at most "theoretical possibilities, which one could postulate without knowing any facts whatever," *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007); *see also Amazon.com, Inc.*, 985 F. Supp. 2d at 618 (dismissing complaint because plaintiffs' failure to "specify who participated in these hypothetical discussions or agreements . . . falls well short of the line between possibility and plausibility of entitlement to relief").  Nor can Plaintiffs transform their blatant speculation into a plausible claim for relief by alleging it "on information and belief."  (*See* FWK Compl. ¶¶ 24, 26-27, 46, 85.)  Courts repeatedly instruct that allegations on information and belief "must be

accompanied by a statement of the facts upon which the belief is founded." *Navarra v. Marlborough Gallery, Inc.*, 820 F. Supp. 2d 477, 485 (S.D.N.Y. 2011); *see also JBCHoldings NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 527 (S.D.N.Y. 2013) (same).  Plaintiffs include no such facts: their generalized and amorphous assertions cannot pass muster. *See In re Elevator*, 502 F.3d at 50-51 (affirming dismissal where complaint alleged conspiracy "in entirely general terms without any specification of any particular activities by any particular defendant").

**B.**     **Plaintiffs fail to allege parallel conduct and circumstantial evidence to support the claim that Defendants agreed to fix the price of Propranolol.**

Unable to allege any direct evidence of a conspiracy, Plaintiffs strain to create a plausible inference of an unlawful agreement based on allegations that the "average prices" for Propranolol rose.  (FWK Compl. ¶¶ 6, 9; CCI Compl. ¶¶ 9, 11.)  "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice" to state a Section 1 claim. *Twombly*, 550 U.S. at 556.  Instead, "allegations of parallel conduct . . . must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557.  Plaintiffs' claims fail in this regard as well.

**1.**     **Plaintiffs' allegations of parallel conduct do not support a plausible inference of conspiracy.**

As a threshold matter, Plaintiffs fail to allege facts even suggesting there was parallel conduct on the part of Defendants.  Plaintiffs' entire claim rests on the assertion that the "average prices" of Propranolol tablets and capsules "began to increase" over nine and twelve month periods respectively.  (FWK Compl. ¶¶ 6, 9; CCI Compl. ¶¶ 9, 11.)  Plaintiffs do not identify which Defendant, if any, raised its prices or when it allegedly did so.  Plaintiffs do not even clarify whether each Defendant raised its prices for Propranolol capsules or tablets during the respective class periods, alleging instead that Defendants' "price increases were, ***for the most***

11

*part*, in lockstep." (FWK Compl. ¶¶ 7, 10; CCI Compl. ¶¶ 10, 12 (emphasis added).) This is not enough to show parallel conduct.

In *Resco Prod., Inc. v. Bosai Minerals Grp. Co.*, 158 F. Supp. 3d 406, 424 (W.D. Pa. 2016), for example, the court found that the plaintiff failed to demonstrate parallel pricing where it asserted that the defendants' prices "doubled during 2003 and 2004 and increased an additional 70 [percent] between 2004 and 2007." *Id.* at 424. The court explained that the plaintiff's assertions of general price movements could not demonstrate parallel increases absent evidence "of the amount or timing of any of the pricing increases it claim[ed] were the product of collusion." *Id.* Plaintiffs' claims here fail similarly as a matter of law because the Complaints describe only a general market-wide ("average") price increase; there are no allegations regarding the amount or timing of any price increase instituted by any Defendant. Moreover, courts routinely reject the use of averages in this manner, chiefly because averages mask variations in the prices charged by individual manufacturers or distributors and fail to suggest anything about the potential liability of individual market participants. *See, e.g., In re Baby Food Antitrust Litig.*, 166 F.3d 112, 129 (3d Cir. 1999); *see also In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 152 (E.D. Pa. 2015) (analyses "based on averages" allow "for large-scale comparisons but do not tell us anything affirmative about the individual purchasers" or their transactions).

