## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FWK Holdings, L.L.C., on behalf of itself and all others similarly situated,<br><br>               Plaintiff,<br><br>      v.<br><br>ACTAVIS ELIZABETH, LLC, TEVA PHARMACEUTICALS USA, INC., PLIVA, INC., MYLAN INC., MYLAN PHARMACEUTICALS INC., UDL LABORATORIES, INC., ENDO INTERNATIONAL PLC; PAR PHARMACEUTICALS HOLDINGS, INC., HERITAGE PHARMACEUTICALS INC., BRECKENRIDGE PHARMACEUTICALS, INC., and UPSHER-SMITH LABORATORIES, INC.,<br><br>               Defendants. | Civil Action No. 1:16-cv-09901-JSR<br><br>Hon. Jed. S. Rakoff |
| CÉSAR CASTILLO, INC., individually and on behalf of all those similarly situated,<br><br>               Plaintiff,<br><br>      v.<br><br>ACTAVIS ELIZABETH, LLC, BRECKENRIDGE PHARMACEUTICALS, INC., ENDO INTERNATIONAL PLC, HERITAGE PHARMACEUTICALS INC., MYLAN INC., MYLAN PHARMACEUTICALS INC., PAR PHARMACEUTICALS HOLDINGS, INC., PLIVA, INC., TEVA PHARMACEUTICALS USA, INC., UDL LABORATORIES, INC., and UPSHER-SMITH LABORATORIES, INC.,<br><br>               Defendants. | Civil Action No. 1:17-cv-00078-JSR<br><br>Hon. Jed. S. Rakoff |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS UNDER RULE 12(b)(6)

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................1

II.  STATEMENT OF FACTS ......................................................................................2

III. ARGUMENT ..........................................................................................................5

    A.  APPLICABLE LEGAL STANDARDS ..........................................................5

        1.  Rule 12(b)(6) ...........................................................................................5

        2.  Sherman Act § 1 ......................................................................................6

    B.  PLAINTIFFS HAVE PLED A PLAUSIBLE PRICE-FIXING CONSPIRACY .........8

        1.  Defendants' Acted in Parallel to Impose Extraordinary and Unprecedented
           Price Increases ........................................................................................8

        2.  Defendants' Parallel Price Increases Arose in a Context Suggestive of
           Conspiracy ............................................................................................10

             a)  Motive to Enter Into a Price-Fixing Conspiracy..............................11

             b)  Actions Contrary to the Economic Self-Interest of the Co-Conspirators ........12

             c)  Interfirm Communications................................................................13

             d)  State and Federal Investigations .......................................................14

    C.  PLAINTIFFS HAVE SUFFICIENT ALLEGATIONS AGAINST EACH
        DEFENDANT..................................................................................................15

        1.  Teva and Pliva........................................................................................16

        2.  Actavis ...................................................................................................17

        3.  Mylan .....................................................................................................17

        4.  Par ..........................................................................................................18

        5.  Heritage..................................................................................................19

        6.  Breckenridge ..........................................................................................21

        7.  Upsher-Smith .........................................................................................21

    D.  PLAINTIFFS HAVE STANDING TO PURSUE THEIR ANTITRUST CLAIMS ...21

      E.  PLAINTIFFS REQUEST LEAVE TO AMEND ........................................................24

IV.     CONCLUSION....................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
  175 F. Supp. 3d 44 (S.D.N.Y. 2016)..............................................................15, 17

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  123 F. Supp. 3d 478 (S.D.N.Y. 2015)..................................................................11

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012).................................................................6, 7, 9, 10

*Arista Records LLC v. Lime Grp. LLC*,
  532 F. Supp. 2d 556 (S.D.N.Y. 2007).................................................................22

*Arista Records, LLC v. Doe 3*,
  604 F.3d 110 (2d Cir. 2010)...................................................................................5

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..........................................................................6, 7, 8, 10

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
  985 F. Supp. 2d 612 (S.D.N.Y. 2013)....................................................................6

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
  996 F.2d 537 (2d Cir. 1993).................................................................................13

*Concord Assocs., L.P. v. Entm't Properties Trust*,
  817 F.3d 46 (2d Cir. 2016).....................................................................................5

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962).............................................................................................11

*Foman v. Davis*,
  371 U.S. 178 (1962).............................................................................................24

*Frontline Processing Corp. v. Merrick Bank Corp.*,
  No. 13 Civ. 3956, 2014 WL 837050 (S.D.N.Y. Mar. 3, 2014) ..............................24

*Gelboim v. Bank of Am. Corp.*,
  823 F.3d 759 (2d Cir. 2016).........................................................................6, 10

*Goldemberg v. Johnson & Johnson Consumer Cos.*,
  8 F. Supp. 3d 467 (S.D.N.Y. 2014)......................................................................24

*H.L. Hayden Co. of New York v. Siemens Med. Sys., Inc.*,
  879 F.2d 1005 (2d Cir. 1989)...............................................................................11

*Hinds Cty., Miss. v. Wachovia Bank N.A.*,
    790 F. Supp. 2d 106 (S.D.N.Y. 2011)............................................................................. 14

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    No. 06-MD-1775 (JG)(VVP), 2008 WL 5958061 (E.D.N.Y. Sept. 26, 2008)........................ 25

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
    No. 06-MD-1775(JG)(VVP), 2009 WL 3443405 (E.D.N.Y. Aug. 21, 2009),
    *aff'd*, 697 F.3d 154 (2d Cir. 2012) ................................................................................. 5

*In re Auto. Parts Antitrust Litig.*,
    50 F. Supp. 3d 869 (E.D. Mich. Sept. 25, 2014)................................................................. 15

*In re Baby Food Antitrust Litig.*,
    166 F.3d 112 (3d Cir. 1999)........................................................................................... 10

*In re Blood Reagents Antitrust Litig.*,
    756 F. Supp. 2d 623 (E.D. Pa. 2010) .................................................................... *passim*

*In re Chocolate Confectionary Antitrust Litig.*,
    602 F. Supp. 2d 538 (M.D. Pa. 2009) .............................................................................. 11

*In re Domestic Airline Travel Antitrust Litig.*,
    No. MC 15-1404 (CKK), 2016 WL 6426366 (D.D.C. Oct. 28, 2016)................................ 9, 20

*In re Domestic Drywall Antitrust Litig.*,
    163 F. Supp. 3d 175 (E.D. Pa. 2016) ............................................................................... 13

*In re Ductile Iron Pipe Fittings ("DIPF") Direct Purchaser Antitrust Litig.*,
    No. CIV. 12-711, 2014 WL 3971620 (D.N.J. Aug. 13, 2014) .................................... 11, 12, 13

*In re Flat Glass Antitrust Litig. (II)*,
    No. CIV.A. 08-MC-180, 2009 WL 331361 (W.D. Pa. Feb. 11, 2009) .................................. 13

*In re Flat Glass Antitrust Litig.*,
    385 F.3d 350 (3d Cir. 2004)............................................................................................ 12

*In re High Fructose Corn Syrup Antitrust Litig.*,
    261 F. Supp. 2d 1017 (C.D. Ill. 2003) ............................................................................. 15

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002) ..................................................................................... 11, 15

*In re Linerboard Antitrust Litig.*,
    504 F. Supp. 2d 38 (E.D. Pa. 2007) ................................................................................ 13

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ....................................................................................... 12

*In re Nasdaq Mkt.-Makers Antitrust Litig.*,
   894 F. Supp. 703 (S.D.N.Y. 1995) .......................................................................... 16

*In re OSB Antitrust Litig.*,
   No. 06–MDL–826, 2007 WL 2253419 (E.D. Pa. Aug. 3, 2007) ............................... 16

*In re OSG Sec. Litig.*,
   12 F. Supp. 3d 619 (S.D.N.Y. 2014) ...................................................................... 14

*In re Packaged Ice Antitrust Litig.*,
   723 F. Supp. 2d 987 (E.D. Mich. 2010) ................................................................. 14

