UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------x
                                           :
In re: PROPRANOLOL ANTITRUST LITIGATION    :    16-cv-09901 (JSR)
                                           :    17-cv-01039 (JSR)
                                           :    OPINION AND ORDER
                                           :
                                           :
-------------------------------------------x

JED S. RAKOFF, U.S.D.J.

Plaintiffs FKW Holdings and Cesar Castillo (the "Direct Purchasers") and Sergeants Benevolent Association Health & Welfare Fund and American Federation of State, County and Municipal Employees District Council 37 Health & Security Plan (the "End-Payors") bring putative nationwide class actions alleging that defendants illegally conspired to fix the price of the generic drug, propranolol hydrochloride ("Propranolol"). By bottom-line Order dated February 27, 2017 (the "Bottom-Line Order"), the Court denied the motion by defendants Heritage Pharmaceuticals Inc. ("Heritage") and Upsher-Smith Laboratories, Inc. ("Upsher-Smith") to dismiss the Direct Purchasers' original complaints for lack of personal jurisdiction. See ECF No. 108. Defendants now jointly move to dismiss the Direct Purchasers' and End-Payors' consolidated amended complaints. For the reasons set forth below, this Opinion and Order denies defendants' instant motions, except for part of their motion to dismiss certain state law claims in the End-Payors' action. This Opinion

1

and Order also explains the reasoning for the previous Bottom-Line Order.

On a motion to dismiss, the Court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in favor of the non-moving party. See Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008). In the antitrust context, stating a claim under Section 1 of the Sherman Act "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007).

Propranolol is the generic version of Inderal and comes in two forms: capsules and tablets. Direct Purchasers' Consolidated Amended Complaint ("DPP") ¶¶ 81-83, ECF No. 109; End-Payors' Consolidated Amended Complaint ("EPP") ¶¶ 1-2, 46-51, Dkt. No. 17-cv-01039, ECF No. 60. The pleadings allege two conspiracies, with one overlapping defendant, to manipulate the price of both forms of the drug. DPP ¶¶ 8-9; EPP ¶¶ 1-2, 46-51. The defendants in the "Capsules Conspiracy" are Actavis Elizabeth, LLC ("Actavis"), Breckenridge Pharmaceuticals, Inc. ("Breckenridge"), and Upsher-Smith (collectively, the "Capsules

2

Defendants"). DPP ¶¶ 46-62; EPP ¶¶ 19-31. The defendants in the "Tablets Conspiracy" are Mylan Inc., Mylan Pharmaceuticals Inc., and UDL Laboratories, Inc. (collectively, "Mylan"), Teva Pharmaceuticals USA, Inc., and Pliva, Inc. (collectively, "Teva"), Endo International PLC, Par Pharmaceuticals Holdings, Inc., and Qualitest Pharmaceuticals, Inc. (collectively, "Par"), Heritage, and Actavis (collectively, the "Tablets Defendants"). Id.

The well-pleaded allegations of the complaints here at issue show the following facts:

Prior to 2013, the price of Propranolol had steadily declined since it entered the market in 1967. DPP ¶ 82; EPP ¶ 40; see DPP ¶¶ 78-79; EPP ¶ 67. This was not unusual in the case of generic drugs. In particular, because federal law requires each generic to be "readily substitutable for another generic of the same brand drug, the products behave like commodities, with pricing being the main differentiating feature and the basis for competition among manufacturers." Id. As a result, prices in a "mature generic market, such as the market for [P]ropranolol" will fall until they stabilize at the generic manufacturers' marginal costs of production. DPP ¶ 82; EPP ¶ 40.

Accordingly to the complaints, the prices of various dosages of Propranolol capsules had either consistently declined or somewhat stabilized prior to the Capsules Conspiracy. DPP ¶¶

3

154; EPP ¶¶ 48-52. In either March or November of 2013,[1] however, the Capsules Defendants abruptly began increasing their effective prices by significant amounts, DPP ¶¶ 114, 124, 126; EPP ¶¶ 2, 42, and continued to raise prices until approximately May 2014. EPP ¶¶ 153-173. Prices then remained relatively stable for a period of months until slightly falling to amounts still above pre-conspiracy levels. Id.

Several months later, a similar occurrence developed with regard to Propranolol tablets. After years of stable or declining prices, the Tablet Defendants abruptly raised the effective price of all dosages of Propranolol tablets in early 2015. Defendant Heritage increased effective prices by 102%-151% in January 2015, and, a few weeks later, defendants Teva and Actavis increased their own prices in March 2015 by 566%-898% and 395%-638%, respectively, DPP ¶ 186; EPP ¶¶ 49-52. Defendants Mylan and Par began increasing their prices soon after, in April

---

[1] The Direct Purchasers and End-Payors give slightly different start dates for the Capsules Conspiracy. The Direct Purchasers allege that defendant Breckenridge increased its effective prices for all dosage levels by 88% to 140% in November 2013, DPP ¶ 155, and one month later, in December 2013, defendant Upsher-Smith also increased its effective prices for all dosage levels by 49% to 79%. Id. at ¶ 168. Defendant Actavis raised prices two months later in February 2014 with increases between 64% and 81%, id. at ¶ 162. The End-Payors, on the other hand, allege that price increases began in March 2013 and rose by an average of 80% between March and November of that year. EPP ¶¶ 2, 42.

4

and June, by amounts ranging from 55% to 607% and 52% to 216%, respectively. DPP ¶¶ 193-194, 199-201; EPP ¶¶ 49-52.[2] Defendants' prices continued to increase over the next year by as much as 1,736%. DPP ¶¶ 136-213; EPP ¶¶ 49-52; see DPP ¶ 202 ("Between December 2014 and November 2015, Actavis raised the price of 80mg propranolol tablets by 1,736% (from $0.03 per tablet to $0.46 per tablet).").

Economic factors make the Propranolol market susceptible to collusion, including industry concentration, barriers to entry, lack of substitutes, demand inelasticity, and interchangeability. See DPP ¶¶ 225-245; EPP ¶¶ 53-68. In addition, during the period of these price increases, there was no significant increase in production costs, no significant decrease in supply, and no significant increase in demand. DPP ¶¶ 214, 254-255; EPP ¶43. Federal law further requires drug manufacturers to report potential drug shortages to the Food and Drug Administration ("FDA"), and no supply disruption was

---

[2] The Direct Purchasers also allege that defendants conspired to increase a secondary pricing mechanism known as Wholescale Acquisition Cost ("WAC"). WAC represents the "manufacturer's published catalog or list price for a drug product to wholesalers as publicly reported by the manufacturer." DPP ¶ 153 fn. 6. Although WAC does not represent actual prices, because it does not include discounts, an increase in WAC results in an increase in effective prices. Id.

reported during the duration of the alleged conspiracies. DPP ¶¶ 222-224.[3]

Finally, state and federal agencies are conducting large-scale investigations of the generic drug industry for alleged price fixing. DPP ¶¶ 10-23, 38-45, 92-94, 241; EPP ¶¶ 5-6, 103, 108. Defendant Mylan disclosed in October 2016 that it had received a subpoena from the Department of Justice ("DOJ") seeking information relating to the "marketing, pricing and sale" of several generic drugs, "including Propranolol." DPP ¶ 43; EPP ¶ 103. Two months later, on December 14, 2016, the DOJ charged the former chief executive officer ("CEO") and former president of defendant Heritage for criminal violations of the Sherman Act in connection with the generic drugs Glyburide and Doxycycline Hyclate DR. DPP ¶¶ 15-16; EPP ¶ 5, 104. The two individuals, Jason Malek and Jeffrey Glazer, subsequently plead guilty and are cooperating. Id.