### 2. Plaintiffs do not allege sufficient additional circumstantial evidence to support their claim of conspiracy.

Even if Plaintiffs' allegations were sufficient to establish parallel conduct−and they are not−they still do not allege sufficient circumstantial evidence to support a claim that there was an unlawful agreement among Defendants regarding Propranolol. Plaintiffs cannot properly plead a conspiracy by supposing parallel conduct on the part of Defendants. Indeed, even an allegation

that Defendants engaged in "consciously parallel" conduct is not enough.  *See Citigroup, Inc.*, 709 F.3d at 139; *see also In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 366 (S.D.N.Y. 2016) ("Even conscious parallelism in pricing among competitors is not itself unlawful."); *Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.*, 738 F. Supp. 2d 505, 514 (D. Del. 2010). (the fact that "Defendants increased their prices in a parallel fashion . . . do[es] not support an inference of an agreement to fix prices").

Instead, Plaintiffs must allege facts showing sufficient "plus factors" supporting a plausible claim that the alleged average price increases for Propranolol were the result of an unlawful agreement.  But here, the supposed plus factors on which Plaintiffs appear to rely come nowhere close to supporting a plausible claim of conspiracy.

**Price increases purportedly against Defendants' "self-interest."**  Plaintiffs allege that "Defendants' price increases for Propranolol capsules and tablets were against their economic self-interest."  (FWK Compl. ¶ 11; CCI Compl. ¶ 13.)  In particular, Plaintiffs contend that "Propranolol is a commodity product" and "absent a cartel, if any manufacturer increased the price of Propranolol capsules or tablets, it would be expected that its competitors would not increase the price but would seek to sell more Propranolol . . . to the first manufacturer's customers."  (FWK Compl. ¶¶ 116-17; CCI Compl. ¶¶ 13-14.)  This conclusory assertion, which relies entirely on Plaintiffs' say-so, should be dismissed out of hand.  But even assuming Plaintiffs are correct, the case law is clear that such self-serving allegations are also an insufficient basis to plead an unlawful agreement as a matter of law.

Courts routinely recognize that "[a]n action that would seem against self-interest in a competitive market may just as well reflect market interdependence giving rise to conscious parallelism."  *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1195 (9th Cir.

2015).  In particular, and as the Second Circuit has explained, it is "a common reaction of firms in a concentrated market [to] recognize their shared economic interests and their interdependence with respect to price and output decisions" but "[s]uch 'conscious parallelism,' however, is not unlawful in itself."  *Citigroup*, 709 F.3d at 139-40.  Thus, courts hold that mere allegations that defendants' price increases "were against their interest" are insufficient to support an inference of an unlawful agreement because in an "oligopolistic market . . . enlightened economic actors may independently and unilaterally choose to adopt and maintain supra-competitive pricing." *Superior Offshore Int'l*, 738 F. Supp. 2d at 514-15; *see also In re Baby Food,* 166 F.3d at 122 ("[R]efusing to raise or lower prices unless rivals do the same could be against a firm's self-interest but nevertheless could spring from independent behavior.").

*Twombly* demonstrates why Defendants' purported parallel conduct does not create a plausible inference of a conspiracy.  There, the plaintiffs alleged an unlawful agreement among regional telephone carriers to refrain from competing against one another and otherwise allocate customers and markets in order to keep prices higher.  550 U.S. at 551.  The plaintiffs' conspiracy theory rested on the "competitive reticence" of the carriers to poach business away from each other despite "attractive business opportunities" to do so.  *Id.* at 567.  However, the Supreme Court, apt here as well, criticized the plaintiffs for misunderstanding rational economic behavior.  "Firms do not expand without limit and none of them enters every market that an outside observer might regard as profitable, or even a small portion of such markets."  *Id.* at 569 (*quoting* Areeda & Hovenkamp ¶ 307d, at 155 (Supp. 2006)).  Here, Plaintiffs do not provide any facts as to why any Defendant's pricing strategy was against its self-interest.  Plaintiffs' "disappointment" at Defendants' purported reticence to attack each other "does not make conspiracy plausible."  *Id.* at 569.