*In re Packaged Seafood Prod. Antitrust Litig.*,
   No. 15-MD-2670 JLS (MDD), 2017 WL 35571 (S.D. Cal. Jan. 3, 2017) ............... 13

*In re Processed Egg Prod. Antitrust Litig.*,
   312 F.R.D. 124 (E.D. Pa. 2015) ............................................................................ 10

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
   580 F. Supp. 2d 896 (N.D. Cal. 2008) ................................................................... 16

*In re Text Messaging Antitrust Litig.*,
   630 F.3d 622 (7th Cir. 2010) ................................................................................... 7

*Jung v. Ass'n of American Medical Colleges*,
   300 F.Supp.2d 119 (D.D.C. 2004) ......................................................................... 16

*Kramer v. Time Warner Inc.*,
   937 F.2d 767 (2d Cir. 1991) ................................................................................... 21

*LaFlamme v. Societe Air France*,
   702 F. Supp. 2d 136 (E.D.N.Y. 2010) ................................................................... 13

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ............................................................................................... 22

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013) ................................................................................. 2, 7

*Medcalf v. Thompson Hine LLP*,
   84 F. Supp. 3d 313 (S.D.N.Y. 2015) ....................................................................... 5

*Meyer v. Kalanick*,
   174 F. Supp. 3d 817 (S.D.N.Y. 2016) .................................................................. 6, 7

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
   No. 08-CV-42 JG VVP, 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011),
   *report and recommendation adopted*, 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012) ............. 16

*Quinn v. Walgreen Co.*,
   958 F. Supp. 2d 533 (S.D.N.Y. 2013)......................................................................... 23

*Resco Prod., Inc. v. Bosai Minerals Grp. Co.*,
   158 F. Supp. 3d 406 (W.D. Pa. 2016) ......................................................................... 9

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
   801 F.3d 412 (4th Cir. 2015) ..................................................................................... 9

*Starr v. Sony BMG Music Entm't*,
   592 F.3d 314 (2d Cir. 2010)............................................................................. *passim*

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001)..................................................................................... 11

*Town of Babylon v. Fed. Hous. Fin. Agency*,
   699 F.3d 221 (2d Cir.2012)........................................................................................ 5

*U.S. v. Alcoa, Inc.*,
   No. CIV. A. 2000–954, 2001 WL 1335698 (D.D.C. June 21, 2001) ....................... 11

*United States v. Apple, Inc.*,
   791 F.3d 290 (2d Cir. 2015),
   *cert. denied*, 136 S. Ct. 1376 (2016) ......................................................................... 7

*United States v. Krasn*,
   614 F.2d 1229 (9th Cir. 1980) ................................................................................. 20

*United States v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940)................................................................................................... 9

*Van Buskirk v. N.Y. Times Co.*,
   325 F.3d 87 (2d Cir. 2003)....................................................................................... 25

*Wacker v. JP Morgan Chase & Co*,
   16-2482-cv (L), 2017 WL 442366 (2d Cir. Feb. 1, 2017) ........................................ 5

## I.    INTRODUCTION

The defendants ignore the plaintiffs' substantial pleading of facts alleging the defendants' unlawful scheme to fix, maintain, and stabilize the prices of generic propranolol tablets and capsules.

*First*, in October 2013, the average prices at which defendants sold generic propranolol capsules increased in lockstep from 164% to 181%. FWK ¶¶ 5-7; CCI ¶¶ 8-10.[1] Similarly, in February 2015, the average prices at which defendants sold generic propranolol tablets increased in lockstep from 818% to 1033%. FWK ¶¶ 9-10; CCI ¶ 12.

*Second*, in the cases of both generic capsules and tablets, these dramatic price increases closely followed meetings of the Generic Pharmaceutical Association ("GPhA") attended by employees of all defendants, at which defendants had opportunities to conspire. FWK ¶¶ 5-9; CCI ¶¶ 8-11.

*Third*, when these price increases were imposed, there was no significant increase in the costs of making propranolol, there was no significant decrease in supply, and there was no significant increase in demand. Contrary to the defendants' claim, there were no shortages prior to the increases. FWK ¶¶ 89-90; CCI ¶¶ 90-91.

*Fourth*, the industry in which the defendants manufacture and sell is conducive to collusion: it is highly concentrated with high barriers to entry, and concerns a product that is a commodity product for which demand is inelastic and there are no reasonable substitutes. FWK ¶¶ 67-71, 73, 107-114; CCI ¶¶ 54-58, 75-80.

---

[1] "FWK or "CCI" followed by paragraph reference numbers refer to the direct purchaser class action complaints filed in *FWK Holdings, L.L.C. v. Actavis Elizabeth, LLC*, Civ. A. No. 1:16-cv-09901-JSR (S.D.N.Y.) and *César Castillo v. Actavis Elizabeth, LLC*, Civ. A. No. 1:17-cv-00078-JSR (S.D.N.Y.), respectively.

*Fifth*, the industry is also the subject of civil and criminal investigations by the United States Department of Justice, 20 state attorneys general, and Congress. The DOJ investigation has already yielded criminal charges and pleas against two pharmaceutical executives from defendant Heritage. FWK ¶ 99; CCI ¶ 100.

To plead a plausible price-fixing conspiracy, plaintiffs are "not required to mention a specific time, place or person involved in each conspiracy allegation." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010). "[E]ven in the absence of direct 'smoking gun' evidence, a horizontal agreement . . . may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors." *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (internal citations omitted).

Plaintiffs have pled more than sufficient facts to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement to fix the price of propranolol. Defendants' motion should be denied.

## II.    STATEMENT OF FACTS

Propranolol is the generic version of Inderal, a beta-blocker that was approved by the F.D.A. in its branded form in 1967. FWK ¶¶ 2-3; CCI ¶ 2. Propranolol is the highest-selling beta-blocker by number of prescriptions. FWK ¶ 3; CCI ¶ 2.

Defendants Actavis Elizabeth, LLC ("Actavis"), Breckenridge Pharmaceuticals, Inc. ("Breckenridge"), and Upsher-Smith Laboratories, Inc. ("Upsher-Smith") sold propranolol capsules between December 18, 2013, to the present. FWK ¶ 6 CCI ¶ 4.[2] Prior to October 2013,

---

[2] While plaintiffs had a good-faith basis for asserting its capsule conspiracy claim against Mylan (as reliable industry data shows continuing sales of the product by Mylan), plaintiffs will not

the price of propranolol capsules was stable. FWK ¶ 6 CCI ¶ 8. Within a few weeks after an October 2013 meeting of the GPhA in Bethesda, Maryland, which was attended by all defendants, the average prices for propranolol capsules began to increase by large amounts: 60 mg capsules increased by 164%; 80 mg capsules increased by 174%; 120 mg capsules increased by 181%; and 160 mg capsules increased by 174%. FWK ¶¶ 5-6; CCI ¶¶ 8-9. "Defendants' price increases were, for the most part, in lock step." FWK ¶ 7; CCI ¶ 10. Defendants offer no explanation for these extraordinary price increases.

There was no significant increase in the costs of making propranolol capsules, there was no significant decrease in supply, and there was no significant increase in demand. FWK ¶12; CCI ¶ 14. Because propranolol is a commodity, such significant price increases would not have been in each defendant's unilateral self-interest absent a cartel. FWK ¶¶ 11, 89-90; CCI ¶¶ 13-14; 90. Federal law requires drug manufacturers to report potential drug shortages to the FDA, and no supply disruption was reported during the Class Period." FWK ¶ 90; CCI ¶ 91.

For propranolol tablets, the price increases were more egregious. Prior to February 2015, the price of tablets was stable. FWK ¶¶ 4, 9; CCI ¶¶ 3-4, 12. Following a GPhA meeting held in Miami Beach in February 2015 that was attended by Mylan, Actavis, Teva,[3] Par,[4] and Heritage Pharmaceuticals Inc. ("Heritage"), the price of tablets began to increase by extraordinary amounts, for the most part, in lock step. FWK ¶¶ 9-10; CCI ¶ 12. For 10 mg tablets, prices increased by 818%; for 20 mg tablets, prices increased by 892%; for 40 mg tablets, prices increased by 1008%;

---

pursue the capsule claim against Mylan. "Mylan" is Mylan Inc., Mylan Pharmaceuticals Inc., and UDL Laboratories, Inc.