Plaintiff FWK Holdings LLC filed suit against defendants on December 23, 2016 on behalf of direct purchasers of Propranolol for violations of § 1 of the Sherman Act. Plaintiff Cesar Castillo Inc. filed a largely identical class action

---

[3] Although the pleadings do not cite the relevant FDA provision, the Court takes judicial notice that the FDA is mandated to report drug shortages where it determines that "demand or project demand for the drug within the United States exceeds the supply of the drug." See 80 FR 38915, 38922.

approximately two weeks later on January 5, 2017. The Court
consolidated the two complaints by Order dated January 11, 2017,
and defendants filed two motions to dismiss on January 27, 2017:
the first, joined by all defendants, sought dismissal for
failure to state a claim; the second, joined by defendants
Heritage and Upsher-Smith, sought dismissal for failure to plead
personal jurisdiction.

Before defendants' motions could be fully briefed, however,
the Government moved to intervene on January 30, 2016, and, upon
consent of the parties, the Court granted the Government leave
on February 7, 2017. Three days later, on February 10, 2017, the
End-Payors filed class action complaints on behalf of end
purchasers of Propranolol seeking injunctive relief under § 1 of
the Sherman Act, damages under the antitrust laws and consumer
protection laws of numerous states, and restitution for common
law unjust enrichment. The Court subsequently held a scheduling
conference on February 21, 2017, during which the Government
moved for a stay of discovery in both actions because of the
"overlap" between the civil cases and "the Government's ongoing
criminal investigation." See Transcript dated February 21, 2017
at 12, ECF No. 112. The Court denied the motion but granted
leave for the Government to file an ex parte motion for
reconsideration, id. at 14, and the Government timely filed its
submission. See Memorandum of Law in Support of the United

7

States' Motion for Reconsideration of Its Motion for a Limited Stay of Certain Discovery ("Government's Mot. for Recons."), ECF No. 102.[4]

The Court held oral argument on the motions to dismiss the Direct Purchasers' actions on February 24, 2017 and, at the conclusion of the hearing, issued a bench ruling denying the motion by defendants Heritage and Upsher-Smith to dismiss the Direct Purchasers' complaints for lack of personal jurisdiction. The Court subsequently issued its Bottom-Line Order on February 27, 2017, dismissing with prejudice the Direct Purchasers' capsules claim against defendant Mylan (on consent of the parties), confirming its bench ruling denying defendants' personal jurisdiction motion, and postponing ruling on the merits motion so as to allow the Direct Purchasers to file amended complaints. See ECF No. 108. The same day, the Court also issued an Order granting in part and denying in part the Government's motion for reconsideration of its request for a partial stay of discovery. See ECF No. 107.

---

[4] In support of that motion, the Government filed an ex parte affidavit for in camera review by the Court. As the Court stated on the record during the oral argument on the defendants' instant motions to dismiss, the decisions made on the instant motions, as reflected in this Opinion and Order in no way rely on the statements made in that affidavit. See Transcript dated March 24, 2017 at 35.

The Direct Purchasers and End-Payors filed consolidated amended complaints on February 27, 2017 and March 3, 2017, and defendants timely filed supplemental briefing in the Direct Purchasers' action and moved to dismiss the End-Payors' action for lack of standing and failure to state a claim.[5] On March 9, 2017, the Court issued an Order consolidating the actions of the End-Payors and ordering that the End-Payor and Direct Purchaser actions be coordinated for pre-trial and trial purposes on a master docket styled In re Propranolol Antitrust Litigation and bearing the case number 1:16-cv-09901-JSR. ECF No. 79. The Court held oral argument on the defendants' instant motions to dismiss the Direct Purchasers' and End-Payors' respective consolidated amended complaints on March 24, 2017.

With this factual background in mind, the Court first turns to defendants' motions to dismiss the counts brought under § 1 of the Sherman Act of the Direct Purchasers' and End-Payors' consolidated amended complaints. The Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15

---

[5] Defendants' supplemental memorandum to dismiss the Direct Purchasers' consolidated amended complaint does not renew their earlier challenge to the Direct Purchasers' standing. The Court accordingly considers this argument withdrawn, particularly given the additional allegations in the amended pleadings concerning the Propranolol products that the Direct Purchasers' purchased at artificially inflated prices and from which defendants they purchased such products. DPP ¶¶ 46-47.

U.S.C. § 1. To plead a plausible price-fixing conspiracy, plaintiffs are "not required to mention a specific time, place or person involved in each conspiracy allegation." See Starr v. Sony BMG Music Entm't, 592 F.3d 314, 325 (2d Cir. 2010). Instead, a conspiratorial agreement "may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors." Mayor & City Council of Baltimore, Md. v. Citigroup, Inc., 709 F.3d 129, 136 (2d Cir. 2013) (internal citations omitted). These plus factors traditionally include: (1) "a common motive to conspire"; (2) "evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators"; and (3) "evidence of a high level of interfirm communications." Gelboim v. Bank of Am. Corp., 823 F.3d 759, 781 (2d Cir. 2016) (quoting Citigroup, 709 F.3d at 136). However, this list is "neither exhaustive nor exclusive, but rather illustrative of the type of circumstances which, when combined with parallel behavior, might permit a jury to infer the existence of an agreement." Id. (quoting Citigroup, 709 F.3d at n. 6).

Plaintiffs here allege the presence of four plus factors: (1) defendants had a motive to increase prices because they operate in an oligopolistic market characterized by falling prices; (2) the price increases were against defendants' self-

interest because in a competitive market, defendants should have tried to undercut each other's prices to increase their market share; (3) defendants frequently communicated at trade association meetings; and (4) there are ongoing state and federal investigations for price manipulation of generic drugs, including Propranolol.

The Court begins with motive. Defendants are correct that the bare allegation that defendants operate in an oligopolistic market is insufficient to establish a common motive to conspire. See Citigroup, 709 F.3d at 139 (allegations that "defendants operate in an oligopolistic market . . . may simply restate the (legally insufficient) fact that market behavior is interdependent and characterized by conscious parallelism."). Instead, a plaintiff must allege facts, specific to the market at issue, suggesting that the defendants had an incentive to manipulate prices. Id.; see Gelboim, 823 F.3d at 766 (plaintiffs sufficiently plead motive to manipulate LIBOR where the complaint alleged that defendants were "reeling from the 2007 financial crisis, [and] a high LIBOR submission could signal deteriorating finances to the public and the regulators").