14

Similarly, an accusation that defendants conspired to fix minimum advertised prices for guitars, as opposed to undercutting each other, was held insufficient by the Ninth Circuit in *In re Musical Instruments*, 798 F.3d at 1195. There, the plaintiffs alleged that the defendants conspired to fix minimum prices at which the manufacturer's guitars could be advertised—a policy the plaintiffs claimed restrained competition. *Id.* In support of their claim that the defendants horizontally agreed to fix prices, the plaintiffs in *In re Musical Instruments*, like Plaintiffs here, alleged that the defendants acted against their interests by agreeing to minimum price restrictions, since it was in their interest to undercut their competitors. *Id.* The court held that such conclusory, self-serving allegations could not support a claim of conspiracy. Noting that the plaintiffs' theory "fail[ed] to account for conscious parallelism and the pressures of an interdependent market," the court explained that "so long as prices can be easily readjusted without persistent negative consequences, one firm can risk being the first to raise prices, confident that if its price is followed, all firms will benefit." *Id.* But this "follow the leader" process, the court held, was not indicative of an unlawful agreement, and the plaintiffs failed to allege facts "connecting the purported price increase to an illegal agreement among competitors." *Id.* at 1195, 1197. "[W]ithout such a connection, there [was] no basis from which [the court could] infer an agreement," and the Ninth Circuit affirmed the dismissal of the plaintiffs' antitrust claims. *Id.* at 1197.

The result should be the same here. Plaintiffs claim (without providing any facts as to Defendants' market shares or the number of manufacturers present to suggest market concentration) that the "Propranolol market is highly concentrated and is dominated by a handful of companies." (FWK Compl. ¶ 107; CCI Compl. ¶ 75.) Yet, in such circumstances, Plaintiffs' allegations of higher prices represent nothing more than rational and lawful interdependence or a

"follow the leader" effect by unnamed market participants.  *See, e.g.*, *In re Musical Instruments*, 798 F.3d at 1195; *In re Baby Food Antitrust Litig.,* 166 F.3d at 122.  Such allegations fall far short of stating a plausible claim that Defendants conspired to fix prices.  *See Twombly*, 550 U.S. at 554 ("The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.").[7]

    **The State AG Action and governmental investigations.**  Plaintiffs come no closer to stating a claim by copying-and-pasting irrelevant allegations from the State AG Action nor by generally referring to governmental investigations against a subset of the Defendants.  ***First***, Plaintiffs improperly attempt to state a claim by alleging that "DOJ is currently conducting a wide-ranging criminal investigation into collusion" among unspecified "generic drug companies," (FWK Compl. ¶ 14) and is "looking closely 'at trade associations as part of their investigation,'" (*id.* ¶ 74).  As a matter of law, such allegations "carr[y] no weight in pleading an antitrust conspiracy claim."  *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (noting that the existence of an investigation was "a non-factor" in pleading antitrust claim); *see also Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) ("[W]e hold that neither a complaint nor references to a complaint which results in a consent judgment may properly be cited in the pleadings under the facts of this case.").  Indeed, it is well-settled that allegations that a defendant is under investigation are inappropriate and

---

[7]    Indeed, the facial plausibility of Plaintiffs' contention that "average" price increases must have resulted from conspiracy is further undermined by their failure to account for ingredient scarcity as an "obvious alternative explanation" for the price changes alleged.  *See Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567).  Contrary to Plaintiffs' account, market participants knew by mid-2015 that there was a Propranolol shortage, and that a "raw materials issue" was a reported cause of that shortage.  *See supra* note 4.

must be disregarded, if not stricken entirely.  *See, e.g., Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 118 n.14 (2d Cir. 2005) (holding congressional investigation was "irrelevant at the pleading stage" because "[a]n allegation that someone has made a similar allegation does not, without more, add anything to the complaint's allegations of fact"), *rev'd on other grounds*, 550 U.S. 544 (2007); *see also Footbridge Ltd. v. Countrywide Home Loans, Inc.*, No. 09-4050, 2010 WL 3790810, at *5 (S.D.N.Y. Sept. 28, 2010) ("strik[ing] . . . allegations . . . based on pleadings, settlements, and government investigations").  That is because "the mere occurrence of [an] investigation is equally consistent with Defendants' innocence."  *Superior Offshore Int'l*, 738 F. Supp. 2d at 517.