[3] "Teva" is Teva Pharmaceuticals USA, Inc. and Pliva, Inc.

[4] As per the parties' stipulation, entered by the Court on (ECF No. 74), Par Pharmaceutical, Inc., including all Qualitest Pharmaceuticals, Inc. holdings, (collectively, "Par") has been substituted for named defendants Endo International PLC and Par Pharmaceuticals Holdings, Inc.

for 60 mg tablets, the increase was 104%; and for 80 mg tablets, the increase was 1033%. As with capsules, these price increases were against defendants' economic self-interest. FWK ¶¶ 11-12, 116-117; CCI ¶¶ 13-14. Again, there was no significant increase in the costs of making tablets, no decrease in supply, or increase in demand. FWK ¶ 12; CCI ¶ 14.

Economic factors made the propranolol market susceptible to collusion, including industry concentration (FWK ¶ 107; CCI ¶ 75); barriers to entry (FWK ¶ 108; CCI ¶ 76); lack of substitutes (FWK ¶ 110; CCI ¶ 79); demand inelasticity (FWK ¶¶ 111-113; CCI ¶¶ 77-79); interchangeability (FWK ¶ 114; CCI ¶ 80); and numerous opportunities to conspire at industry events, including the October 2013 and February 2015 GPhA meetings. FWK ¶¶ 74-81; CCI ¶¶ 64-73.

The DOJ is investigating the generic drug industry. FWK ¶¶ 13-15; CCI ¶¶ 16-17; 100. Teva, Activis, and Mylan have received grand jury subpoenas. FWK ¶¶ 31-32; CCI ¶ 102. Mylan disclosed that its subpoena sought information relating to the "marketing, pricing and sale" of several generic drugs, "including propranolol." FWK ¶ 34; CCI ¶ 106. Par, Teva, and Actavis received subpoenas from the Connecticut Attorney General's office, which has named Teva, Heritage, and Mylan in a civil action. FWK ¶¶ 30, 33; CCI ¶¶ 105.

Furthermore, two former Heritage executives, Jason Malek and Jeffrey Glazer, have pled guilty to fixing prices and allocating markets of two generic drugs, doxycycline and glyburide, between 2013 and 2015 – the very time period that Heritage is alleged to have conspired with Teva and Mylan about propranolol. FWK ¶ 15; CCI ¶ 17.[5] Malek and Glazer compiled a large list of

---

[5] The Court may take judicial notice that Malek and Glazer have now entered plea agreements to criminal informations charging that between April 2013 through December 2015, each engaged in a conspiracy to allocate customers, rig bids, and fix and maintain prices of doxycycline hyclate, and a similar conspiracy between April 2014 and December 2015 concerning glyburide. Plea Agreements ¶ 4. Their plea agreements provide for cooperation in any federal investigation involving violations of criminal and antitrust law concerning "the production and sale of generic pharmaceuticals in the United States." *Id.* ¶ 18. In exchange, the government promised immunity

generic drugs and instructed employees to contact competitors to reach agreement to increase prices and allocate customers. FWK ¶ 24. Malek was responsible for contacting Teva and Mylan and did so with respect to a number of drugs, including, on information and belief,[6] propranolol. *Id.* During these communications, Heritage, Teva, and Mylan executives agreed to raise prices, allocate market share, and refrain from competing with one another for customers. FWK ¶ 25.

## III.   ARGUMENT

### A.   APPLICABLE LEGAL STANDARDS

#### 1.   Rule 12(b)(6)

"[T]here is no heightened pleading standard in antitrust cases, and the facts alleged are subject to Federal Rule of Civil Procedure 8(a)'s general requirement of a 'short plain statement' of facts supporting a plausible claim." *Concord Assocs., L.P. v. Entm't Properties Trust*, 817 F.3d 46, 52 (2d Cir. 2016). *Accord Wacker v. JP Morgan Chase & Co*, 16-2482-cv (L), 2017 WL 442366, at *2 (2d Cir. Feb. 1, 2017).

On a motion to dismiss, the court accepts as true the factual allegations in the complaint and draws all reasonable inferences in favor of the plaintiff. *Town of Babylon v. Fed. Hous. Fin. Agency,* 699 F.3d 221, 227 (2d Cir.2012). "In the antitrust context, stating a claim under Section

---

from criminal prosecution regarding doxycycline hyclate, glyburide, or any generic pharmaceutical product enumerated on a list filed under seal. Plea Agreements ¶ 19. The Malek and Glazer Information and Plea Agreements are Exhibits 1-4 to the Declaration of Elana Katcher, dated February 10, 2017. *See Medcalf v. Thompson Hine LLP*, 84 F. Supp. 3d 313, 321 (S.D.N.Y. 2015); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775(JG)(VVP), 2009 WL 3443405, at *1 (E.D.N.Y. Aug. 21, 2009), *aff'd,* 697 F.3d 154 (2d Cir. 2012) (relying upon later-filed guilty pleas to find a price-fixing conspiracy plausible).

[6] *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) *(*plaintiffs may plead facts upon information and belief "where the facts are peculiarly within the possession and control of the defendant" or "where the belief is based on factual information that makes the inference of culpability plausible").

1 of the Sherman Act 'requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.'" *Meyer v. Kalanick*, 174 F. Supp. 3d 817, 820 (S.D.N.Y. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007))*; Anderson News, L.L.C. v. Am. Media, Inc.,* 680 F.3d 162, 184 (2d Cir. 2012) ("to present a plausible claim at the pleading stage, the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages"). "[A]lthough an innocuous interpretation of the defendants' conduct may be plausible, that does not mean that the plaintiff's allegation that that conduct was culpable is not also plausible." *Id.* at 190. *See Gelboim v. Bank of Am. Corp.,* 823 F.3d 759, 782 (2d Cir. 2016) ("at the motion-to-dismiss stage, appellants must only put forth sufficient factual matter to plausibly suggest an inference of conspiracy, even if the facts are susceptible to an equally likely interpretation").

## 2.   Sherman Act § 1

Sherman Act § 1 bans "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states." 15 U.S.C. § 1. The "crucial question" is whether the alleged conduct "stems from independent decision or from an agreement, tacit or express." *Starr*, 592 F.3d at 321. To state a claim under § 1, a plaintiff must show (1) "a combination or some form of concerted action between at least two legally distinct economic entities," and (2) "that the agreement constituted an unreasonable restraint of trade either per se or under the rule of reason." *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 618 (S.D.N.Y. 2013). An agreement between horizontal competitors to fix prices or to allocate markets is *per se* unreasonable. *Meyer*, 174 F. Supp. 3d at 822

To plead a plausible price-fixing conspiracy, plaintiffs are "not required to mention a specific time, place or person involved in each conspiracy allegation." *Starr*, 592 F.3d at 325. "[E]ven in the absence of direct 'smoking gun' evidence, a horizontal agreement . . . may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors." *Mayor & City Council of Baltimore, Md.,* 709 F.3d at 136 (internal citations omitted). As this Court has held:

> [I]t is well to remember that a Sherman Act conspiracy is but one form of conspiracy, a concept that is as ancient as it is broad. It is fundamental to the law of conspiracy that the agreements that form the essence of the misconduct are not to be judged by technical niceties but by practical realities. Sophisticated conspirators often reach their agreements as much by the wink and the nod as by explicit agreement, and the implicit agreement may be far more potent, and sinister, just by virtue of being implicit.

*Meyer*, 174 F. Supp. 3d at 825.