Plaintiffs here have alleged such market specific factors. The pleadings set forth that because federal law requires each generic to be "readily substitutable for another generic of the same brand drug," competition will cause pricing in a "mature

11

generic market, such as the market for [P]ropranolol" to fall
until it nears the generic manufacturers' marginal costs of
production. DPP ¶ 82; EPP ¶ 40; see DPP ¶¶ 78-79; EPP ¶ 67. The
data cited in the pleadings confirm this trend, and show that
prior to the alleged conspiracies, the prices of Propranolol
capsules and tablets either were falling or had finally
stabilized. DPP ¶ 154; EPP ¶¶ 48-52.[6] This gradual devaluation of
Propranolol also caused defendants' profits to decline and level
out over time, giving them a common motive to conspire. See
Starr, 592 F.3d at 324 (finding that the "continuing
devaluation" of digital music gave defendant distributors a
common motive to conspire to raise prices).[7]

Defendants' characterization of these industry specific
factors as a bare allegation that defendants wanted to "make
more money" is unconvincing. So too is their reliance on In re

---

[6] Defendants are correct that the pleadings state that the prices
of some dosages of Propranolol became "stable" prior to the
alleged conspiracies. See EPP ¶ 2; see also DPP ¶¶ 147, 180
(alleging that prices were stable for a "substantial" period of
time). Taken in context, however, these allegations confirm that
prices of these dosages had finally reached defendants' marginal
costs of production, which is precisely why defendants had a
motive to conspire to raise prices.

[7] It is immaterial that in Starr, the CEO for one of the
defendants admitted that the defendants' pricing scheme was
designed to prevent the "continuing devaluation of music." Id.
at 319, 324. While the present case lacks such a high level
admission, the common motive (preventing the devaluation of the
sellers' product) is the same.

Baby Food Antitrust Litig., 166 F.3d 112, 137 (3d Cir. 1999), which is not binding on this Court and factually distinguishable from the present dispute. There, plaintiffs submitted an expert report in support of their motion for summary judgment that "never made any reference to the evidence in this case" and "never analyzed the pricing conduct of any of the defendants." Id. at 134. Instead, the expert made "an abstract statement based on 'economic theory' that the interest in enhancing profits motivated the defendants to conspire" to raise the price of baby food in the United States, id. at 134, and the Third Circuit found that such "bare opinion of an obvious fact" (common to all companies in a capitalist economy) was insufficient to establish motive. Id. at 137-38. The pleadings here, on the other hand, set forth in detail a regulatory regime that has historically pushed the price of Propranolol downwards and gradually reduced defendants' profits, thereby giving them a common motive to conspire.

The Court next turns to whether plaintiffs have alleged that defendants' price increases were against their self-interest. Plaintiffs argue that defendants could not have sustained their market-wide price increases absent an unlawful agreement because, "[i]n a competitive industry . . . a firm would cut its price with the hope of increasing its market share if its competitors were setting prices above marginal costs."

13

See Starr, 592 F.3d at 324. This is particularly so given the magnitude of defendants' price increases (upwards of 1,736%) and the fact that Propranolol is identical across manufacturers. A rational competitor therefore should have kept its prices stable and vastly increased its market share.

Defendants respond that this analysis oversimplifies economic markets because, "so long as prices can be easily readjusted without persistent negative consequences, one firm can risk being the first to raise prices, confident that if its price is followed, all firms will benefit." In re Musical Instruments & Equip. Antitrust Litig., 798 F.3d 1186, 1195 (9th Cir. 2015). This argument may be true in theory, but defendants' application here suffers from a foundational flaw. Defendants condemn the pricing data in the pleadings as not reflective of their actual prices, but fail to identify any other data that they believe is accurate. See Transcript dated March 24, 2017 at 22.[8] Defendants have thus left themselves with no pricing data that they can say they have followed.

This situation distinguishes the present case from Musical Instruments (which is not binding on this Court in any event)

---

[8] While discovery may ultimately prove plaintiffs' pricing data less than accurate, on a motion to dismiss the Court takes all well-plead allegations as true, and the pleadings adequately allege falling or stabilizing prices before the conspiracy and a sudden rise in prices of capsules in 2013 and tablets in 2015.

14

and Citigroup, where the complaints alleged that each defendant
engaged in a single instance of anticompetitive activity and
clearly set forth the common impetus for each defendant's
conduct. In Musical Instruments, the Ninth Circuit (in a split
decision) affirmed the dismissal of the case because "the
complaint itself . . . provide[d] ample independent business
reasons why each of the [defendants] adopted and enforced [the
minimum prices] even absent an agreement." Id. In particular,
each defendant was responding to "similar demands made by a
common, important customer." Id. Likewise, in Citigroup, the
Second Circuit held that defendants' collective decision to exit
the market for auction rate securities ("ARS") was not against
their self-interest where "the complaints vividly
demonstrate[d]" that "the market as a whole was essentially
holding its breath waiting for the inevitable death spiral of
ARS auctions," 709 F.3d at 138, and one of the defendants
subsequently disclosed that it would no longer support such
auctions. Mayor & City Council of Baltimore, Md. v. Citigroup,
Inc., No. 08 CV. 7746 (BSJ), 2010 WL 430771, at *2 (S.D.N.Y.
Jan. 26, 2010). Here, on the other hand, the pleadings here
allege a pattern of price fixing spanning several years and no

15

clear mechanism through which the defendants could legitimately and consistently monitor each other's pricing activity.[9]

Defendants' additional explanations for their price increases, albeit more grounded in the pleadings, do not render plaintiffs' allegations implausible. With respect to the Capsules Conspiracy, the pleadings admit that defendant Mylan ceased selling Propranolol capsules prior to the price increases in 2013, which, in defendants' view, establishes that the increases were simple supply-demand economics. At the motion to dismiss stage, however, plaintiffs need not "offer evidence that tend[s] to rule out the possibility that the defendants were acting independently." Starr, 592 F.3d at 321. Instead, plaintiffs "need only allege enough factual matter (taken as true) to suggest that an agreement was made." Id.[10] Here,

---

[9] To be sure, the pleadings do include pricing information from a third-party provider known as "IMS," DPP ¶ 147, which the Direct Purchasers assert in their opposition is the "gold standard" for drug sales data in the United States. Direct Purchaser Plaintiffs' Supplemental Opposition to Defendants' Joint Motion to Dismiss ("DPP Opp.") at 8, ECF No. 118. The pleadings, however, do not allege that the defendants followed or monitored such data, and the defendants explicitly attacked the reliability of the IMS data during oral argument on the motions to dismiss. See Transcript dated March 24, 2017 at 22.

[10] The Second Circuit has yet to clarify the precise standard for measuring whether defendants' conduct was against their individual self-interest. At one end of the spectrum, the Second Circuit in Starr found it sufficient (but not necessary) that an industry commentator wrote that "nobody in their right mind" would want to purchase the defendants' products at their inflated prices. 592 F.3d at 327. At the other end of the

plaintiffs plausibly allege that because the FDA did not report a shortage of Propranolol capsules following Mylan's exit, there was no "shift" in the total supply of Propranolol that would rationally increase prices. Additionally, because defendants cite no contemporaneous publications reporting Mylan's exit, they cannot explain when or how they learned of this development and whether it was responsible for their price increases.[11] Furthermore, while it is true that defendants' price increases did not always align on a monthly basis, defendants consistently raised prices on a bi-monthly and quarterly basis, which is consistent with an illegal agreement. See, e.g., United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 222-23 (1940) ("Nor is it important that the prices paid by the combination were not fixed in the sense that they were uniform and inflexible . . . . An agreement to pay or charge rigid, uniform prices would be an

---

spectrum, in Citigroup, the Second Circuit held that defendants' decision to leave the ARS market was not against their self-interest where "at that point abandoning bad investments was not just a rational business decision, but the only rational business decision." 709 F.3d at 138. The Court need not resolve the exact standard here because no company "in its right mind" would raise prices by as much as 1,700% relying on nothing but industry data that the company itself claims is flawed (the present situation).