These considerations are particularly appropriate here.  While Plaintiffs allege that the DOJ has investigated the marketing and pricing practices of generic drugs since November 3, 2014, no allegations of unlawful practices regarding price-fixing have ever been proven against any Defendant with respect to Propranolol.  Plaintiffs cannot create such an inference merely by pointing to an investigation.  Absent an adjudication of wrongdoing, Plaintiffs' allegations regarding governmental investigations must be disregarded as a matter of law.  *Footbridge Ltd.*, 2010 WL 3790810, at *5; *see also Lipsky*, 551 F.2d at 893-94 (unadjudicated assertions copied from other proceedings properly stricken as immaterial under Rule 12(f)).

***Second***, even if it were otherwise permissible to consider the allegations Plaintiffs copy from other proceedings, including the State AG Action, those allegations would still be of no help to Plaintiffs because they are plainly irrelevant.  Plaintiffs do not (and cannot) point to a single allegation in the State AG Action that Defendants unlawfully agreed to fix the price for Propranolol.  The State AG Action consists entirely of allegations related to Doxycycline Hyclate Delayed Release and Glyburide, neither of which is a subject of this action.  Plaintiffs

17

allege no required "linkage" between those allegations and any of their claims in this case.  *See In re Elevator*, 502 F.3d at 52 ("Allegations of anticompetitive wrongdoing in Europe—absent any evidence of linkage between such foreign conduct and conduct here—is merely to suggest . . . that 'if it happened there, it could have happened here.'"); *In re London Silver Fixing, Ltd., Antitrust Litig.*, No. 14 md 2573, 2016 WL 5794777, at *16 (S.D.N.Y. Oct. 3, 2016) ("[The] mere fact that regulatory entities are investigating the possibility of similar misconduct . . . is not a 'plus factor'").  And, indeed, Plaintiffs have argued precisely the opposite:  They have opposed consolidation of these cases with the Doxycycline and Digoxin Multi-District Litigation, which is currently pending in the Eastern District of Pennsylvania because, according to Plaintiffs, this action does not "concern Digoxin and Doxycycline . . . [and] because each action involves different generic drugs, different alleged conspiracies, different class periods, and names certain defendants that are not named in the Digoxin and Doxycycline actions."  (*See* Case No. 1:16-cv-09901-JSR, Doc. 7.)[8]  Thus, even by Plaintiffs' own account, the allegations in the State AG Action pertain to a "different alleged conspiracy" and have no bearing here.

**Defendants' purported opportunity to conspire.**  Finally, Plaintiffs try to prop up their conspiracy claim by alleging that Defendants had the opportunity to conspire due to their interactions at trade functions.  Specifically, Plaintiffs allege that Defendants interact at "various conferences and trade shows" as well as "golf outings, lunches, cocktail parties, dinners, and other scheduled activities."  (FWK Compl. ¶¶ 74-81; CCI Compl. ¶¶ 64-73.)  But such allegations, which simply reflect the routine practice of multiple, diverse industries, are also insufficient to state a plausible claim of conspiracy.  Courts universally recognize that "membership and participation in a trade association alone does not give rise to a plausible

---

[8]   *See In re Generic Digoxin and Doxycycline Antitrust Litig.*, MDL No. 2724 (E.D. Pa.).

inference of illegal agreement." *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 148 (E.D.N.Y. 2010); *see also Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993) (a "mere opportunity to conspire" at legitimate meetings will not support an inference that "an illegal combination actually occurred"); *In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2014 WL 4277510, at *33 (S.D.N.Y. Aug. 29, 2014) (allegation that defendants met and communicated at meetings was "no more than suggestive of potential opportunity to communicate"); *In re Elevator Antitrust Litig.*, No. 04 CV 1178 (TPG), 2006 WL 1470994, at *11 (S.D.N.Y. May 30, 2006) ("[T]he allegation that elevator company executives attend trade, industry, or social functions together is clearly insufficient to state a claim."), *aff'd*, 502 F.3d 47 (2d Cir. 2007).