Placing parallel conduct in a context that suggests agreement suffices. *See, e.g., Anderson News,* 680 F.3d at 186-87. In *Twombly*, the Supreme Court provided two examples of contexts that plausibly suggest agreement: (i) "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties" or (ii) "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason." *Twombly*, 550 U.S. at 556 n.4.[7] A plaintiff may state a § 1 claim by alleging

---

[7] *United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015), *cert. denied,* 136 S. Ct. 1376 (2016) ("Parallel conduct alone may support an inference of conspiracy, moreover, if it consists of complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason."); *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (finding a plausible allegation of price-fixing where "[t]he change in the industry's pricing structure was so rapid, the complaint suggests, that it could not have been accomplished without agreement on the details of the new structure, the timing of its adoption, and the specific uniform price increase that would ensue on its adoption.") *See also In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 632 (E.D. Pa. 2010) (an unprecedented triple digit price increase, common trade association membership, a parallel criminal investigation,

conduct "that would plausibly contravene each defendant's self-interest in the absence of similar behavior by rivals." *Starr,* 592 F.3d at 327 (citation omitted).

**B.    PLAINTIFFS HAVE PLED A PLAUSIBLE PRICE-FIXING CONSPIRACY**

To allege a price-fixing conspiracy, plaintiffs need only allege parallel conduct plus sufficient context (known as "plus factors") to allow their claim to rise "above the speculative level." *Twombly*, 550 U.S. at 555. Viewing plaintiffs' allegations as a whole, and construing all inferences in plaintiffs' favor, the requirements of Rule 8(a) and *Twombly* are satisfied in this case.

1.    Defendants' Acted in Parallel to Impose Extraordinary and Unprecedented Price Increases

As described above, plaintiffs allege that, beginning in December 2013 for capsules and February 2015 for tablets, defendants moved in near "unison" or "lockstep" to impose extraordinary and unprecedented increases in the cost of propranolol in the face of flat demand, flat costs, and flat supply. FWK ¶¶ 5-12, 89; CCI ¶¶ 6-14. The soaring prices followed a history of price stability. FWK ¶¶ 5-6, 8; CCI ¶¶ 6, 8, 11. There were no increases in manufacturing or research and development costs and no product shortages (which are required by law to be reported to the FDA) justifying the spike in the pricing of this mature generic pharmaceutical. FWK ¶¶ 71, 89, 90; CCI ¶¶ 58, 90-91. The increase was contrary to the expectation that prices for a mature, commodity generic drug marketed by several competing firms should *fall* over time to levels near the sellers' marginal costs of production. FWK ¶ 71; CCI ¶ 58. Under the cases cited in the previous section, these allegations are more than sufficient to state a § 1 claim.

Nonetheless, defendants argue that plaintiffs have insufficiently argued parallelism, because the increases occurred over time, and because plaintiffs rely on the spike in the average price across

---

among factors sufficient to "raise a reasonable expectation that discovery will reveal evidence of an illegal agreement").

defendants rather than specifying the dates and amounts of each defendants' increase. Def. Br. at 11-12.

However, "[a] plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted 'similarly.'" *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 427 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015). Sophisticated participants in an anticompetitive scheme will very rarely be so daft as to act in perfect unison, and such a showing is not necessary to plead parallel conduct. *Blood Reagents*, 756 F. Supp. 2d at 630 ("[p]laintiffs are not required to plead simultaneous price increases—or that the price increases were identical— in order to demonstrate parallel conduct. . . . Nor are they required to plead with specificity the price by which each [product] was increased at a particular time").[8]

Defendants rely on procedurally inapposite cases to argue that plaintiffs have inappropriately relied on average price increases to plead parallelism. For example, defendants rely on *Resco Prod., Inc. v. Bosai Minerals Grp. Co.*, 158 F. Supp. 3d 406, 424 (W.D. Pa. 2016), which dismissed on summary judgment a claim of collusive price increases where plaintiffs failed to produce any evidence of the amount or timing of the increases. But plaintiffs opposing a summary judgment motion have had an opportunity to develop their evidence through discovery, and thus the standard to survive is set much higher than at the pleading stage. *Compare Anderson News,* 680 F.3d at 184

---

[8] *See also In re Domestic Airline Travel Antitrust Litig.*, No. MC 15-1404 (CKK), 2016 WL 6426366, at *13 (D.D.C. Oct. 28, 2016) ("Plaintiffs do not need to demonstrate that Defendants cut or limited capacity in exactly the same way in order to adequately allege parallel conduct."); *SD3*, 801 F.3d at 427-28 (finding plausible allegations of parallel conduct in a group boycott case where sophisticated defendants used varying methods to achieve agreed exclusionary objectives); *Anderson News*, 680 F.3d at 191 (holding that variability in the timing of defendants' conduct did not defeat parallelism where defendants ultimately all acted to boycott plaintiff); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940) ("An agreement to pay or charge rigid, uniform prices would be an illegal agreement under the Sherman Anti-Trust Act, and so would agreements to raise or lower prices whatever machinery for price-fixing was used.").

("[T]o present a plausible claim at the pleading stage, the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment[.]") *with Resco Prod.,* 158 F. Supp. 3d at 423 ("To survive a motion for summary judgment, therefore, a plaintiff 'must present evidence that 'tends to exclude the possibility' that the alleged conspirators acted independently.'").[9,10]

Moreover, it defies common sense to believe that an average price spike of up to 1033% for a mature, generic commodity could be maintained if all sellers *did not* participate.

### 2.    Defendants' Parallel Price Increases Arose in a Context Suggestive of Conspiracy

The Second Circuit has recognized the following plus factors: (1) a common motive to conspire; (2) parallel acts against the apparent individual economic self-interest of the conspirators; and (3) a high level of interfirm communications. *Gelboim,* 823 F.3d at 781. These factors are "neither exhaustive nor exclusive," but suggest conspiracy when combined with allegations of parallel conduct. *Id.* Each has been alleged here, along with the pending government investigations that have already yielded relevant criminal charges. While each of these plus factors is discussed individually below, the Court should weigh plaintiffs' allegations in their totality to determine if, taken as a whole, they create a plausible inference of an anticompetitive conspiracy.

---

[9] *See also Twombly,* 550 U.S. at 556 ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.") (internal quotation marks omitted).

[10] Still more inappropriate is defendants' reliance on the class certification decisions from *In re Processed Egg Prod. Antitrust Litig.*, 312 F.R.D. 124, 151 (E.D. Pa. 2015), and *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 129 (3d Cir. 1999). Both cases concerned plaintiffs' experts' use of average prices in econometric analyses to show that challenged price increases impacted all or virtually all class members. *Processed Eggs,* 312 F.R.D. at 151; *Baby Food,* 166 F.3d at 129. These class certification opinions are irrelevant in evaluating a complaint under Rule 8(a) and *Twombly.*

*See H.L. Hayden Co. of New York v. Siemens Med. Sys., Inc.,* 879 F.2d 1005, 1012 (2d Cir. 1989)

(citing *Cont'l Ore Co. v. Union Carbide & Carbon Corp*., 370 U.S. 690, 699 (1962)).

a)      Motive to Enter Into a Price-Fixing Conspiracy

A "[m]otive to conspire may be inferred where the parallel 'action taken [by defendants] had

the effect of creating a likelihood of increased profits.'" *Anderson News, L.L.C. v. Am. Media, Inc.*,

123 F. Supp. 3d 478, 500 (S.D.N.Y. 2015). Pleading motive requires allegations suggesting "that

the industry is conducive to oligopolistic price fixing, either interdependently or through a more

express form of collusion." *In re Ductile Iron Pipe Fittings ("DIPF") Direct Purchaser Antitrust

Litig.,* No. CIV. 12-711, 2014 WL 3971620, at \*7–8 (D.N.J. Aug. 13, 2014). In other words,

plaintiffs must plead sufficient allegations to suggest "that the structure of the market was such as

to make secret price fixing feasible." *Id.* (citing *In re High Fructose Corn Syrup Antitrust Litig.*,