[11] This omission is particularly probative given that defendants have sought that the Court take judicial notice of other contemporaneous publications allegedly explaining the price increases for Propranolol tablets. See Defendants' Memorandum of Law in Support of their Joint Motion to Dismiss the Class Action Complaints ("Defs.' Br.") at 6, ECF No. 68.

illegal agreement under the Sherman Act. But so would agreements to raise or lower prices whatever machinery for price-fixing was used.").

Defendants' alternative explanations for the increases in prices of Propranolol tablets are similarly unpersuasive. The pleadings admit that six months after the alleged Tablet Conspiracy began, an organization known as the American Society of Health-System Pharmacists ("ASHP") began reporting shortages of Propranolol tablets. DPP ¶ 244. The reports consist solely of statements from the various defendants concerning the purported development, including that Activis and Teva "cannot provide a reason for the shortage," that defendant Heritage was having a "raw materials issue," that defendant Mylan "discontinued Propranolol unit-dose tablets," and that defendant Qualitest refused to provide any reason. While discovery may substantiate some of these explanations, defendants' self-serving statements, made months after the onset of the price increases, and during a period in which the FDA did not issue a shortage notification, are insufficient to render plaintiffs' allegations of price fixing implausible at this stage of the litigation.[12]

---

[12] It is also immaterial at this stage of the litigation that defendant Mylan raised its prices of Propranolol tablets slightly later than its alleged co-conspirators. "If six firms act in parallel fashion and there is evidence that five of the firms entered into an agreement, for example, it is reasonable to infer that the sixth firm acted consistent with the other

The Court accordingly finds that plaintiffs have plausibly alleged that the price increases in Propranolol capsules and tablets were against defendants' self-interest.

The Court next turns to whether the plaintiffs have alleged a high level of interfirm communications. The pleadings extensively recount defendants' participation in trade association meetings taking place over a number of years and list the dates of such conferences, the names of the attendees from each defendant, and their respective job titles. See EPP ¶¶ 71-83; DPP ¶¶ 113-134. The pleadings further allege that the defendants' representatives had "discussions" at these meetings, DPP ¶ 9, and, quoting a recent civil complaint brought by 20 state attorney generals, that "generic drug manufacturer representatives who attend these functions, . . . use these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers, among other competitively-sensitive information." EPP ¶ 89 (emphasis added).

Defendants largely ignore these allegations rather than challenge their factual basis. See Defendants' Supplemental Memorandum of Law in Support of Their Joint Motion to Dismiss

---

five firms' actions because it was also a party to the agreement. That is especially so if the sister firm's behavior mirrored that of the five conceded coconspirators." In re Flat Glass Antitrust Litig., 385 F.3d 350, 363 (3d Cir. 2004).

the Direct Purchaser Complaint ("Defs.' Supp. Br.") at 12, ECF No. 117.[13] In any event, the Court finds that these allegations are not conclusory. The pleadings set forth in detail that defendants' attendees were responsible for setting drug prices and that the stated purposes of the various conferences were to provide "peer-to-peer connections," DPP ¶ 96, "strategic business discussions," id. at 99, and "one-on-one strategic meetings," id. at ¶ 110.[14] Plaintiffs accordingly have alleged far more than the "mere opportunity to conspire," and so have shown a high level of interfirm communications.

---

[13] Moreover, lead counsel for the defendants conceded at oral argument on the motions to dismiss that the allegation that defendants' representatives spoke at trade association meetings would be sufficient to add plausibility. See Transcript dated March 24, 2017 at 27-28 ("to say that the defendants actually met with each other is a little bit misleading. That's not in the allegations . . . . Without an allegation that the defendants actually communicated at those events, it doesn't add plausibility.").

[14] The present case is factually distinguishable from In re Aluminum Warehousing Antitrust Litig., No. 13-MD-2481 KBF, 2014 WL 4277510, at *33 (S.D.N.Y. Aug. 29, 2014), upon which defendants rely but which is not binding on this Court. There, Judge Forrest found that allegations concerning defendants' common committee membership failed to raise an inference of interfirm communications where there were no allegations as to "who was on a particular [] committee at a particular time . . . or at which suspect action by committee members or others within their control occurred." No. 13-MD-2481 KBF, 2014 WL 4277510, at *33 (S.D.N.Y. Aug. 29, 2014). Here, on the other hand, the plaintiffs recount the who, what, where, and when of each trade association meeting. This raises a plausible inference that the defendants' representatives communicated with each other.

The Court lastly turns to the relevance of the state and federal governments' ongoing investigations of generic drug pricing. Defendants are correct that governmental investigations into conduct entirely separate from that alleged in the pleadings cannot support an inference of conspiracy. See In re Elevator Antitrust Litig., 502 F.3d 47, 52 (2d Cir. 2007). The investigations here, however, implicate the pleadings in two material ways.

First, the DOJ has expanded its investigation to include Propranolol, as evidenced by the subpoena served on defendant Mylan for Propranolol-related information. While it is true that only one defendant has received such a subpoena, a conspiracy, by its nature, requires an agreement between two or more entities, and the subpoena served on Mylan indicates that the Government is investigating other Tablets Defendants as well. Moreover, the Government has sought a partial stay of discovery in this matter on the basis that "Plaintiffs claim of propranolol price-fixing overlaps substantially with one aspect of [the DOJ's] criminal investigation," Government's Mot. for Recons. at 8, and (after its motion was partially denied) filed a motion as amicus curie to the United States Judicial Panel on Multidistrict Litigation seeking to consolidate this action and others before a single judge (other than this Court) because the civil suits "overlap significantly with aspects of the ongoing

criminal investigation." MDL No. 2724, ECF No. 285. The presence of an ongoing investigation into the same subject matter as alleged in the pleadings here raises an inference of conspiracy. See Starr, 592 F.3d at 324.[15]

Second, the former CEO and former president of defendant Heritage have pled guilty to fixing prices, and while their pleas do not concern Propranolol, they provide circumstantial evidence of motive, actions against interest, and interfirm communications. Defendants respond, relying on the Second Circuit's decision in Elevator Antitrust Litig., that these guilty pleas are immaterial as a matter of law because they concern generic drugs other than Propranolol. Defendants are mistaken. In Elevator Antitrust Litig., the plaintiffs argued that investigations by European regulators into price fixing by defendants' European subsidiaries raised an inference that defendants' American subsidiaries had also engaged in price fixing. 502 F.3d at 52 The Second Circuit affirmed the dismissal of the case, reasoning that "[a]llegations of anticompetitive wrongdoing in Europe-absent any evidence of linkage between such foreign conduct and conduct here-is merely to suggest (in

---

[15] Despite defendants' argument that the Government's investigation concerns solely the Tablets Conspiracy, the Government's public filings never make this distinction.

defendants' words) that 'if it happened there, it could have happened here.'" Id.