### C. Plaintiffs have failed to plead a plausible conspiracy with respect to the individual Defendants.

The fundamental failure of Plaintiffs' Sherman Act claims is also highlighted by the defective (or non-existent) allegations raised against the individual Defendants. For example:

**Teva, Actavis, and Pliva.** The Complaint does not plead that defendants Teva, Actavis, and Pliva received any subpoenas seeking information about Propranolol. If Plaintiffs believe they can satisfy the *Twombly* pleading standard by referencing actions on the part of regulatory authorities (which they cannot), then the fact that the regulators have not allegedly taken any action against, or even requested documents from, Teva, Actavis, or Pliva regarding Propranolol decisively undercuts Plaintiffs' case. Likewise, the bare-bones allegations asserted by FWK regarding the supposed formation of agreements concerning Propranolol "upon information and belief", and entered into by unnamed executives and employees from Teva, should also carry no weight. (FWK Compl. ¶¶ 24-27.) These formulaic and conclusory allegations, copied verbatim from the State AG Action (which does not even concern Propranolol), are not evidence of any

agreement regarding Propranolol and do not permit the inference of such an agreement.  (FWK Compl. ¶¶ 24, 26, 27.)  The same is true for Plaintiffs' conclusory allegations concerning an unnamed Teva executive discussing "price increase strategies" at an industry event, as the Complaint does not specify which products were discussed and does not establish the formation of an agreement.  (FWK Compl. ¶ 29.)

**Mylan.**   Plaintiffs allege that average prices of Propranolol capsules (60mg, 80mg, 120mg and 160mg) increased from December 2013 through October 2014.  (FWK Compl. ¶ 6; CCI Compl. ¶ 9.)  But there are no allegations whatsoever about Mylan's pricing—none of the prerequisite "who, what, how much and when" facts.  *Hinds Cnty., Miss. v. Wachovia Bank*, 620 F. Supp. 2d 499, 513 (S.D.N.Y. 2009).  Although the lack of allegations is dispositive, Plaintiffs' failure to allege any specific facts concerning Mylan was not mere oversight because from September 2013 (three months *before* the start of the allegedly anticompetitive price increases) to the present, Mylan has discontinued selling Propranolol capsules (60mg, 80mg, 120mg and 160mg).[9]  On Propranolol tablets, Plaintiffs reference increases in the average price in 2015-2016.  (FWK Compl. ¶ 9; CCI Compl. ¶ 11.)  However, Plaintiffs say nothing about Mylan's *own* pricing of Propranolol tablets, including whether Mylan may have been simply following the lead of others.  *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 61-62 (2d Cir. 2012).  Plaintiffs further allege that "Mylan disclosed in a filing with the SEC . . . that the DOJ is seeking additional information relating to the marketing, pricing, and sale of several generic drugs, including Propranolol."  (FWK Compl. ¶ 105.)  The existence of a DOJ investigation "carries no weight."  *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d at 1024.

---

[9]   Mylan will provide the documents regarding the discontinuance to Plaintiffs upon entry of a protective order.

**Par.**  Plaintiffs do not allege that Par sold capsules, and so their theory must be that Par—which sold only tablets through Qualitest starting in February, 2015 (*see* FWK Compl. ¶¶ 9, 45, 118; CCI Compl. ¶¶ 3, 4, 30)—joined the alleged conspiracy in 2015.  But the Complaints are devoid of any facts to support such a theory.  For example, Plaintiffs do not allege when Par joined, nor the meetings or communications (or individuals) through which it did so.  Rather, the only facts Plaintiffs can muster as to Par are that (i) in October 2014, Endo (which acquired Qualitest and later Par) was one of several generic drug manufacturers that received a letter from Senator Sanders and Congressman Cummings, which was the precursor to a grand jury investigation opened by the Department of Justice in November 2014 into the "marketing and pricing of generic drugs" in general (*see* FWK Compl. ¶¶ 97, 99; CCI Compl. ¶¶ 97, 100); (ii) in May 2015, Endo's CEO stated on an earnings call that the company expected double-digit growth for its domestic generics business as a whole, "as a result of consistent volume growth supplemented by recent pricing opportunities" (*see* FWK Compl. ¶ 95; CCI Compl. ¶ 95); and (iii) in December 2015, the Connecticut AG's office requested from Endo information "regarding pricing of certain of its generic products."  (FWK Compl. ¶¶ 30, 101; CCI Compl. ¶ 103.)  These allegations cannot plausibly state a conspiracy claim as to Par because they all suffer from the same fatal flaw:  they relate to generic drugs in general and not to Propranolol specifically.  And the 2014 letter (which pre-dated Par's Propranolol sales) and 2015 subpoena at best shows that Par was investigated, which as discussed above, would be insufficient to state a claim even if the investigations were alleged to have involved Propranolol (and they are not).[10]