295 F.3d 651, 655 (7th Cir. 2002)).

Industries conducive to collusion include those that, for example, are highly concentrated,

contain high barriers to entry, have inelastic demand, lack reasonable substitutes, and are based on

a standardized product.[11] Here, plaintiffs allege that (1) generic pharmaceuticals in general, and

propranolol in particular, are commodity products which are rigorously regulated to be sure that

the generic versions are the therapeutic equivalent and fully substitutable for the branded products

and each other (FWK ¶¶ 67-71, 114; CCI ¶¶ 54-58, 75-80); (2) the propranolol market is highly

---

[11] *Blood Reagents*, 756 F. Supp. 2d at 631–32. *See also Todd v. Exxon Corp.,* 275 F.3d 191, 208
(2d Cir. 2001) ("Generally speaking, the possibility of anticompetitive collusive practices is the
most realistic in concentrated industries."); *In re Chocolate Confectionary Antitrust Litig.,* 602 F.
Supp. 2d 538, 576 (M.D. Pa. 2009) (industry conducive to collusion where there are
"[oligopolistic] sellers, diffuse buyers, prohibitive entry barriers, and standardized products.");
*U.S. v. Alcoa, Inc.,* No. CIV. A. 2000–954, 2001 WL 1335698, at \*1; 2 (D.D.C. June 21, 2001)
(describing product homogeneity and inelastic demand as conductive to anticompetitive
coordination).

11

concentrated and dominated by a handful of companies, which renders elaborate and easily detected communication schemes to be unnecessary for effective collusion (FWK ¶¶ 73, 107, 109; CCI ¶¶ 75-76); (3) manufacturing costs, intellectual property, and expenses related to regulatory oversight are barriers to entry that increase the propranolol market's susceptibility to collusive prices because new suppliers cannot easily enter the market and destabilize the agreed pricing (FWK ¶ 108; CCI ¶ 76); and (4) many patients are unable to substitute other medications for propranolol, a necessary treatment for millions of patients, which reduces the risk that a supplier of another product could undercut collusive pricing (FWK ¶¶ 110-113; CCI ¶¶ 77-79).

    b) Actions Contrary to the Economic Self-Interest of the Co-Conspirators

 "Evidence that the defendant acted contrary to its interests means evidence of conduct that would be irrational assuming that the defendant operated in a competitive market." *DIPF*, 2014 WL 3971620, at *8 (quoting *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360–361 (3d Cir. 2004)). "In a competitive industry, for example, a firm would cut its price with the hope of increasing its market share if its competitors were setting prices above marginal costs." *Starr*, 592 F.3d at 324 (quoting *In re Flat Glass*, 385 F.3d at 360–61).

 As discussed above, absent an agreement, defendants could not have sustained the sudden and extraordinary spikes in price of a mature, generic commodity, such as propranolol. Faced with up to tenfold price increases by their competitors in the absence of cost or demand increases, or supply constrictions, each supplier should have seen the opportunity in a competitive system to gain market share by slightly undercutting one another, triggering a race back down to the equilibrium.[12]

---

[12] Defendants rely heavily on *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1195 (9th Cir. 2015), which they assert stands for the proposition that defendants' failure to undercut each other is insufficient to serve as a plus factor. First, the Second Circuit has held to

c)       Interfirm Communications

As described above, plaintiffs have alleged a large number of direct interfirm communications that facilitated the conspiracy, through Heritage's Malek and Glazer, trade associations such as GPhA, and other industry events. FWK ¶¶ 74-86, 115; CCI ¶¶ 64-73, 81.

Defendants argue that opportunities to conspire at trade meetings and events cannot "prop up" a conspiracy. Def. Br. at 18. However, while membership in trade associations is not enough by itself to confer plausibility, common memberships are "another feature of the market that is suggestive of an inference of an agreement." *DIPF*, 2014 WL 3971620, at *7 (quoting *Blood Reagents*, 756 F. Supp. 2d at 632). In particular, "opportunities to conspire may be probative of a conspiracy when meetings of Defendants are closely followed in time by suspicious actions or records." *In re Domestic Drywall Antitrust Litig.*, 163 F. Supp. 3d 175, 197 (E.D. Pa. 2016).[13,14]

---

the contrary. *See, e.g., Starr*, 592 F.3d at 322–24. Second, as one recent court has explained "*Musical Instruments* involved no specific allegations of a horizontal agreement between competitors . . . . In stark contrast, Plaintiffs in the present case have presented allegations of several specific horizontal agreements . . . . To discredit such allegations would both move beyond *Musical Instruments* and effectively transform *Twombly*'s standard from one of plausibility to one of probability." *In re Packaged Seafood Prod. Antitrust Litig.,* No. 15-MD-2670 JLS (MDD), 2017 WL 35571, at *11 (S.D. Cal. Jan. 3, 2017).

[13] *In re Linerboard Antitrust Litig.*, 504 F. Supp. 2d 38, 59 (E.D. Pa. 2007) ("Importantly, plaintiffs do not offer their evidence of opportunity to conspire in isolation."); *In re Flat Glass Antitrust Litig. (II)*, No. CIV.A. 08-MC-180, 2009 WL 331361, at *3 (W.D. Pa. Feb. 11, 2009) ("the meeting dates provide the Defendants with notice of specific time frames and manner of the alleged agreement . . . . Furthermore, attendance at said meetings should be easily ascertained through discovery such that there is a reasonable expectation that discovery may reveal evidence of the alleged illegal conspiracy.").

[14] Defendants cite cases that stand only for the proposition that trade association participation *alone* does not give rise to a plausible inference of illegal agreement. *See, e.g., LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 149 (E.D.N.Y. 2010) (participation in *immunized* trade association meeting cannot support antitrust claim); *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993) (on a *summary judgment* motion, finding that evidence that defendants had opportunity to conspire does not *by itself* support the inference that such an illegal combination actually occurred).

d)      State and Federal Investigations

Defendants' statement that "it is well-settled that allegations that a defendant is under investigation are inappropriate and must be disregarded, if not stricken entirely" is wishful thinking. Def. Br. at 16-17. There is also no logical reason that plaintiffs cannot rely upon highly detailed factual allegations from the State AG complaint, which itself is based upon an exhaustive investigation of the type that must await discovery for private litigants. As one court reasoned:

> While allegations from another lawsuit are not evidence and cannot be introduced in a later trial for collateral estoppel purposes, plaintiffs need not provide admissible proof at this stage. The Federal Rules of Civil Procedure permit discovery on relevant matters that appear reasonably calculated to lead to the discovery of admissible evidence. Similarly, plaintiffs may plead facts [alleged in another action] upon information and belief, and find admissible evidence to support those allegations at a later stage.

*In re OSG Sec. Litig.*, 12 F. Supp. 3d 619, 622 (S.D.N.Y. 2014) (internal quotations omitted).

The Second Circuit has relied on pending investigations to bolster the plausibility of a price-fixing claim. *See Starr,* 592 F.3d at 324–25 (concluding that allegations regarding investigations by New York State Attorney General and the DOJ into defendants' price fixing support plausibility of a § 1 claim). Other courts have done the same.[15]

Indeed, "[t]he mere existence of such investigations is a circumstance that, 'when combined with parallel behavior, might permit a jury to infer the existence of an agreement.'" *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 55 (S.D.N.Y. 2016). That is particularly

---

[15] *See, e.g., Hinds Cty., Miss. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 106, 115 (S.D.N.Y. 2011) ("Although pending government investigations may not, standing alone, satisfy an antitrust plaintiff's pleading burden, government investigations may be used to bolster the plausibility of § 1 claims."); *Blood Reagents*, 756 F. Supp. 2d at 632 ("Add to this . . . the existence of a parallel criminal investigation - an allegation demonstrating that the government believes a crime may have occurred - and the result is "enough fact to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement."); *In re Packaged Ice Antitrust Litig.,* 723 F. Supp. 2d 987, 1009 (E.D. Mich. 2010) ("This Court finds that the government investigations surrounding the Packaged Ice industry ... while not determinative standing alone as to the plausibility of Plaintiffs' claims of conspiracy, do bolster the plausibility analysis and heighten the Court's expectation that 'discovery will reveal evidence of illegal agreement.'").

true when, as the charges against (and plea agreements) Malek and Glazer indicate, the investigations have turned up evidence of relevant criminal wrongdoing. *Id.* at 55. *See also Hinds Cty.,* 790 F. Supp. at 115.