Plaintiffs' allegations here, on the other hand, establish such a linkage. Malek and Glazer enacted their price fixing scheme contemporaneously with the alleged conspiracies and, by virtue of their high-level corporate positions, were plausibly responsible for setting prices of Propranolol.[16] Moreover, the Government has represented that the Direct Purchasers have propounded document requests on Malek and Glazer, in addition to the corporate defendants, and, "[e]ven if these requests were limited to propranolol . . . they would overlap directly with the United [States'] criminal investigation." Government's Mot. for Recons. at 4-5. These facts establish a plausible link between the conduct to which Malek and Glazer plead guilty and the conspiracies alleged in the present case.

---

[16] Defendants' reliance on In re London Silver Fixing, Ltd., Antitrust Litig. is similarly misplaced. No. 14-MD-2573 (VEC), 2016 WL 5794777, at *15 (S.D.N.Y. Oct. 3, 2016). There, the plaintiffs claimed that defendants conspired to fix silver prices and alleged that employees sitting at the same trading desk were being investigated for wrongdoing concerning FX trading and LIBOR. Id. at *15. Judge Caproni held that these other forms of trading were distinct from silver trading, and also found relevant that the Government had been investigating silver trading for over two years but never indicted any of the defendants. Id. There is a difference, however, between a trading desk being investigated and the former CEO and president of a company pleading guilty to price fixing. Moreover, the Government's investigation here is still in its early days.

23

Taken as a whole, the plus factors alleged in the consolidated amended complaints plausibly establish that the defendants illegally conspired to fix the prices of Propranolol capsules and tablets in 2013 and 2015. The Court accordingly denies defendants' motion to dismiss the Direct Purchasers' and End-Payors' respective claims under § 1 of the Sherman Act.[17]

The Court next turns to defendants' motion to dismiss the End-Payors' state law claims. The End-Payors bring claims under the antitrust laws of 29 states and the District of Columbia, the unfair competition statutes of 13 states and the District of Columbia, and a common law unjust enrichment claim under the laws of unspecified states. During the course of the briefing on the motion to dismiss, the End-Payors voluntarily withdrew their claims under the antitrust statues of Utah and Missouri and the consumer protection statutes of Rhode Island, Hawaii, Missouri, and the District of Columbia. Defendants now move to dismiss all of the remaining state law claims for lack of standing and for failure to state a claim.

---

[17] Given that the Court finds that the plus factors alleged in the consolidated amended complaints are sufficient to state a claim under § 1 of the Sherman Act, the Court does not reach the issue of whether the price changes here were so "unprecedented" that this fact alone would be sufficient to survive a motion to dismiss. See DPP Opp. at 9.

24

The Court begins with the End-Payors' state antitrust claims and, in particular, whether the End-Payors have sufficiently alleged standing. To establish standing, a private antitrust plaintiff must demonstrate not only that it is an "efficient enforcer" of antitrust claims, but also that it has suffered an injury in fact. IBM Corp. v. Platform Sol'ns, Inc., 658 F. Supp. 2d 603, 609 (S.D.N.Y. 2009). In deciding whether plaintiffs are efficient enforcers, courts consider: "(1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them . . . so as to avoid duplicative recoveries." Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C., 711 F.3d 68, 78 (2d Cir. 2013) (citing Associated General Contractors of Cal., Inc. v. California State Council of Carpenters, 459 U.S. 519, 534 (1983) ("AGC")). The action by the End-Payors here meets the four criteria set forth in AGC.

Under the first factor, "[d]irectness in the antitrust context means close in the chain of causation." Gatt, 711 F.3d at 78 (quoting International Bus. Machs. Corp. v. Platform Solutions, Inc., 658 F.Supp.2d 603, 611 (S.D.N.Y.2009)). Here, the chain of distribution in the pharmaceutical industry is

short, direct, and well-understood: manufacturers sell to
wholesalers, which in turn sell to the pharmacies from which the
End-Payors' buy the drug. EPP ¶ 52; DPP ¶¶ 82, 88, 153, 244; see
In re Asacol Antitrust Litig., No. CV 15-12730-DJC, 2017 WL
53695, at *3 (D. Mass. Jan. 4, 2017) (chain of distribution
passes "from Defendants [manufacturers], to wholesalers, to
pharmacies, and then to end payors."). Price increases can be
directly traced throughout this distribution chain. See In re
Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust
Litig., 64 F. Supp. 3d 665, 698 (E.D. Pa. 2014) ("The End Payors
also point out that they have purchased the product and/or
provided reimbursement to their members who have purchased the
product. This is not the situation . . . where there are
numerous links in the causal chain.").[18]

---

[18] The decisions cited by defendants where the Second Circuit has
rejected standing are not to the contrary because the "harm" in
those cases was probabilistic and highly speculative. For
example, in Paycom Billing Servs., Inc. v. Mastercard Int'l,
Inc., the plaintiff (a credit card payment processor) alleged
that absent the price fixing conspiracy, third-party credit card
companies could have accessed additional banks, making the third
parties more competitive, and this increased competition could
have caused the defendant to adopt more favorable contractual
agreements with the plaintiff, thereby boosting its profits. 467
F.3d 283, 293 (2d Cir. 2006). Likewise, in Gatt, the Second
Circuit held that the plaintiff, a former member of a bid
rigging conspiracy, lacked antitrust standing to sue the
orchestrator of the scheme because it failed to allege that it
could lawfully have won the contracts absent the conspiracy. See
711 F.3d at 79 (plaintiff "did not pay higher prices by virtue

Second, the End-Payors have a sufficient self-interest in the litigation. Defendants are correct that there is another class of persons "potentially inclined" to enforce the antitrust claims here: the Direct Purchasers. Their presence, however, does not necessarily destroy the End-Payors' standing. For example, in In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 688 (2d Cir. 2009), the Second Circuit found that direct purchasers of a generic drug had standing to bring antitrust claims even though competitors of the defendant were also plaintiffs in the action and arguably was "most directly impacted by the alleged anticompetitive behavior." The court reasoned that the presence of the competitors was "not dispositive" because the relevant question was whether "the plaintiff was an entity most motivated by self-interest, not the entity most motivated by self-interest." Id. (citing Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc., 467 F.3d 283, 294 (2d Cir. 2006)). Here, the End-Payors are significantly motived not only "due to their 'natural economic self-interest' in paying the lowest price possible," see id., but also because Propranolol is a life-saving drug for which no substitutes are available.

---

of the conspiracy; it merely lost the right to sell one brand of radio.")

Third, the End-Payors' damages are not speculative. As set forth in the extensive pricing data cited in the pleadings, the details of each transaction are tracked by wholesalers, pharmacies, pharmacy benefit managers, and third-party payors. EPP ¶¶ 43-44, 52; DPP ¶¶ 82, 88, 153, 244. Consequently damages can be readily determined.