---

[10] SEC filings, which this Court can consider on a motion to dismiss, *see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (holding that on a motion to dismiss courts may take judicial notice of "legally required public disclosure documents filed with the SEC"), demonstrate that neither the grand jury nor the Connecticut AG investigations related to Propranolol.  *See* Declaration of Edward D. Hassi Ex. A (Endo International plc

**Heritage.**  For its part, Heritage allegedly participated only in the purported Propranolol tablets conspiracy, not the purported Propranolol capsules conspiracy.  But the Complaints do not describe any particular Heritage sales of Propranolol tablets, thereby failing to show that Heritage sold tablets when those sales—because of their timing and volume—could have affected the prices at which the named Plaintiffs allegedly purchased the drug.  The Complaints also do not allege that Heritage made such sales throughout the alleged class period for Propranolol tablets.  (FWK Compl. ¶ 4; CCI Compl. ¶ 3).  To the contrary, Heritage did not sell tablets for a substantial portion of that period, and it disclosed to market participants as early as July 2015 that its shortage of tablets resulted from a constricted supply of "raw materials," *see supra* note 4.  Nor do Plaintiffs' allegations copied from those by the DOJ in Pennsylvania and the state attorneys general in Connecticut depict actual acts by Heritage concerning Propranolol (let alone acts causing injury to Plaintiffs).  (FWK Compl. ¶¶ 15, 16, 20-24, 27-28; CCI Compl. ¶¶ 17, 18, 110, 111.)  Instead, those allegations describe the conduct of former executives concerning different drugs without showing that the markets for those drugs are connected to the market for Propranolol, which they are not.

**Breckenridge.**  Breckenridge is mentioned in a mere three paragraphs in each Complaint. The *only* substantive allegation about Breckenridge is that it sold Propranolol capsules, nothing more.  Neither Complaint alleges that Breckenridge, for Propranolol or any of its other drug products, is a party to any governmental investigation or litigation, or that it has received any formal or informal inquiries from any regulator regarding alleged excessive pricing.  This is for

---

Form 10-Q (Nov. 8, 2016)) at 32 (December 2014 grand jury subpoena requested information relating to "authorized generic version of Lanoxin (digoxin) oral tablets and . . . generic doxycycline products"), 34 (Connecticut discovery requests for "information regarding pricing of certain . . . generic products, including [five drugs but not Propranolol]").

good reason, because Breckenridge has not.  Despite that Plaintiffs know their own Propranolol capsule purchase history and pricing with Breckenridge, the Complaints do not contain any allegations as to Breckenridge concerning (1) whether it sold Propranolol capsules to Plaintiffs during the alleged class period; (2) any prices at which it sold Propranolol capsules; (3) whether its prices for Propranolol capsules increased, decreased or stayed the same during the alleged class period; (4) when any price changes for Propranolol capsules occurred; or (5) what the pertinent market conditions were at the time of any change in pricing of Propranolol capsules. Plaintiffs' meager allegations as to Breckenridge fall far short of the *Twombly* pleading standard.

**Upsher-Smith.**  Finally, the only actual fact that Plaintiffs allege regarding Upsher-Smith is that it "sold Propranolol capsules."  (FWK Compl. ¶ 6; CCI Compl. ¶ 4.)  Upsher-Smith is not even a party to the State AG Action upon which Plaintiffs so heavily rely.  Plaintiffs' lone allegation is plainly insufficient.