It does not matter that the charges brought against Malek and Glazer are limited to doxycycline and glyburide. Guilty pleas pertaining to a conspiracy to fix the prices and allocate the market for other generic drugs during the same time period that Heritage executives are alleged to have conspired with respect to propranolol are relevant to a plausibility analysis.[16] The relevant plea agreements explicitly provide for immunity from prosecution and require Malek's and Glazer's cooperation in connection with the broader federal investigation of the generic pharmaceutical industry. *See* n. 5 above.

## C.   PLAINTIFFS HAVE SUFFICIENT ALLEGATIONS AGAINST EACH DEFENDANT

The defendants object to the use of the collective term "defendants" in certain of plaintiffs' allegations and argue that plaintiffs fail to tie each individual defendant to the conspiracy. However, "[t]he more relevant consideration is whether the instances in which they are specifically identified sufficiently allege, or permit the reasonable inference, that they were members of the alleged conspiracy." *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08-CV-42 JG VVP, 2011 WL 7053807, at *13 (E.D.N.Y. Jan. 4, 2011), *report and recommendation*

---

[16]*See, e.g. Packaged Ice,* 723 F. Supp. at 1009 (analyzing cases); *In re Auto. Parts Antitrust Litig.,* 50 F. Supp. 3d 869, 882 (E.D. Mich. Sept. 25, 2014) (same); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d at 661 (upholding on summary judgment "a garden-variety price-fixing conspiracy orchestrated by a firm, ADM, conceded to have fixed prices on related products [lysine and citric acid] during a period overlapping the period of the alleged conspiracy to fix the prices of [high fructose corn syrup]"); *In re High Fructose Corn Syrup Antitrust Litig.,* 261 F. Supp. 2d 1017, 1022 (C.D. Ill. 2003) (accepting plaintiffs' argument that "evidence of an explicit agreement to fix prices in the HFCS market [was relevant] to the corn syrup market based on the similarity of the market structures, actors involved, time frame, and mechanisms employed to implement the illegal agreement").
.

*adopted,* 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012). Prior to discovery, plaintiffs must plead

that "an individual defendant was a participant in the conspiracy in the first instance," but "need

not allege overt acts committed by each defendant in furtherance of a conspiracy." *Jung v. Ass'n*

*of American Medical Colleges*, 300 F.Supp.2d 119, 164 n. 27 (D.D.C. 2004).[17]

        1.   <u>Teva and Pliva</u>

    The Teva defendants each sold propranolol tablets during the relevant period (February 18,

2015 to the present.). FWK ¶¶ 9, 38-39; CCI ¶¶ 4, 35-36. Teva has received a grand jury subpoena

and is a subject of the DOJ investigation of the generic pharmaceutical industry, which has been

expanded at least as of September 2016 to include propranolol. FWK ¶¶ 31-32, 103; CCI ¶ 104.

Teva is specifically alleged to have been named in the State Attorneys General complaint

concerning glyburide and doxycycline, and also to have been a subject of the State investigation

of "a wide-ranging series of conspiracies implicating numerous different drugs and competitors."

FWK ¶¶ 16-17, 33; CCI ¶¶ 105. Teva has also been sent inquiries in connection with a

Congressional investigation into skyrocketing generic pricing. FWK ¶ 97; CCI ¶ 97.

    Plaintiffs also allege that, upon entering a generic drug market, Teva, along with Heritage and

Mylan, "routinely sought out their competitors in an effort to reach agreement to allocate market

share, maintain high prices and/or avoid competing on price." FWK ¶ 23; CCI ¶ 68. As an example,

the complaint alleges that, "in 2013 and 2014," Teva executives reached price-fixing and market

---

[17] *See also In re Nasdaq Mkt.-Makers Antitrust Litig.*, 894 F. Supp. 703, 712 (S.D.N.Y. 1995) ("Plaintiffs in this District have not been required to specify individual acts of each defendant in an antitrust conspiracy allegation."); *In re OSB Antitrust Litig.*, No. 06–MDL–826, 2007 WL 2253419, at *5 (E.D. Pa. Aug. 3, 2007) ("Antitrust conspiracy allegations need not be detailed defendant by defendant."); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 904 (N.D. Cal. 2008) ("Although Plaintiffs will need to provide evidence of each Defendants' participation in any conspiracy, they now only need to make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy.").

allocation agreements with Heritage's then CEO Malek to avoid price wars on a variety of generic drugs, including propranolol. FWK ¶¶ 24-27. Although the Teva executive remains unnamed, the complaint specifically alleges that "Malek had a direct relationship with a Teva executive and was able to successfully communicate with her and reach an agreement to raise prices on several drugs, including, propranolol." FWK ¶ 27. A "Teva executive" is also specifically alleged to have attended a 2014 meeting of the Minnesota Multistate Contracting Alliance for Pharmacy, at which the executive discussed "price increase strategies" with Teva's competitors. FWK ¶ 29.

These allegations are sufficient to plausibly raise the inference that Teva was a part of the propranolol tablet conspiracy.

### 2. Actavis

Actavis sold propranolol capsules and tablets during the relevant time for each conspiracy. FWK ¶¶ 9, 37; CCI ¶¶ 4, 28. It has received a grand jury subpoena and is a subject of the DOJ investigation of the generic pharmaceutical industry, including propranolol. FWK ¶¶ 31-32, 103; CCI ¶ 104. Actavis is a subject of the State investigation of "a wide-ranging series of conspiracies implicating numerous different drugs and competitors.". FWK ¶¶ 33, 104; CCI ¶ 105. In August 2016, Actavis was purchased by defendant Teva. FWK ¶¶ 37, 73; CCI ¶ 28. These facts are sufficient to allege that Actavis participated in an otherwise plausible conspiracy. *See, e.g., Alaska Elec.*, 175 F. Supp. 3d at 55.

### 3. Mylan

Mylan sold propranolol tablets during the tablet conspiracy. FWK ¶¶ 9, 41-44; CCI ¶¶ 4, 32-33, 37. Mylan is a subject of the DOJ investigation of the generic pharmaceutical industry, including propranolol. FWK ¶¶ 31, 34, 105; CCI ¶ 106. In addition to having received subpoenas seeking information pertaining to several generic drugs, including propranolol, Mylan has also disclosed that the DOJ has executed "multiple search warrants" related to its probe. FWK ¶¶ 34,

17

105; CCI ¶¶ 106. Mylan is specifically alleged to have been named in the States' complaint concerning glyburide and doxycycline, and also to have been a subject of the States' investigation of "a wide-ranging series of conspiracies implicating numerous different drugs and competitors." FWK ¶¶ 16-17, 33; CCI ¶ 19. Mylan has also been sent inquiries in connection with a Congressional investigation. FWK ¶ 97; CCI ¶ 97.

Plaintiffs also allege that, upon entering a generic drug market, Mylan, along with Heritage and Teva, "routinely sought out their competitors in an effort to reach agreement to allocate market share, maintain high prices and/or avoid competing on price." FWK ¶ 23; CCI ¶ 68. As an example, the complaint alleges that, "in 2013 and 2014," Mylan executives reached price-fixing and market allocation agreements with Heritage's then CEO Malek to avoid price wars on, among other drugs, propranolol. FWK ¶¶ 24-27. It is alleged that, in one instance, "Mylan agreed to 'walk away' from at least one large national wholesaler and one large pharmacy chain to allow Heritage to obtain the business and increase its market share." FWK ¶ 25.

Plaintiffs' allegations are sufficient to plausibly raise the inference that Mylan was a part of the propranolol tablet conspiracy.