Lastly, under the fourth factor, there is no dispute that allowing both the Direct Purchasers' and End-Payors' suits to proceed would result in a duplicative recovery. However, the Court agrees with the general view among district courts that "[s]tates . . . which have repealed Illinois Brick and allowed End-Payors to sue for antitrust violations, have necessarily made the policy decision that duplicative recovery may permissibly occur." In re Dynamic Random Access Memory (Dram) Antitrust Litig., 516 F. Supp. 2d 1072, 1093 (N.D. Cal. 2007).[19] Accordingly, "[d]uplicative recovery is . . . a necessary consequence that flows from indirect purchaser recovery" and no bar against standing. Id.

---

[19] See In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig., No. CIV. 12-169, 2013 WL 5503308, at *18 (D.N.J. Oct. 2, 2013) (citing same); In re Auto. Parts Antitrust Litig., No. 12-MD-02311, 2013 WL 2456612, at *18 (E.D. Mich. June 6, 2013) (citing same); In re Flash Memory Antitrust Litig., 643 F. Supp. 2d 1133, 1156 (N.D. Cal. 2009) (citing same); see also In re Intel Corp. Microprocessor Antitrust Litig., 496 F. Supp. 2d 404, 410 (D. Del. 2007).

For the foregoing reasons, the Court holds that the End-Payors have alleged facts sufficient to establish that they are "efficient enforcers" of their antitrust claims.

Defendants next challenge the injury-in-fact element of End-Payors' standing. Defendants argue that the End-Payors do "not allege that they purchased or provided reimbursement for Propranolol in any state other than New York" and thus lack Article III standing to sue under the laws of states other than New York. The Court partially agrees. The End-Payors do allege that "they indirectly purchased, paid, and reimbursed for generic propranolol" in seventeen states, EPP ¶¶ 17-18, which is sufficient to establish standing under these states' laws. See United Food & Commercial Workers Local 1776 & Participating Emps. Health & Welfare Fund v. Teikoku Pharm. USA, Inc., 74 F. Supp. 3d 1052, 1080 (N.D. Cal. 2014) (collecting cases).

The End-Payors nonetheless fail to allege that they indirectly purchased, paid, or reimbursed for Propranolol in the 10 remaining states named in their consolidated amended complaint.[20] Instead, they argue that the Court should defer the standing question until after class certification. The Court is unpersuaded. Although an Article III court must ordinarily

---

[20] The states are Arkansas, D.C., Michigan, Minnesota, Mississippi, Nebraska, New Mexico, North Dakota, Oregon, South Dakota, Tennessee, West Virginia, and Wisconsin.

assure itself that it has jurisdiction before proceeding, there is an exception to that rule when class certification issues are "logically antecedent to Article III concerns." In re Digital Music Antitrust Litig., 812 F. Supp. 2d 390, 406 (S.D.N.Y. 2011). This exception, however, applies only where "resolution of class certification obviates the need to decide issues of Article III standing." Mahon v. Ticor Title Ins. Co., 683 F.3d 59, 65 (2d Cir. 2012); In re Facebook, Inc., Initial Pub. Offering Derivative Litig., 797 F.3d 148, 156-57 (2d Cir. 2015) (emphasis added) ("Supreme Court precedent in the class certification context suggests that if a threshold, non-merits basis for dismissal is 'logically antecedent' to the adjudication of an alleged jurisdictional defect, the court is not required to decide the jurisdictional question.").

Here, because there is no dispute that the End-Payors at least have standing under New York law, the case will move forward regardless of how the Court decides the class certification issue. See In re AIG Advisor Grp., No. 06 CV 1625 (JG), 2007 WL 1213395, at *5 (E.D.N.Y. Apr. 25, 2007) (internal citation omitted) ("Defendants do not challenge the named plaintiff' standing with respect to funds in which they have owned shares, so the case can move forward on the plaintiffs' claims, whether or not similarly situated plaintiffs are brought

into the action pursuant to Rule 23.").[21] It is therefore inappropriate to defer the standing issue to after class certification.

The Court is cognizant that some courts in this Circuit have held oppositely under similar circumstances. For example, in Blessing v. Sirius XM Radio Inc., Judge Baer held that because there was "no question that named plaintiffs have standing to sue" under the consumer protection statutes of nine states, the standing issue could be deferred to after class certification because the "class certification process will address whether named plaintiffs' injuries are sufficiently similar to those of the proposed class to justify a nationwide class action, and the answer to that question will determine

_____

[21] See also In re AllianceBernstein Mut. Fund Excessive Fee Litig., No. 04 CIV. 4885(SWK), 2005 WL 2677753, at *9 (S.D.N.Y. Oct. 19, 2005) ("because Plaintiffs clearly have standing to sue on behalf of the thirteen Funds in which they own shares, addressing class certification would not be outcome determinative."); Parks v. Dick's Sporting Goods, Inc., No. 05-CV-6590 (CJS), 2006 WL 1704477, at *3 (W.D.N.Y. June 15, 2006) ("when considering standing, the Court must look at the named plaintiff or plaintiffs, not the unnamed class members, and since here, there is just one named plaintiff, who lacks either statutory or Article III standing to sue for violations of state laws other than those of New York, the Court fails to see what impact a motion for class certification would have on the pending motion"); Hoffman v. UBS-AG, 591 F. Supp. 2d 522, 531 (S.D.N.Y. 2008) ("Class certification in this case is not similarly dispositive. Plaintiffs' case will move forward regardless of whether Defendants prevail on their standing argument because Defendants are not contesting standing for all of Plaintiffs' claims.").

whether there are plaintiffs with standing to bring claims under the laws of states in which no currently-named plaintiff resides." 756 F. Supp. 2d 445, 452 (S.D.N.Y. 2010).

The flaw with this approach, however, is that in "a class action, a court must analyze the injuries allegedly suffered by the named plaintiffs, not unnamed members of the potential class, to determine whether the plaintiffs have Article III standing. Vigil v. Take-Two Interactive Software, Inc., No. 15-CV-8211 (JGK), 2017 WL 398404, at *6 (S.D.N.Y. Jan. 30, 2017) (emphasis added) (citing Warth v. Seldin, 422 U.S. 490, 502 (1975)). Accordingly, since "a plaintiff must demonstrate standing for each claim [s]he seeks to press," Mahon, 683 F.3d at 64 (quoting DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 335 (2006)), each state law claim must be accompanied by a named plaintiff who has suffered an injury under that state's statute, and class certification does not remedy this requirement.[22]

For the foregoing reasons, the Court dismisses the End-Payors' state law antitrust claims under Arkansas, D.C., Michigan, Minnesota, Mississippi, Nebraska, New Mexico, North

---

[22] While the argument could be made that the numerous state law antitrust actions here constitute one "claim" for the purposes of standing, the Supreme Court has explicitly rejected the argument that "federal jurisdiction extends to all claims sufficiently related to a claim within Article III to be part of the same case, regardless of the nature of the deficiency that would keep the former claims out of federal court if presented on their own." Daimler, 547 U.S. at 351.

Dakota, Oregon, South Dakota, Tennessee, West Virginia, and Wisconsin law, with leave to the End-Payors' amending their pleadings to add additional named plaintiffs.