## II.    PLAINTIFFS DO NOT HAVE STANDING TO PURSUE THEIR CLAIMS

Plaintiffs' claims also fail for the independent reason that Plaintiffs do not have Article III or statutory standing to assert class claims against Defendants for any alleged conspiracy regarding Propranolol tablets or capsules.  To have standing to pursue an antitrust claim, "a plaintiff must show (1) an injury-in-fact; (2) that has been caused by the violation; and (3) that is the type of injury contemplated by the statute." *Arista Records LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556, 568 (S.D.N.Y. 2007) (quoting *Blue Tree Hotels Inv., Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 220 (2d Cir. 2004)).  Even if Plaintiffs sufficiently pleaded the existence of an unlawful agreement (and they have not), Plaintiffs still have not sufficiently alleged that they suffered an injury-in-fact as a result of Defendants' purported

conduct with respect to the classes they purport to represent.[11]   While Plaintiffs vaguely allege

that the "average prices" of Propranolol increased during the Class Periods, (FWK Compl. ¶¶ 6,

9; CCI Compl. ¶¶ 9, 11), Plaintiffs do not bother to specify from whom they purchased

Propranolol, at what prices, and whether the prices they paid were among those that were

increased during the Class Periods.   Instead, Plaintiffs allege ambiguously that they purchased

"Propranolol during the Class Periods directly from one or more of Defendants at artificially

inflated prices."   (FWK Compl. ¶ 36; CCI Compl. ¶ 27.)   Worse still, Plaintiffs cannot even

allege whether they purchased Propranolol tablets or capsules.   Their allegations are not enough.

Absent an injury-in-fact, Plaintiffs can neither establish the Court's subject matter jurisdiction

under Article III nor state a claim for relief under the antitrust laws.   *See Arista Records*, 532 F.

Supp. 2d at 569 (dismissing claim where "Lime Wire's retail competitors may have 'faced

excessive wholesale prices' for licenses as a result of the alleged price-fixing scheme, but Lime

Wire itself has not alleged any facts demonstrating that it suffered such harm").

   This defect is especially true of Plaintiffs' claims for injunctive relief.   The United States

Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to

constitute injury in fact, and that allegations of *possible* future injury are not sufficient" to show

entitlement to injunctive relief.   *Clapper v. Amnesty Int'l, USA*, 133 S. Ct. 1138, 1147 (2013)

(quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (emphasis added by *Clapper*).

Moreover, even if Plaintiffs' allegations were sufficient to overcome the Article III problem, "in

---

[11]   Of course, Plaintiffs cannot rely on allegations as to the purported unnamed class members to
establish the minimum requirements for Article III standing.   "That a suit may be a class
action adds nothing to the question of standing, for even named plaintiffs who represent a
class 'must allege and show that they personally have been injured, not that injury has been
suffered by other, unidentified members of the class to which they belong.'"   *Spokeo, Inc. v.
Robins*, 136 S.Ct. 1540, 1547 n.6 (2016) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426
U.S. 26, 40 n.20 (1976)).

order to seek injunctive relief" an antitrust plaintiff "must allege threatened loss or damage." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 113 (1986); 15 U.S.C. § 26.  "[L]ingering monetary injury, without any ongoing threat of recurrent violations [to the plaintiffs], is not sufficient to confer standing to seek an injunction."  *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 209 (S.D.N.Y. 2012) (dismissing plaintiffs' claim for injunctive relief under Clayton Act because they failed to "demonstrate a significant threat of injury from an impending violation . . . or from a contemporary violation likely to continue or recur").  Plaintiffs here announce simply that "Defendants' anticompetitive conduct is ongoing," (FWK Compl. ¶ 130; CCI Compl. ¶ 115), but do not allege facts showing there is any threat of future harm or currently "ongoing" harm to which Plaintiffs are exposed.  In fact, at least with respect to FWK, such allegations are impossible as a matter of common sense.  FWK is an assignee of Kerr, which is currently in wind-down proceedings in Chapter 11 bankruptcy that began before FWK filed its Complaint.  *See In re Frank W. Kerr Co.*, Case No. 16-51724, Doc. 43 ¶ 13 (Bankr. E.D. Mich 2016).  Kerr is obviously not buying Propranolol while it is winding down, and the only claims it assigned to FWK arose before FWK brought this lawsuit.  Thus, to suggest that there is any threat of "ongoing" harm to FWK or Kerr defies reality.  Absent an allegation that there is an "ongoing threat of recurrent violations" against Plaintiffs, their injunctive claim cannot stand.  *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d at 209.