4.   Par

Par sold propranolol tablets during the relevant time for the tablet conspiracy. ¶¶ 9, 45-47, 73; CCI ¶¶ 4, 30-34. Par has also been a subject of the States' investigation of "a wide-ranging series of conspiracies implicating numerous different drugs and competitors." FWK ¶¶ 30, 101, 104; CCI ¶¶ 4, 28. Par has also been sent inquiries in connection with a Congressional investigation. FWK ¶ 97; CCI ¶ 97.

Par also submitted an excerpt from an SEC filing that discloses:

In December 2014, our subsidiary, Par Pharmaceutical Companies, Inc. (subsequently renamed Endo Generics Holdings, Inc.¶ and referred to . . . as Par), received a Subpoena to Testify Before Grand Jury from the Antitrust Division of the DOJ and issued by the U.S.

18

District Court for the Eastern District of Pennsylvania. The subpoena requests documents and information focused *primarily* on product and pricing information relating to Par's authorized generic version of Lanoxin (digoxin) oral tablets and Par's generic doxycycline products, and on communications with competitors and others regarding those products. Par is currently cooperating fully with the investigation.

Hassi Decl. at Exh. A (emphasis added).

Thus, Par has admitted to being the subject of the DOJ investigation that has yielded two guilty pleas for price-fixing generic pharmaceuticals in the same time frame, and with several of the same competitors, as are involved in this case. This supports the plausibility of Par's involvement in a propranolol conspiracy. FWK ¶ 105; CCI ¶ 106.

5. <u>Heritage</u>

Heritage sold propranolol tablets during the relevant time for the tablet conspiracy. FWK ¶¶ 9, 48; CCI ¶¶ 4, 31. Two former Heritage executives have pled guilty to criminal charges for anticompetitive conduct in a related market. FWK ¶ 15; CCI ¶ 17. Heritage is a subject of the DOJ investigation of the generic pharmaceutical industry, including propranolol. FWK ¶¶ 31-32, 103; CCI ¶ 16, 100. Heritage has been named in the States' complaint concerning glyburide and doxycycline and is the subject of the States' investigation of "a wide-ranging series of conspiracies implicating numerous different drugs and competitors." FWK ¶¶ 16-17, 33; CCI ¶ 19. Heritage has also been sent inquiries in connection with a Congressional investigation. FWK ¶¶ 97; CCI ¶ 97.

Plaintiffs also allege that, upon entering a generic drug market, Heritage, along with Teva and Mylan, "routinely sought out their competitors in an effort to reach agreement to allocate market share, maintain high prices and/or avoid competing on price." FWK ¶ 23. As an example, the complaint alleges that "in 2013 and 2014," Heritage executives Glazer and Malek "compiled a large list of generic drugs and instructed employees to contact competitors to reach agreement to increase prices and allocate customers." FWK ¶¶ 24, 29. Malek reached price-fixing and market

19

allocation agreements with Teva and Mylan executives to avoid price wars on a variety of generic drugs, including propranolol. FWK ¶¶ 24-27. In one instance, "Mylan agreed to 'walk away' from at least one large national wholesaler and one large pharmacy chain to allow Heritage to obtain the business and increase its market share." FWK ¶ 25.

These allegations are sufficient to plausibly raise the inference that Heritage was a part of the propranolol tablet conspiracy. Heritage argues that the allegations are not plausible because it supposedly suffered from a shortage of raw materials in or around July 2015, and therefore stopped selling tablets for a portion of the relevant time period. Def. Br. at 22. First, these hearsay assertions, based on the archived pages of a trade association's website, are outside the complaint and should await discovery and summary judgment. *See Domestic Airline*, 2016 WL 6426366, at *15 (taking judicial notice of the *existence* of news articles but not accepting these articles for the truth of their assertions). Nonetheless, to the extent Heritage relies on these assertions to suggest that there was a general propranolol shortage in July 2015, plaintiffs stand by their allegations that none were reported to the FDA, as required by law. FWK ¶¶ 89-90; ¶91. Second, prices for propranolol tablets began to skyrocket in February and March 2015, not July 2015 when Heritage claims the shortage first existed. FWK ¶ 9; CCI ¶ 11. Third, the documents cited by Heritage estimate that whatever shortage existed, if any, was expected to last about one month. Fourth, Heritage's claim that it is not liable for any portion of the class period that it did not sell propranolol tablets is incorrect. It is hornbook law that a conspirator is jointly and several liable for all damages stemming from a conspiracy unless it affirmatively withdraws from that conspiracy, which is not alleged to have happened here. *See United States v. Krasn*, 614 F.2d 1229, 1236 (9th Cir. 1980)

("[p]articipation in the conspiracy is presumed to continue until the last overt act of the conspirators unless [the defendant] produces affirmative evidence of [its] withdrawal").[18]

### 6.   Breckenridge

Breckenridge sold propranolol capsules during the capsule conspiracy period. FWK ¶¶ 6, 49; CCI ¶¶ 4, 29. As with the other defendants, Breckenridge raised propranolol prices and participated in relevant trade association meetings, including those very close in time to the price hikes. These allegations are sufficient to plausibly allege Breckenridge's participation in the conspiracy.

### 7.   Upsher-Smith

Upsher-Smith sold propranolol capsules during the capsule conspiracy period. FWK ¶¶ 6, 50; CCI ¶¶ 4, 38. As with the other defendants, Upsher-Smith raised propranolol prices and participated in relevant trade association meetings, including those very close in time to the price hikes. These allegations are sufficient to plausibly allege Upsher-Smith's participation in the conspiracy.

## D.   PLAINTIFFS HAVE STANDING TO PURSUE THEIR ANTITRUST CLAIMS

While defendants acknowledge that plaintiffs' respective complaints allege that plaintiffs purchased "Propranolol during the Class Periods directly from one or more of Defendants at artificially inflated prices," defendants incorrectly argue that plaintiffs lack Article III standing. Defendants assert that because plaintiffs have not specified "from whom they purchased

---

[18] Judicial notice cannot support the statement that "by the fall of 2015 market participants *knew* the shortage of Propranolol tablets was *reportedly* caused by ingredient scarcity, *i.e.*, a 'raw materials issue' and that the FDA downgraded certain suppliers, preventing them *from* supplying Propranolol." Def. Br. at 6 (emphasis added). *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (judicial notice may not be used to establish truth of the matter asserted). Further, what "market participants" "knew" to have been "reported" by the "fall of 2015" is not relevant to whether the spikes in price that began in February and March 2015 were actually caused by shortages rather than collusion. This issue must await discovery.

Propranolol, at what prices, and whether the prices they paid were among those that were increased during the Class Periods," Plaintiffs' complaints should be dismissed. Def. Br. at 24. Defendants' argument lacks merit.

The single allegation quoted by defendants—plaintiffs purchased propranolol **from the defendants** at **artificially inflated prices** during the **class periods**—answers each of defendants' arguments with sufficient specificity to satisfy Article III standing. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992) ("[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim"). Defendants instead rely on *Arista Records LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556 (S.D.N.Y. 2007), which is inapposite because the *Arista* complaint "contain[ed] no allegation" – not even 'general allegations' – "that [the counter-plaintiff] ever attempted to obtain or purchase a license from any of the counter-defendants or their respective joint ventures." *Id.* at 569.

Defendants' contention also ignores other allegations:

- "Defendants' scheme injured Plaintiff and the Classes of direct purchasers it seeks to represent (as defined below) causing them to pay overcharges. Plaintiff seeks to recover ***these*** overcharges and seeks other relief arising out of Defendants' conspiracy to charge supra-competitive prices for: 1) Propranolol capsules during the period from December 18, 2013 to the present ("the Propranolol Capsules Class Period") and 2) for Propranolol tablets during the period from February 18, 2015 to the present ("the Propranolol Tablets Class Period.")" FWK ¶ 4 (emphasis added).