The Court next turns to whether the End-Payors have stated a claim under the 17 state antitrust statutes for which they have standing.[23] Defendants argue that the antitrust laws of four states (Alabama, Nevada, New York, and North Carolina) require plaintiffs to allege intrastate price fixing conduct, i.e., that defendants actually conspired or manufactured Propranolol within the relevant state. While defendants are correct that Alabama law does impose such a requirement, see Abbott Labs. v. Durrett, 746 So. 2d 316, 339 (Ala. 1999), the other three states require only allegations of intrastate effects on commerce, i.e., that someone in the state purchased Propranolol at inflated prices. See In re Intel Corp. Microprocessor Antitrust Litig., 496 F. Supp. 2d 404, 414 (D. Del. 2007) (Nevada); In re Aggrenox Antitrust Litig., 94 F. Supp. 3d 224, 253 (D. Conn. 2015) (New York); In re DDAVP Indirect Purchaser Antitrust Litig., 903 F. Supp. 2d 198, 231 (S.D.N.Y. 2012) (North Carolina). The Indirect Purchasers have made such a showing of intrastate effects. EPP ¶¶ 16, 131-165.

---

[23] The Court does not reach the alternative reasons for dismissing the 13 antitrust claims for which End-Payors presently lack standing.

The Court further finds unpersuasive defendants' argument
that Illinois and Hawaii law prohibit end-payors from bringing
state law antitrust claims. While it is true that the relevant
Illinois statute states that "no person shall be authorized to
maintain a class action in any court of this State for End-
Payors . . . with the sole exception of this State's Attorney
General," 740 ILCS 10/7(2), it is "not obvious that the
formulaic expression 'in any court of this State' appearing in
an Illinois statute applies to a federal court in [New York]."
In re Aggrenox Antitrust Litig., No. 3:14-md-2516 (SRU), 2016 WL
4204478, at *5 (D. Conn. Aug. 9, 2016). In addition, the Court
is persuaded that this state procedural rule does not control in
federal court, where Rule 23 sets the only relevant requirements
to file a class action. See id.(citing Shady Grove Orthopedic
Associates v. Allstate Ins. Co., 559 U.S. 393, 397-406 (2010)).
The same is true of the procedural rules set forth in Hawaii's
antitrust statute. See In re Aggrenox Antitrust Litig., 94 F.
Supp. 3d 224, 254 (D. Conn. 2015) (citing Shady Grove, 559 U.S.
at 397-406).[24]

---

[24] The Court acknowledges that while the End-Payors partially
complied with Hawaii's procedural requirements by filing notice
of their complaint with the Hawaii Attorney General, see Girard
Decl., Ex. 2, they did not file their complaint under seal and
wait 60 days (as set forth in the statute). The Court is
persuaded, however, that the statute does not require dismissal
for failure to comply with this procedural rule. See In re
Aftermarket Filters Antitrust Litig., No. 08 C 4883, 2009 WL

The Court agrees, however, that Kansas law imposes a three-year statute of limitations barring End-Payors' capsules claims. See Kan. Stat. 60-512. Although End-Payors argue that defendants "ignore" the discovery rule, tolling for fraudulent concealment, or the "continuing violation" doctrine, it is plaintiffs' burden to show that these exceptions apply. See Vincent v. Money Store, 915 F. Supp. 2d 553, 568 (S.D.N.Y. 2013) (citing Katz v. Goodyear Tire & Rubber Co., 737 F.2d 238, 243 (2d Cir. 1984)).

For the foregoing reasons, the Court dismisses with prejudice the End-Payors' antitrust claim under Alabama law, and dismisses without prejudice the End-Payors' antitrust claim under Kansas law for conspiracy to manipulate the price of capsules.

The Court next turns to the End-Payors' state law consumer protection claims. Defendants argue, and the Court agrees, that the End-Payors lack standing to bring consumer protection claims under the laws of those states in which they did not indirectly purchase, pay, or reimburse for Propranolol (Arkansas, Montana, Nebraska, and New Mexico). The Court additionally dismisses the End-Payors' remaining consumer protection claims, except for the claim brought under North Carolina law, because they have failed

---

3754041, at *6 (N.D. Ill. Nov. 5, 2009)(holding that dismissal of an action for failure to fully comply with Hawaii's antitrust statute is inconsistent with the remedial purposes of the act).

to show that the defendants engaged in a "deceptive act" under the relevant state statutes. See In re Digital Music Antitrust Litig., 812 F. Supp. 2d 390, 408-10 (S.D.N.Y. 2011) (dismissing plaintiffs' New York consumer protection claim for failure to show a deceptive act but denying dismissal of plaintiffs' North Carolina consumer protection claim because plaintiffs' antitrust allegations constitute "unfair conduct" under the statute); In re Aggrenox Antitrust Litig., 2016 WL 4204478, at *9 (dismissing California, Illinois, South Carolina, and Vermont consumer protection claims for failing to show a deceptive act).

Here, the End-Payors' sole argument that the price increases were deceptive is that defendants "concealed the true cause of these price increases." However, if "failure to disclose participation in a purported antitrust conspiracy were sufficient to state a consumer-protection claim, then any Section 1 antitrust case would automatically become a consumer-protection case. That is not the law." Digital Music Antitrust Litig., 812 F. Supp. 2d at 408-10 (quoting In re New Motor Vehicles Canadian Exp. Antitrust Litig., 350 F. Supp. 2d 160, 177 (D. Me. 2004)); accord Leider v. Ralfe, 387 F.Supp.2d 283, 295-96 (S.D.N.Y. 2005). Instead, antitrust schemes are deceptive where, for example, the defendant secretly altered its product as part of the scheme. See, e.g., Cox v. Microsoft Corp., 8

A.D.3d 39, 40 (2004). The End-Payors make no such allegations here.

For the foregoing reasons, the Court dismisses without prejudice End-Payors' consumer protection claims under Arkansas, Montana, Nebraska and New Mexico, and dismisses with prejudice End-Payors' consumer protection claims under New York, California, Illinois, South Carolina, and Vermont law.

The Court next addresses defendants' argument to dismiss End-Payors' unjust enrichment claims for failure to specify under which state laws they are brought. The Court is persuaded that such identification is not necessary at the pleading stage because the "elements of unjust enrichment are similar in every state." In re Credit Default Swaps Antitrust Litig., No. 13MD2476 DLC, 2014 WL 4379112, at *18 (S.D.N.Y. Sept. 4, 2014) (citing Daniel R. Karon, Undoing the Otherwise Perfect Crime: Applying Unjust Enrichment to Consumer Price-Fixing Claims, 108 W. Va. L. Rev. 395, 410 & n. 79 (2005)). Moreover, defendants have made no showing that any differences in the various state laws are material at this early stage of the litigation. Id.[25]

---

[25] While defendants cite Sperry v. Crompton Corp., 8 N.Y.3d 204, 216 (2007) for the proposition that "End-Payors cannot use unjust enrichment as a substitute for antitrust claims," the holding of this decision is much narrower and ruled only that it was not appropriate for end-payors to substitute unjust enrichment to avoid statutory limitations on treble damages.