## CONCLUSION

For the reasons set forth herein, Defendants respectfully request that the Court grant this motion and dismiss Plaintiffs' Complaints with prejudice.

DATED: New York, New York
          January 27, 2017

KIRKLAND & ELLIS LLP

By: */s/ Jay P. Lefkowitz, P.C.*
Jay P. Lefkowitz., P.C.
Devora W. Allon
Nathan E. Taylor
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone: (212) 446-4800
Facsimile: (212) 446-6460
lefkowitz@kirkland.com
devora.allon@kirkland.com
nate.taylor@kirkland.com

*Attorneys for Defendant Upsher-Smith*
*Laboratories, Inc.*

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: */s/ Chul Pak*
Chul Pak
Jeffrey C. Bank
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone:  (212) 999-5800
Facsimile:  (212) 999-5899
cpak@wsgr.com
jbank@wsgr.com

*Attorneys for Defendants Mylan Inc., Mylan*
*Pharmaceuticals, Inc. and UDL Laboratories,*
*Inc.*

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
By: */s/  Marc E. Kasowitz*
Marc E. Kasowitz
Hector Torres
Sheron Korpus
Seth Davis
1633 Broadway
New York, New York 10019
Tel.: (212) 506-1700
Fax: (212) 506-1800
mkasowitz@kasowitz.com
htorres@kasowitz.com
skorpus@kasowitz.com
sdavis@kasowitz.com

*Attorneys for Actavis Elizabeth, LLC, Pliva,*
*Inc. and Teva Pharmaceuticals USA, Inc.*

GIBSON, DUNN & CRUTCHER LLP

By: */s/ D. Jarrett Arp*
D. Jarrett Arp[12]
Melanie L. Katsur[13]
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8500
Facsimile: (202) 530-9527
jarp@gibsondunn.com
mkatsur@gibsondunn.com

Indraneel Sur
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Facsimile: (212) 716-0875
isur@gibsondunn.com

*Attorneys for Defendant Heritage*
*Pharmaceuticals Inc.*

MORGAN, LEWIS & BOCKIUS LLP

By: */s/ Stacey Anne Maloney*
Stacey Anne Mahoney
101 Park Avenue
New York, New York 10178
Telephone: (212) 309-6000
Facsimile: (212) 309-6001
stacey.mahoney@morganlewis.com

R. Brendan Fee[14]
1701 Market Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 963-5000
Facsimile: (215) 963-5001
brendan.fee@morganlewis.com

*Attorneys for Defendant Breckenridge*
*Pharmaceutical, Inc.*

O'MELVENY & MYERS LLP
By: */s/ Edward D. Hassi*
Edward D. Hassi
1625 Eye St., N.W.
Washington, D.C. 20006
Telephone: (202) 383-5336
Facsimile: (202) 383-5414
ehassi@omm.com

Edward Moss
7 Times Square
New York, New York 10036
Telephone: (212) 728-5671
Facsimile: (212) 326-2061
emoss@omm.com

*Attorneys for Defendant Par Pharmaceutical,*
*Inc.*

---

[12]   *Pro hac vice* motion granted in No. 16 Civ. 9901 (Doc. 27); forthcoming in No. 17 Civ. 78.

[13]   *Pro hac vice* motion granted in No. 16 Civ. 9901 (Doc. 28); forthcoming in No. 17 Civ. 78.

[14]   *Pro hac vice* motion forthcoming.