- Plaintiff seeks to represent a Class consisting of all persons in the United States who purchased Propranolol capsules directly from Defendants on or after December 1, 2013. Plaintiff also seeks to represent a Class consisting of all persons in the United States who purchased Propranolol tablets directly from Defendants on or after February 1, 2015. Accordingly, the relevant Class Period runs from December 1, 2013 to the present day. CCI ¶ 3.

- "Plaintiff and the other members of the Classes paid artificially inflated prices that exceeded the amount they would have paid if a competitive market had determined prices for Propranolol." FWK ¶ 35.

- During the Class Periods, Plaintiff and Class Members directly purchased Propranolol from Defendants. As a result of the Defendants' anticompetitive conduct, Plaintiff and Class Members paid more for Propranolol than they would have and thus suffered substantial overcharges. This is a cognizable antitrust injury and constitutes harm to competition under the federal antitrust laws. FWK ¶ 127; CCI ¶ 113.

- Because Defendants' unlawful conduct has successfully restrained competition in the market, Plaintiff and Class Members have sustained, and continue to sustain, significant losses in the form of artificially inflated prices paid to Defendants. CCI Compl. ¶ 114.

- As a result of Defendants unlawful conduct, Plaintiff and Class Members have been injured in their business and property in that they have paid more for Propranolol than they otherwise would have paid in the absence of Defendants unlawful conduct. CCI Compl. ¶ 122.

These allegations sufficiently allege injury-in-fact from defendants' conspiracy.

Defendants also erroneously argue that plaintiffs do not allege "whether they purchased Propranolol tablets or capsules." Def. Br. at 24. But plaintiffs have alleged that they purchased propranolol, which is defined to include both generic propranolol tablets and capsules. FWK ¶ 1; CCI ¶ 1. Moreover, the distinction raised by defendants in regard to tablets and capsules is a red herring because the products are substantially similar, both consisting of generic propranolol. *See Quinn v. Walgreen Co.*, 958 F. Supp. 2d 533, 541 (S.D.N.Y. 2013) ("[C]ourts that have carefully analyzed the question hold that a plaintiff may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products and alleged misrepresentations are substantially similar," and "Courts have found products with only minor differences in ingredients or flavors to be substantially similar for standing purposes.").

Moreover, in *Quinn*, where there were substantial similarities between all of defendants' glucosamine supplements, the court found that a more appropriate time to consider whether plaintiffs could bring claims on behalf of purchasers of the various glucosamine supplements is at the class certification stage, not on a motion to dismiss. 958 F. Supp. 2d at 542; *see also*

*Goldemberg v. Johnson & Johnson Consumer Cos.*, 8 F. Supp. 3d 467, 484 (S.D.N.Y. 2014) ("Defendant's argument that Plaintiff lacks standing to represent a class including persons who purchased Aveeno Active Naturals products which he did not purchase is properly considered at the class certification stage."). Thus, because propranolol tablets and capsules are substantially similar, the appropriate time to consider whether there is a capsule vs. tablet difference of any import is at the class certification stage.

Defendants contend that plaintiffs do not have standing to pursue injunctive relief. This argument fails because, as alleged in the CCI Complaint, "Plaintiff and Class Members have sustained, and continue to sustain, significant losses in the form of artificially inflated prices paid to Defendants" and "Defendants' anticompetitive conduct is ongoing, and as result, Plaintiff and the Class continue to pay supracompetitive prices and for Propranolol." CCI ¶¶ 114-115.

### E.      PLAINTIFFS REQUEST LEAVE TO AMEND

To the extent this Court finds that the complaints fail to satisfy Rule 8(a) or *Twombly* and its progeny, plaintiffs respectfully request leave to amend to cure any deficiencies. The Federal Rules of Civil Procedure provide that leave to amend pleadings "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a).

The Supreme Court has interpreted that phrase liberally, stating:

> In the absence of any apparent or declared reason [for denial]—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendments, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'

*Foman v. Davis*, 371 U.S. 178, 182 (1962).

Here, there is no showing of undue delay, undue prejudice, bad faith, or repeated failure to cure that would bar plaintiffs from amending their initial pleading. *See Frontline Processing Corp. v. Merrick Bank Corp.*, No. 13 Civ. 3956, 2014 WL 837050, at *11 (S.D.N.Y. Mar. 3, 2014) (leave

to amend freely given for first pleading).[19] Plaintiffs have recently received and are continuing to receive document productions and other relevant information from third parties. To the extent the Court finds additional factual details are needed to further support the existing allegations, plaintiffs can provide in an amended complaint details about the price increases implemented by each defendant, as well as specific dates, locations, and participants at meetings. Accordingly, if the Court finds the existing complaints insufficient, plaintiffs should have the opportunity to amend their complaints to supplement their allegations. *See In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775 (JG)(VVP), 2008 WL 5958061, at *43 (E.D.N.Y. Sept. 26, 2008) (leave to amend should be granted when "a liberal reading of the complaint gives any indication that a valid claim might be stated.") (quoting *Van Buskirk v. N.Y. Times Co.*, 325 F.3d 87, 91 (2d Cir. 2003)).

## IV.    CONCLUSION

For all of the foregoing reasons, defendants' joint motion to dismiss should be denied. Alternatively, plaintiffs should be granted leave to amend to cure any deficiencies.

---

[19] While the Court's Scheduling Order (ECF No. 6) states that amended pleadings may be filed without leave of Court until February 1, 2017, the Court explained at a January 6, 2017 conference that the early amendment opportunity was intended for corrections of misspellings and other such housekeeping matters. *See* Katcher Decl. Exh. 5.

Case 1:16-cv-09901-JSR   Document 84   Filed 02/10/17   Page 33 of 35

Dated: February 10, 2017

Respectfully submitted,

KAPLAN FOX & KILSHEIMER LLP

By: _____
    Robert N. Kaplan
    Richard J. Kilsheimer
    Jeffrey P. Campisi
    Elana Katcher
    Joshua Saltzman
    850 Third Avenue, 14th Floor
    New York, New York 10022
    Tel: 212-687-1980
    Fax: 212-687-7714
    rkaplan@kaplanfox.com
    rkilsheimer@kaplanfox.com
    ekatcher@kaplanfox.com
    jcampisi@kaplanfox.com
    jsaltzman@kaplanfox.com

HAGENS BERMAN SOBOL SHAPIRO LLP
Thomas M. Sobol
David S. Nalven
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Tel.: 617-482-3700
Fax: 617-482-3003
E-mail: tom@hbsslaw.com
E-mail: davidn@hbsslaw.com

VANEK, VICKERS & MASINI P.C.
Joseph M. Vanek
David P. Germaine
55 W. Monroe, Suite 3500
Chicago, Illinois 60603
Tel: 312-224-1500
Fax: 312-224-1510
E-mail: Jvanek@vaneklaw.com
E-mail: Dgermaine@vaneklaw.com

*Counsel for FWK Holdings LLC and the Proposed Direct Purchaser Class*

and

Linda P. Nussbaum
Bart D. Cohen
Bradley J. Demuth
Peter E. Moran
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas
40th Floor
New York, NY 10036-8718
(917) 438-9189
lnussbaum@nussbaumpc.com

Juan R. Rivera Font
JUAN R. RIVERA FONT LLC
Ave. González Giusti #27, Suite 602
Guaynabo, PR 00968
(787) 751-5290
juan@riverafont.com

*Counsel for César Castillo and the Proposed Direct Purchaser Class*

## <u>CERTIFICATE OF SERVICE</u>

I, Robert N. Kaplan, hereby certify that on February 10, 2017, I caused the foregoing

Plaintiffs' Opposition to Defendants' Motion to Dismiss, and the accompanying Declaration of

Elana Katcher to be filed electronically with the United States District Court for the Southern

District of New York through the Court's mandated ECF service.  Counsel of record are required

by the Court to be registered e-filers, and as such are automatically e-served with a copy of the

document(s) upon confirmation of e-filing.

<u>/s/ Robert N. Kaplan</u>
Robert N. Kaplan