The Court accordingly denies defendants' motion to dismiss the End-Payors' unjust enrichment claims.

Having addressed the instant motions to dismiss the consolidated amended complaints, the Court now turns to its Bottom-Line Order denying the motion by defendants Heritage and Upsher-Smith to dismiss the Direct Purchasers' complaint for lack of personal jurisdiction. Defendants are headquartered out of state (New Jersey and Minnesota, respectively) and argue, principally, that the complaints fail to establish specific jurisdiction under New York's long arm statute because the Direct Purchasers are located out of state and do not allege that they purchased Propranolol in New York. The Direct Purchasers respond that since the Clayton Act provides for nationwide service of process, they do not need to establish that defendants Heritage and Upsher-Smith had contacts with New York in order to establish personal jurisdiction. Instead, it is sufficient that defendants' suit-related activities occurred within the United States.

Defendants do not dispute that the Sherman Act provides for nationwide service of process. They argue, however, that Second Circuit has "not yet decided" whether this approach to personal jurisdiction is constitutional, see Gucci Am. v. Li, 768 F.3d 122, 142 n. 21 (2d Cir. 2014), and that the Court should hold

that nationwide provision of service violates the Fifth
Amendment's due process clause. The Court is unpersuaded.

In cases such as here where Congress has authorized a
federal court to exercise its jurisdiction in matters involving
federal questions, the constitutionality of such jurisdiction is
tested under the due process clause of the Fifth Amendment.
S.E.C. v. Softpoint, Inc., No. 95 CIV. 2951 GEL, 2001 WL 43611,
at *3 (S.D.N.Y. Jan. 18, 2001). The Fifth Amendment, in turn,
does not prohibit nationwide service of process as a general
matter. As the Second Circuit has held, "the due process
analysis . . . is basically the same under both the Fifth and
Fourteenth Amendments. The principal difference is that under
the Fifth Amendment the court can consider the defendant's
contacts throughout the United States, while under the
Fourteenth Amendment only the contacts with the forum state may
be considered." Waldman v. Palestine Liberation Org., 835 F.3d
317, 330 (2d Cir. 2016) (emphasis added) (quoting Chew v.
Dietrich, 143 F.3d 24, 28 n.4 (2d Cir. 1998)).[26] Accordingly,

---

[26] Defendants are correct that the court in Waldman did not
address whether it was reasonable to subject the defendants
there to nationwide service of process because the Court found,
as a preliminary matter, that the defendants lacked "minimum
contacts" with the United States. It is nonsensical, however,
that the panel would state that under the Fifth Amendment the
court can consider the defendant's contacts throughout the
United States, but leave open the question of whether such
consideration is per se unconstitutional. The decision in
Waldman is properly read as holding that the Court must conduct

defendants must show that the application of nationwide service
of process here would run afoul of the Fifth Amendment.

"Pursuant to the due process clauses of the Fifth and
Fourteenth Amendments, there are two parts to the due process
test for personal jurisdiction . . . the 'minimum contacts'
inquiry and the 'reasonableness" inquiry.'" Id. (internal
citations and quotations omitted). "The reasonableness inquiry
requires the court to determine whether the assertion of
personal jurisdiction over the defendant comports with
'traditional notions of fair play and substantial justice' under
the circumstances of the particular case." Id. (quoting Daimler,
134 S.Ct. at 754)). Relevant factors include: "(1) the burden
that the exercise of jurisdiction will impose on the defendant;
(2) the interests of the forum state in adjudicating the case;
(3) the plaintiff's interest in obtaining convenient and
effective relief; (4) the interstate judicial system's interest
in obtaining the most efficient resolution of the controversy."
Softpoint, 2001 WL 43611, at *3 (citing Metro. Life Ins. Co. v.
Robertson-Ceco Corp., 84 F.3d 560, 568 (2d Cir. 1996)). The
burden is on the defendant to demonstrate that the assertion of
jurisdiction in the forum will "make litigation so gravely
difficult and inconvenient that [he] unfairly is at a severe

---

a fact specific inquiry into the reasonableness of subjecting
the defendants to nationwide service of process.

disadvantage in comparison to his opponent." Id. (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 478 (1985) (citations omitted)).

Defendants Heritage and Upsher-Smith conspicuously fail to address (or mention) any of these factors. Perhaps this is because defendants have global bases of operations, maintain distribution networks throughout the United States, and have retained New York counsel. DPP Complaint ¶¶ 48, 50, ECF No. 1.[27] Or maybe it is because defendants sell substantial quantities of Propranolol in this district and therefore do not dispute that the Southern District of New York is a proper venue for the litigation. Augusteijn Decl. ¶ 4., ECF No. 86; see Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 427 (2d Cir. 2005) (holding that the Sherman Act "can properly confer personal jurisdiction over a defendant" only where the action is brought in "the district where . . . venue lies."). What is certain, however, is that defendants have failed to show that litigation in this forum will be so gravely difficult and inconvenient that they

---

[27] Indeed, according to Google Maps, defendant Heritage's principal place of business in Eatontown, New Jersey is approximately 50 miles away from the courthouse located in Manhattan – a shorter commute than that of many federal judges. Courts commonly use internet mapping tools to take judicial notice of distance and geography. See, e.g, Logan v. Matveevskii, 57 F. Supp. 3d 234, 265 (S.D.N.Y. 2014); Rindfleisch v. Gentiva Health Sys., Inc., 752 F. Supp. 2d 246, 259 (E.D.N.Y. 2010).

will be at a severe disadvantage in comparison to their opponents.

The remaining factors also favor personal jurisdiction. New York has a "manifest interest in providing effective means of redress for its residents," Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 173 (2d Cir. 2010) (citing Burger King, 471 U.S. at 483), and given that the claims here are for conspiracy, the parties at trial will undoubtedly seek to call witnesses and introduce evidence from the other defendants named in the pleadings. A joint trial of all the defendants will ensure convenient and effective relief for all parties, and enhance the efficiency of the proceedings, and it is for these reasons that the Court issued its Bottom-Line Order denying the motion by defendants Heritage and Upsher-Smith.

For the foregoing reasons, the Court denies defendants' joint motions to dismiss the consolidated amended complaints, except for the part of their motion seeking dismissal of certain state law claims brought by the End-Payors. The Court hereby dismisses with prejudice the End-Payors' antitrust claim brought under Alabama law and consumer protection claims brought under New York, California, Illinois, South Carolina, and Vermont law, and dismisses without prejudice the antitrust claims brought under Arkansas, D.C., Michigan, Minnesota, Mississippi, Nebraska, New Mexico, North Dakota, Oregon, South Dakota,

Tennessee, West Virginia, and Wisconsin law, the consumer

protection claims brought under Arkansas, Montana, Nebraska, and

New Mexico law, and the antitrust claim brought under Kansas law

insofar as its relates to the Capsules Conspiracy. The Court

additionally hereby reaffirms its Bottom-Line Order, and directs

the Clerk of Court to close docket 16-cv-09901 at numbers 65 and

67 and docket 17-cv-01039 at number 72.

     SO ORDERED.

Dated:    New York, NY
          April  6, 2017                              
                                               JED S. RAKOFF, U.S.D.J.